# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* | ) |
| | ) |
| CHARLES T. HUTCHINS | )  CASE NO.:_____ |
| 45441 Bison Court | ) |
| Temecula, California 92592 | )  COMPLAINT |
| | ) |
| AND | )  FILED UNDER SEAL |
| | )  PURSUANT TO |
| JOYCE SUBHI | )  31 U.S.C. § 3730(b)(2) |
| 27 Edgewood Drive | ) |
| Hurricane, West Virginia 25526 | ) |
| | )  JURY TRIAL DEMANDED |
| PLAINTIFF-RELATORS | ) |
| | ) |
| BRINGING THIS ACTION ON BEHALF | ) |
| OF THE UNITED STATES OF AMERICA | ) |
| | ) |
| c/o | ) |
| | ) |
| UNITED STATES ATTORNEY | ) |
| CIVIL-PROCESS CLERK | ) |
| 555 4th St., NW | ) |
| Washington, DC 20530 | ) |
| | ) |
| ATTORNEY GENERAL OF | ) |
| THE UNITED STATES | ) |
| U.S. Department of Justice | ) |
| 950 Pennsylvania Avenue, N.W. | ) |
| Washington, DC 20530 | ) |
| | ) |
| v. | ) |
| | ) |
| DYNCORP INTERNATIONAL, INC. | ) |
| 655 15th St NW # 500 | ) |
| Washington, DC 20005 | ) |
| | ) |
| DYNCOPR INTERNATIONAL, LLC | ) |
| 3190 Fairview Park Drive, | ) |
| Falls Church Virginia 22042 | ) |
| | ) |
| DELTA TUCKER HOLDINGS, INC | ) |
| of 3190 Fairview Park Drive | ) |
| Falls Church Virginia 22042 | ) |

DELTA TUCKER SUB, INC.                         )
3190 Fairview Park Drive                        )
Falls Church Virginia 22042                     )
                                               )
CERBERUS CAPITAL MANAGEMENT, L.P.              )
875 Third Avenue,                              )
New York, New York 10022                       )
                                               )
ONSITE OCCUPATIONAL HEALTH                     )
AND SAFTEY "OHS"                               )
101 N. Hart Street                             )
Princeton, Indiana 47670                       )
                                               )
DEFENDANTS                                     )
_____)

## COMPLAINT

1.    This is an action filed under the *qui tam* provisions of the False Claims Act 31 U.S.C.

      Sec. 3729, *et seq*. by Plaintiff-Relators Charles T. Hutchins and Joyce Subhi in the name

      of the United States Government and themselves to recover civil fines and damages

      arising from illegal activities related to the performance of the LOGCAP IV contract.

2.    The Defendants engaged in numerous practices in violation of the Federal False Claims

      Act while charging the U.S. Government under this contract. The violations include but

      are not limited to ordering vehicles they knew to be duplicative, because each vehicle's

      stated purpose was already fulfilled by existing subcontracts, accepting and ordering

      vehicles which were not up to specifications required by the military, paying for vehicles

      which were not mission capable, paying for vehicles which were older than ordered,

      requesting funding for medical devices, which were not delivered, charging for services

      not authorized by the military, charging for duplicative or unneeded medical procedures,

      drugs and material, using purchase orders to charge for services so as to receive higher

      rates of compensation, charging the U.S. Government for personnel who were not

qualified for the position hired, and numerous related fraudulent charges made to the United States. In addition both Plaintiff-Relators suffered retaliation for protesting the practices described herein.

## JURISDICTION AND VENUE

3.     This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

4.     This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

5.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the defendants regularly transact business in this District and did so at all times relevant to this Complaint and the False Claims Act confers national jurisdiction. In addition, at least one Defendant maintains offices in the District of Columbia.

6.     There has been no public disclosure of the allegations contained in this Complaint.

7.     Charles T. Hutchins and Joyce Subhi are each an original source of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B).

8.     Mr. Hutchins and Ms. Subhi each have independent knowledge of the information contained herein, and Mr. Hutchins and Ms. Subhi have voluntarily provided such information the United States.

9.     Indeed, the Plaintiff Relators have served the United States with information including substantially all the evidence in this matter as required by 31 U.S.C. § 3730(b)(2)(B) and will serve the Complaint on the United States as required once it is filed under seal.

## PARTIES

10.    Plaintiff-Relator Charles T. Hutchins of 45441 Bison Court, Temecula, California 92592, is an attorney. He graduated from Seton Hall Law School in 1997 and is licensed to

practice law in the State of New Jersey. Mr. Hutchins was hired by DynCorp International, Inc. as of September 2010. His employment was terminated in August 2012. Mr. Hutchins worked for DynCorp out of Kandahar Air field and Camp Leatherneck as Subcontracts Senior Manager. He has worked overseas as a Department of Defense civilian contractor since June 2004 including in Iraq for 52 months, Djibouti seven months and Afghanistan for 24 months. He has worked for defense contractors holding job titles including, Subcontracts Senior Manager, Subcontracts Manager, Procurement Manager, Contracts Manager, Acting Procurement Supply & Materials Manager, Subcontracts & Procurement Supervisor and Senior Subcontracts Administrator. Mr. Hutchins was Honorably Discharged from the U.S. Army in 1991 with 6 years of Active Duty and Reserve service. He currently resides in Temecula, California when he is not working abroad. He is a citizen of the United States.

11.   Plaintiff-Relator Joyce Subhi of 27 Edgewood Drive Hurricane, West Virginia 25526 is an attorney. She graduated from Southern University Law Center in 1986. DynCorp, International, Inc. hired her in May 2011. Her employment was terminated in March 2013.  After her active duty and reserve service in the Judge Advocate General's Corps., Ms. Subhi has worked overseas as a Department of Defense civilian contractor since November 2003 (Iraq 52 months, Kuwait 2 months, United Arab Emirates 12 months, Jordan 18 months and Afghanistan 23 months. Her civilian contractor job titles during this time were Subcontracts Senior Manager, Subcontracts Manager, Senior Commercial Manager, Contracts Compliance Manager, PRDC Deputy Program Manager, T&D Contract & Logistics Manager and Subcontracts Administrator. Ms. Subhi was Honorably Discharged from the U.S. Army in 1996. She currently resides in

Hurricane, West Virginia when she is not working abroad. She is a citizen of the United States.

12.     Defendant DynCorp International, Inc. is the parent Company of Defendant DynCorp International, LLC and both companies have corporate headquarters at 3190 Fairview Park Drive, Suite 700, in Falls Church, Virginia, 22042. In addition DynCorp International, Inc. maintains offices in the District of Columbia at 655 15th St NW # 500 Washington, DC 20005.

13.     DynCorp International, LLC of 3190 Fairview Park Drive, Falls Church Virginia 22042 transacts business in Virginia, in Texas and in the District of Columbia with the Department of Defense, by and through the Department of the Army under Prime Contract LOGCAP IV – W52P1J-7-D-0007 ("LOGCAP contract") and did so at all times relevant to the allegations herein.

14.     Defendant Delta Tucker Holdings, Inc. of 3190 Fairview Park Drive, Falls Church Virginia 22042 is the parent company of DynCorp International, Inc. It also owns Delta Tucker Sub, Inc., which in turn was merged into DynCorp International Inc.

15.     Delta Tucker Holdings Inc. and Defendant, Delta Tucker Sub, Inc. are entities created on behalf of affiliated funds and or managed accounts of Cerberus Capital management L.P. Hereinafter defendant DynCorp International, Inc. and DynCorp International, LLC as well as Delta Tucker, Inc. and Delta Tucker Sub, Inc. will be collectively referred to as "DynCorp."

16.     Defendant, Cerberus Capital Management, L.P. of 875 Third Avenue, New York, New York 10022 effectively owns or controls all DynCorp entities.

17.     Defendant, Onsite Occupational Health and Safety ("OHS") has headquarters at 101 N.

Hart Street, Princeton, Indiana 47670.

## FACTUAL ALLEGATIONS

**1. DynCorp received funds and acted to handle subcontracts under the LOGACP IV program.**

18.     The allegations contained in the paragraphs above are hereby re-alleged and

set forth fully as above.

19.     DynCorp began operations in Southern and Southwestern Afghanistan under Department

of the Army Logistics Civil Augmentation Program ("LOGCAP") Prime Contract No.

W52P1J-7-D-0007 on August 1, 2009. The first year period of performance ended on

July 31, 2010. Subsequent one year options periods were approved by the U.S. Military

for August 1, 2010 to July 31, 2011; August 1, 2011 to July 31, 2012 and August 1, 2012

to July 31, 2013.

20.     Please note that separate task orders under this Prime Contact were awarded to support

DynCorp operations in Fort Worth, Texas; Kuwait; Dubai, United Arab Emirates and

Afghanistan.  Under this "LOGCAP IV" contract DynCorp was paid to provide logistical

support to the U.S. Military in Afghanistan, and other locations. DynCorp LOGCAP IV

Project Management offices in Afghanistan were located at Kandahar Air Field ("KAF").

21.     Under the LOGCAP Contract DynCorp awarded subcontracts and managed the

subcontractors to obtain services and equipment on behalf of the United States. DynCorp

abused its authority as the Prime Contractor to charge the United States and thereby

created numerous violations of the Federal False Claims Act.

**2. DynCorp double-billed the U.S. Government for waste management vehicles, water delivery vehicles and wastewater removal vehicles in Afghanistan.**

22.     The allegations contained in the paragraphs above are hereby re-alleged and

set forth fully as above.

23.   The contracts DynCorp administered included the provision of waste management services including, but not limited to, black water and sewage removal, grey water removal from showers and sinks and solid waste and garbage removal as well as water delivery services including potable drinkable water and non-potable water for showers, toilets and sinks.

24.   Yet, DynCorp still leased vehicles ostensibly to make it possible to self perform this work at a cost of more than $20,000,000.00.

25.   DynCorp ordered these vehicles and charged the U.S. for them knowing they were not able to self perform any of the services the vehicles were ostensibly ordered to help perform.

26.   These subcontractors who performed on their subcontracts include Ecolog, Unity Logistics, Beverly Sue Global, Separ, Motamadem and Fakhrizada. (Hereinafter "subcontractors")

27.   The subcontractors are not defendants in this action.

28.   The subcontractors had their own vehicles and did not need vehicles from DynCorp to do the work. To the extent that they ever used DynCorp vehicles, that should have resulted in back charges and reimbursements to the United States. There also should have been written authorization assigning such vehicles to a subcontractor. No such actions were taken in the Plaintiff-Relators' experience.

29.   DynCorp subcontracted with these companies to perform waste management and water delivery services at more than 20 different Forward Operating Bases ("FOBs") in the South and Southwest areas of Afghanistan.

30. DynCorp paid the subcontractors and charged award fees and bonuses pursuant to the LOGCAP contract.

31. DynCorp was aware at all times that this work was conducted by subcontractors.

32. In early October 2011, DynCorp upper management indicated to DynCorp Supplier Mangers a group including the Plaintiff-Relators, that it was the company's intention to self perform these services. DynCorp hoped to make more money by performing these services than through subcontractors.

33. Under DynCorp's LOGCAP contract it was the Company's right to attempt to self-perform, provided they could demonstrate to the government that it would be cost-effective.

34. Deputy Program Manager Richie Hayes led a cost analysis meeting attended by Relator Subhi in late 2011.

35. Mr. Hayes pushed for cost analysis exercises to continue even after it was clear the cost would make self-performing impossible to justify to the United States.  Ms. Subhi participated in cost analysis exercises regarding this project.

36. One analysis indicated that DynCorp would have to charge the U.S. $1.2 Million more to self perform for FOB Spin Boldak as opposed to the subcontractors continuing to perform those services.

37. DynCorp conducted similar exercises for other sites. In the case of FOB Shindand the cost analysis indicated it would also cost over $1 Million more to self perform.

38. DynCorp had as many as 27 sites in theater during this period of time.

39. The cost analyses of shifting to self-performance indicated it would cost approximately $1 Million more for the U.S. Government if DynCorp took on this responsibility per

Forward Operating Base. DynCorp's Deputy Program manager, Richie Hayes maintained that the company should attempt this if only to demonstrate that the company could self perform.

40. Nonetheless, it was immediately apparent that DynCorp could not compete with the local subcontractors on the basis of what they would have to charge the United States for these services.

41. Ecolog, for example, was paying employees local wages, not wages for U.S. employees.

42. Ecolog already had vehicles based in theater and did not need to incur any new costs to purchase or lease such equipment or any ancillary equipment. For these and other reasons DynCorp could not provide the services at a competitive price.

43. Despite knowing these facts and despite never obtaining permission to self perform, DynCorp ordered vehicles as if they were going to self perform. They leased millions of dollars vehicles at the expense of the United States, which they knew were not needed in theater.

44. DynCorp procurement in Dubai, United Arab Emirates, began shipping to Afghanistan water delivery trucks, which handled both potable and non-potable water, SST trucks (designed to service portable toilets), garbage trucks, black water removal tanker trucks and grey water removal tanker trucks.

45. DynCorp leased vehicles for this purpose from AMECO in South Carolina and FAMCO (a.k.a. Al Futtaim and Naseeb) in Dubai.

46. For example, DynCorp issued purchase order LG40032418 with an approved order dated 11/02/2011 with AMECO for $1,385,226. The purchase order includes 12-month leases

9

on numerous vehicles, and line item 8 is for a lease of one 3,000 Gallon water truck for Spin Boldak ("Spin B").

47. Under DynCorp Purchase Order LG40030861 the company leased one trash truck, the equipment annual lease amount was $101,400.00.

48. The cost to get the equipment from Dubai, UAE to Afghanistan (mobilization cost) was $82,000.00. The cost to return the equipment to Dubai was $42,000.00. Billing to acquire and lease this one trash truck is $226,200.00 through 31 August 2012.

49. Other than ordering the trucks and material handling equipment, DynCorp was unable to make any real attempts to self perform.

50. DynCorp Procurement did not order most of the ancillary equipment which would have been needed to perform these services such as trash cans, trash bins, dumpsters, portable toilet units, blue chemical, toilet paper.

51. The lead-time needed to obtain most of these items was four to six months and the subcontractors already had the equipment needed to perform the services.

52. The few attempts they made bordered on the comical, for example DynCorp did order some trash dumpsters.

53. However, DynCorp apparently did not know what kind of truck they were ordering to fit. So when the dumpsters arrived they were meant for front-loading trucks not the back loaded trucks that had been ordered.

54. Even if DynCorp were otherwise in a position to self-perform garbage services using those trucks they would have needed different dumpsters.

55.    DynCorp even asked their subcontractors to sell their chemical latrines and or trash bins to DynCorp so that DynCorp could self perform.  Not surprisingly, all subcontractors denied the request.

56.    DynCorp did order and pay for numerous trucks and material handling equipment as if they were going to self perform. The vast majority of this equipment was never used on the forward bases from the time the equipment arrived through the end of July 2012.

57.    The unused vehicles were divided among many bases, which to be sure, had a lot of activity unrelated to these vehicles, so their lack of use went largely undetected. Since the subcontractors were performing the services there was nothing much for personnel on the base to notice about these trucks in any event.

58.    These vehicles simply sat at the forward operating bases. On some very rare isolated occasions some vehicles were used for other services such as sucking up water off the ground after some rains.

59.    Nonetheless, after having leased these vehicles some DynCorp managers took additional steps to disguise the fact that the company had ordered vehicles, which had no purpose. When the Army Contracting Officer asked for a usage report DynCorp executives directed workers to take vehicles and drive them around the bases to make it look like they were being used at some sites.

60.    Contract management personnel were aware of efforts to put miles on the vehicles so that they would appear to have had some use. These issues were discussed in several conference calls between DynCorp managers in the spring of 2012.

61.    Such conference calls included the discussion of a few Ecolog trucks breaking down temporarily at Camp Spin B. Ecolog employees were allowed to drive the a few DynCorp

vehicles, which had been leased ostensibly for DynCorp's self performance, in place of Ecolog's vehicles.

62. At another site, Ecolog workers were allowed to use the leased vehicles and while a DynCorp employee was operating the vehicle itself, the Ecolog person would provide the required services, such as lifting the trash bins or hooking the bins to the truck, sweeping debris, cleaning the ground area.

63. Ecolog should have been required to provide trucks and or reimburse DynCorp for using trucks, which should in turn have been forwarded to the United States.

64. No such back charges were issued. Indeed, there never was an immediate need for the use of the DynCorp trucks, as Ecolog had a good reputation for relocating their own vehicles to cover when such vehicles were needed at another base.

65. Furthermore, no DynCorp personnel had been approved to drive the leased vehicles for any purpose. In the early summer of 2012, the Department of the Army declined to create DynCorp job classifications for drivers and driver's helpers to operate the equipment.

66. Therefore, DynCorp had leased vehicles for which it had no authorized drivers.

67. Despite lacking any approval to use the trucks or obtain personnel for their use, DynCorp kept, what amounted to a fleet of duplicative vehicles in theater for at least two years.

68. When DynCorp finally did take action to attempt to return the vehicles the company often incurred additional costs. Trucks had entered the country by air transport on C-130 aircraft. As a result, there was no documentation to show import duties had been paid to the government of Afghanistan. Indeed, such duties had not been paid. To return these trucks, DynCorp had to pay customs to the government of Afghanistan to send them back out of the country, as they could not find air transport to return the trucks.

12

69. Import export taxes were passed along to the United States for vehicles, which were not needed in theater in the first place.

70. The issue of the import/export taxes was discussed at numerous meetings weekly with charts and graphs showing the progress. Of course, these taxes amount to additional costs for unneeded, duplicate vehicles.

71. Altogether, DynCorp leased more than 225 vehicles and pieces of material handling equipment, which were not used for any real purpose. They were ordered as if DynCorp was going to self perform, which the company never had permission to do. Most of these vehicles arrived by air transport in Afghanistan in October and November 2011.

72. As early as March of 2012, Plaintiff-Relator Charles Hutchins attempted to find out how DynCorp could be paying for the duplicate vehicles. DynCorp could not afford to absorb the cost.

73. Hutchins asked a female member of the DynCorp's Project Controls Department in Camp Leatherneck. She reported that the lease cost for this equipment was being passed through to the U.S. Government under a DynCorp generic equipment billing code.

74. The same information was addressed during meetings at Kandahar that as long as the vehicles were not being used they could be billed under a generic code but once put in service they would be billed according to the service.

75. Each month the leasing subcontractors submitted invoices to DynCorp for payment of these vehicles and pieces of material handling equipment. DynCorp Accounting and Finance paid these invoices and then invoiced the U.S. Government through an itemized invoice that allocated charges to Prime Contract line items.

76.     In addition to billing the equipment leases to the U.S. Government when they were duplicative of service subcontracts, DynCorp obtained a commission estimated between 2% and 3.5% each month on all of these payments and would receive an additional 1% to 7% each quarter as an Award Fee Board based upon the Army's evaluation of DynCorp's job performance. That evaluation was made without the knowledge that the government was being billed for equipment that had no purpose in theater.

77.     The periods of performance were extended with regard to many of these vehicles as well.

**3. DynCorp billed the Government for leased material handling equipment and other leased vehicles that were not fully mission capable, accepted vehicles, which were not up to specification and falsified service received reports.**

78.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

79.     The U.S. Government does not knowingly pay for leased equipment or vehicles that are not mission capable. A cracked windshield, transmission problems, flat tire, missing side mirror, worn out brakes, non-functional seat belts, burned out head-lights, malfunctioning turn signals or inoperable stop lights are some of the defects that will cause a piece of equipment to be down-graded to "Not Mission Capable."

80.     DynCorp billed for vehicles, which were not mission capable through several sub contracts including subcontracts with AMECO.

**A- DynCorp accepts AMECO vehicles which are not mission capable by avoiding the use of service received reports.**

81.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

82.     Beginning in 2011, when DynCorp procurement personnel, operating from Dubai, United Arab Emirates, negotiated purchase orders with subcontractor AMECO for the lease of

material handling equipment, heavy equipment cranes, forklifts, front-end material handling equipment and vehicles such as loaders, dump trucks, flatbed trucks, bull dozers, pick-up trucks, and other vehicles including SUVs. DynCorp agreed to the provision that AMECO would be paid each month regardless of whether their equipment was "Fully Mission Capable" ("FMC") or not during the entire month.

83.   Such vehicles are required to be maintained, according to the LOGCAP contract of course. *See* LOGCAP IV Performance Work Statement ("PWS") Paragraph 5.13:

> The Contractor shall provide equipment, supplies, personnel, and management required to perform equipment and vehicle maintenance services IAW AR 750-1 and/or the manufacturer's suggested maintenance instructions. The Contractor shall adhere to the assignment of maintenance priorities IAW, The Army Maintenance Management System (TAMMS).

84.   In most cases, DynCorp would require the leasing company to maintain the vehicles.

85.   However, DynCorp had the discretion to agree with a leasing company to pay the established lease rate even if the vehicle is not "Fully Mission Capable" for any part of a month or for the entire month. DynCorp was not authorized to bill the government for the entire monthly lease amount if a vehicle was not "fully mission capable" for the entire month.

86.   Beginning in 2011, DynCorp repeatedly billed the government for material handling equipment and vehicles leased from AMECO.

87.   DynCorp circumvented their own established procedures in the payment of invoices to AMECO. Normally, at the end of each month the vehicle leasing company will submit a Service Received Report ("SRR") for all vehicles listed on a particular purchase order. Each vehicle would be listed separately and identified by VIN number or serial number.

88.     The Service Received Report would be transmitted through the subcontracts department

         to the DynCorp maintenance or service manager at the camp or Forward Operating Base

         ("FOB") where the material handling equipment and/or vehicle(s) were being used such

         as Camp Leatherneck or Camp Dwyer.

89.     The maintenance manager would review his maintenance records for the previous month

         for each individual piece of material handling equipment or vehicle and make one of

         three notations:

                  The equipment or vehicle was Fully Mission Capable for the entire month;
                  The equipment or vehicle was Not Mission Capable for the entire month;
                  The equipment or vehicle was Partly Mission Capable meaning it was
                        fully mission capable for less than the full month.

90.     "Fully Mission Capable" meant the vehicle or piece of equipment was on-site and ready

         to be used during the entire month.

91.     "Not Mission Capable" meant the equipment was not available to be used for any portion

         of the month.

92.     "Partly Mission Capable" meant the equipment was on-site and ready to be used for only

         a portion of the month.

93.     The vehicles leased ranged from brand new to eight or nine years old. The equipment

         leases, if they involved more than  $25,000 had to be reviewed and approved by the

         Administrative Contracting Officer in Houston, Texas. ("ACO").

94.     All the ACO would have to rely on to make a determination would be the representations

         on DynCorp purchase orders and other contract documents.

95.     The probability that a vehicle would remain in a mission capable status would be based

         upon the age and condition of the equipment when received, how frequently it was used,

how hard it was used, the environmental conditions it was operating in, the skill of the operator, the original quality of the equipment, and a number of other factors.

96.  If equipment or vehicle was not fully mission capable for any portion of the month the service manager would annotate in a comments block on the Service Received Report how many days the equipment or vehicle was not mission capable.

97.  The maintenance manager would sign the Service Received Report and forward it to the Site Manager for his/her review and signature.

98.  The subcontracts department would then return the fully executed Service Received Report back to the equipment leasing company, which would then generate and submit an invoice for payment based upon the pro-rated monthly lease rate. For example, if a crane that leased for $20,000 per month was only mission capable for half of the month the equipment leasing company would only be allowed to invoice for $10,000 for that piece of equipment for that month.

99.  However, with AMECO vehicles no Service Received Report was submitted to DynCorp to evaluate the mission capable status of that equipment or vehicle. Rather, an invoice was submitted to DynCorp at the end of each month listing each piece of equipment and/or leased vehicle from a particular purchase order with the monthly lease rate for each piece of equipment and/or vehicle.

100.  On the invoice, each vehicle would be listed separately and identified by VIN number or serial number. With AMECO, the maintenance manager was directed only to verify that the equipment was present on his camp or FOB. The invoice was signed and transmitted to DynCorp Accounting and Finance for payment in full.

101.   The maintenance managers did not consult their maintenance records to determine the mission capable status of each vehicle and piece of equipment for the month.

102.   DynCorp procurement entered into numerous lease agreements with AMECO to lease material handling equipment and vehicles that required DynCorp personnel to provide all maintenance and repairs.

103.   These agreements were made without verifying whether the sites where the equipment or vehicles would be used had the resources including facilities, equipment, parts and trained manpower to perform the maintenance or the repairs in a timely manner.

104.   For example DynCorp had a purchase order LG40032410 with a total value of $353,176 and a period of performance of 1 Nov 20011 through 31 July 2011 for such vehicles from AMECO.

105.   In fact, none of the DynCorp sites had all the facilities, equipment, parts and trained manpower needed so material handling equipment and leased vehicles would sit "dead-lined" for extended periods of time for as long as several months.

106.   These vehicles were not mission capable but were still being billed to the United States as if they were.

**B. DynCorp accepts vehicles from vendor and bills the United States Government for vehicles and material handling equipment, which are significantly older than represented on invoices.**

107.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

108.   When DynCorp solicited bids for leased vehicles the specifications and features include the year of the vehicles (i.e. 2009 or newer). After negotiations were complete and a

vendor was selected a package of documents was sent to the Administrative Contracting Officer ("ACO") in Houston, Texas for review and approval.

109.    The ACO approval for leases, and associated costs, were based upon the determination that the lease amount was fair and reasonable, was the overall best value, and was in the best interests of the U.S. Government.

110.    Such a decision was made in reliance upon DynCorp representations that the vehicle specifications provided in the package of documents was what was delivered to DynCorp on behalf of the U.S. in Afghanistan.

111.    However, it was apparent to Relator Hutchins that such representations were falsified. In fact he participated in a conference call when DynCorp Supplier Management personnel at Kandahar Air Field were questioned in May 2012 about the acceptance of vehicles and material-handling equipment that did not meet the specifications listed on the purchase orders.

112.    Several questions were asked during a conference call with DynCorp Supplier Management officials at Camp Leatherneck. The questions were specifically addressed to Mario Galiouras at Kandahar Air Field regarding the acceptance of vehicles that were older than listed on the purchase orders.

113.    Mario Galiouras, Subcontracts Senior Manager at DynCorp Subcontracts office at Kandahar Air Field, indicated that he was aware of this discrepancy, but that it was nothing to worry about. He added his opinion that the year indicated on the purchase order was actually more of a general guideline rather than a hard and fast requirement.

114.    Nothing was done to inform the United States of the "discrepancies," obtain a back charge for them or even insist on vehicles that were up to specification.

115. For example, DynCorp listed a 2011 Toyota Hilux on Purchase order LG4007361 from Safi Sultani with VIN number of KZN1679070215. The vehicle was leased for $1,773.27 per month in July of 2011. Upon inspection the vehicle was really a 2007 model.

116. SAK provided a forklift with serial number DL1155HJZ1241136 for $48,820 for 29 November 2011 to 28 April 2012, which was supposed to be a 2005 model. It was actually a 2001 model forklift.

117. Numerous charges for vehicles that were considerably older than represented on DynCorp purchase orders were paid by DynCorp to vendors including SAK, Naseeb and Zaland all without the prime contractor insisting upon the actual year model ordered.

**C. DynCorp billed the Government for bus leases, which did not meet purchase order specifications.**

118. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

119. The Department of the Army Performance Work Statement for the August 1, 2011 to July 31, 2012 Period of Performance directed DynCorp to lease seven 50-passenger busses, with fire extinguishers, to transport military personnel on Camp Leatherneck in Afghanistan.

120. On or about September 20, 2011 DynCorp issued Purchase Order # LG40029880 to Ghulam Dawood Naseeb Trading Company ("Naseeb") in Dubai, United Arab Emirates to lease seven 50-passenger busses through 31 July 2012.

121. When the buses arrived at Camp Leatherneck, beginning in October 2011, it was apparent that the bus seating was inadequate to accommodate the physical size and weight of U.S. military personnel and their weapons and other gear.

122.   The size and spacing of the seats appeared to be designed to accommodate children. No fire extinguishers were provided in the buses. Naseeb proposed to reconfigure the seats so as to allocate more space for the military personnel.

123.   One of the seven buses was reconfigured in late February or early March of 2012. Relator Hutchins at Camp Leatherneck was directed to inspect and photograph the reconfigured bus. Hutchins noted that the reconfigured bus only had 43 seats instead of the 50 seats specified by the Army and on the purchase order. Hutchins transmitted the photos to DynCorp Supplier Management Manager Mario Galiouras at Kandahar Air Field several days later.

124.   Within three days Mr. Galiouras of DynCorp approved the reconfiguration with the 43 seats and directed Naseeb to proceed with this same reconfiguration on the other six buses.

125.   It was subsequently brought to Mr. Galiouras' attention that the purchase order lease price needed to be adjusted downward to reflect the reduced capacity of the seven buses. Mr. Galiouras did not have the authority to revise the contract or enter into discussion concerning reduction in the contract price.

126.   DynCorp USA was aware of the situation and did not modify the contract and recover the cost associated with the reduction in the Scope of Work, 43 seats vs. 50 seats. No fire extinguishers, as required in the Scope of Work were ever provided.

127.   DynCorp invoiced the U.S. Government for seven 50-seat buses (with fire extinguishers) when Naseeb provided seven 43-seat buses without a fire extinguisher.

128.   Some of the buses were eventually used, but only for a short period of time, because the tube-aluminum frame of the seats were not made to handle the weight of American soldiers and the backs to the seats were not attached firmly.

129.   This problem was identified in the late May – early June time frame of 2012. It had not been resolved when plaintiff-relator Hutchins left theater.

**D. DynCorp falsified Service Receiving Reports.**

130.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

131.   DynCorp personnel at Kandahar Air Field in Afghanistan falsified DynCorp Service Receiving Reports ("SRR") indicating that heavy equipment and leased vehicles were "Fully Mission Capable" during the entire preceding invoicing period when, in fact, the equipment and/or vehicles was/were not fully mission capable.

132.   In August 2012, Plaintiff-Relator Hutchins reviewed one purchase order for seven buses on Camp Leatherneck to confirm whether or not the military was being invoiced for these "Dead-Line/Out-of-Service/Not Mission Capable buses. Hutchins discovered that $100,000 in lease payments for these buses was billed to the Department of the Army even when they were not mission capable.

133.   DynCorp Supplier Management and Fleet Management personnel at Kandahar Air Field were falsifying the status of the vehicles to get the vendor paid. DynCorp Accounting and Finance verified that the amounts had been paid to the vendor. Hutchins review encompassed the period of 1 January 2012 through 30 June 2012.

134.   Hutchins summarized his findings in a memorandum and transmitted it to DynCorp
       Project Management at Kandahar Air Field and to DynCorp Site Management at Camp
       Leatherneck.

135.   On or about 20 August 2012 Plaintiff-Relator Hutchins attempted to expand this review
       to selective subcontract line items from other heavy equipment and leased vehicle
       subcontracts. He sent his request for information and copies of documents to DynCorp
       Accounting and Finance at Kandahar Air Field and to DynCorp Fleet Management.
       DynCorp Accounting and Finance refused to provide the requested information and
       informed Supplier Management and Project Management.

136.   On the day of his termination, Plaintiff-Relator Hutchins was told by the DynCorp Camp
       Leatherneck HR Manager Mike Harless that there was a directive not to respond to any
       of Mr. Hutchins requests for information.

137.   DynCorp's refusal to even answer basic questions about the use of these documents and
       the Plaintiff-Relator's additional experience with DynCorp's management of vehicles
       leads to conclusion that the practice of using falsified Service Received Reports was
       widespread.

138.   Plaintiff-Relator Hutchins was terminated on August 28, 2012, the reason given to Mr.
       Hutchins was an unspecified violation of DynCorp's Code of Conduct.  Of course, Mr.
       Hutchins disputes any such violation and alleges DynCorp terminated him in retaliation
       for protesting fraudulent activity.

**4. DynCorp billed the Government for subcontract services as purchase order items to obtain higher commissions than authorized for subcontract services.**

139.   The allegations contained in the paragraphs above are hereby re-alleged and
       set forth fully as above.

140.    DynCorp switched conventional service subcontracts onto purchase orders on 1 April 2011 so DynCorp could invoice the Department of the Army at a higher commission rate.

141.    This switch was not approved in advance by the Defense Contract Management Authority ("DCMA"). The change was never incorporated into the Prime Contract.

142.    Krista Robinson proposed the plan, according to A.W. Short, the former DynCorp International LOGCAP Program Manager.

143.    Plaintiff-Relator Hutchins acting as the DynCorp Director of Subcontracts in Afghanistan from February 2011 through June 2011 participated in approximately 25 conference calls in March 2011 and April 2011 between DynCorp Project Management including Hank Miller at Kandahar Air Field in Afghanistan and Krista Robinson in Texas where this, and other substantive changes, were discussed and debated.

144.    Traditionally, goods that are purchased such as tires, chairs, beds, and tools are compensated at approximately a three and one half percent surcharge.

145.    Services for labor, such as waste management, dining facilities services, and vehicle leases, heavy equipment leases, and construction are compensated at approximately a two percent surcharge.

146.    Items ordered via purchase orders are compensated at a higher rate because of the disproportionate amount of work required to account for them as contrasted with the total value of the item purchased.

147.    The more that DynCorp was able to submit invoices as purchase orders the higher their commission would be.

148.    However, DynCorp did not submit any plan to engage in this practice for approval by the Administrative Contracting Officer.

149.   Instead at the end of each month DynCorp would submit an invoice to the U.S. Army for payment of purchase orders, subcontracts and other costs such as DynCorp employee wages, company equipment and vehicles, for example, that they had paid during the previous month.

150.   DynCorp could have and should have gone to the U.S. Army and the Defense Contract Management Agency and requested a change to the Prime Contract in order to change the commission rates that were negotiated prior to the award of the Prime Contract to DynCorp. During that negotiation process DynCorp proposed to the U.S. Army that they would invoice the U.S. Army for 3.5% for purchase order commissions and 2.0% commissions for subcontracted services commissions.

151.   By putting subcontracted services onto a purchase order, rather than onto a subcontract, DynCorp unilaterally altered the commissions' schedule without notice to or permission from the U.S. They thereby made millions of dollars more since they would be getting $1.5% extra commissions on multiple contracts.

152.   Plaintiff-Relator Hutchins had several discussions regarding exactly this change during conference calls from DynCorp's Kandahar Air Field office to Krista Robinson, VP for contracts and procurement in Fort Worth, Texas on our about February through March 2011. Plaintiff-Relator Hutchins repeatedly asked Robinson if the Prime Contract had been changed to reflect the change in commissions invoicing.

153.   Krista Robinson said no, but that she had told the ACO.

154.   Hutchins stated that the ACO did not have the authority to change the terms of the Prime Contract. Hutchins warned Robinson that these additional costs being invoiced to the U.S. Army could be recovered from DynCorp in the future and could include penalties.

The Project Manger, Deputy Project Mangers, and other support staff were all present on

the conference call. At the time Hutchins was the acting Procurement and Subcontracts

Director for DynCorp at Kandahar Air Field.

155.   No documentation was provided to support the position that the government ever agreed

to such changes to the contract commission rates.

**5. DynCorp billing for employees who did not meet the specifications, qualifications and experience for the jobs they were hired to perform, and or were working at a jobs below the pay scale they were hired to perform.**

156.   The allegations contained in the paragraphs above are hereby re-alleged and

set forth fully as above.

157.   DynCorp routinely hired personnel who did not meet the minimum specified employment

requirements.

158.   In response to internal complaints about this practice, Linda Wrubbel, DynCorp Regional

Human Resources manager in Afghanistan, conducted an investigation of the

Subcontracts Department also called Supplier Management beginning in December 2011

and concluding in February 2012. In December of 2011 Linda Wrubbel began an

investigation in response to complaints in the Department.

159.   Ms. Wrubell told Plaintiff-Relator Hutchins that Human Resources generated a report in

February 2012 showing that more than 80% of the department staff did not meet the job

qualification requirements of education and experience and were not qualified for the

positions for which they were hired.

160.   This problem was repeated in each DynCorp department in Afghanistan. Linda Wrubbel

told Plaintiff-Relator Hutchins about the results of her investigation on or about end of

June or early July 2012.

161.    For the report Ms. Wrubbel had interviewed Dan Scott, the DynCorp Supplier
        Management Director in Afghanistan. When asked about the hiring criteria for the
        Subcontracts Department personnel Mr. Scott stated that his requirements were that the
        person have a pulse, be able to string together a sentence in English and be enthusiastic.

162.    Dan Scott was allowed to resign in February 2012, but none of the unqualified personnel
        he hired were terminated or transferred to another position.

163.    Plaintiff-Relator Subhi had also filed complaints with Human Resources regarding the
        Supplier Management office personnel. She reported an office meeting during which Mr.
        Scott commented on the type of people he wanted working in the office. Mr. Scott did not
        include anything about qualifications. Ms. Subhi was present at this meeting and after
        about 40 Minutes Ms. Subhi raised her hand and asked about qualifications. Mr. Scott
        stated it was his meeting and his time to talk.

164.    Ms. Subhi reported this incident to Ms. Wrubbel. Ms. Wrubbel said that 90% of the
        employees were not qualified, but felt they could not get rid of everyone. So they were
        just going to keep everyone. Ms. Wrubbel also told Ms. Subhi about Mr. Scott's
        statements regarding an employee only needing a pulse.

165.    The Department had grown to include approximately 20 people and Dan Scott was in
        charge for about 8 months to January 2012.

166.    These positions involved include senior managers at relatively high pay rates.    For
        example the U.S. agrees to pay a DynCorp Senior Subcontracts Manager $167,000 per
        year (including uplifts), there are education requirements such as a college degree and
        experience requirements generally four to six years which are specified.

167.   The majority of the personnel hired had no contract administration experience and no

college degree.   Education requirements and experience requirements for each job

specification are set forth in the Prime contract. Compensation rates are also established

in these documents.

168.   Yet, DynCorp hired and continued to employ personnel who did not meet the military's

requirements under the contract.

169.   Similarly, hundreds or workers from the Philippines, India, Bosnia, Nepal, Kenya, were

hired under labor subcontracts, who did not meet the hiring criteria.

170.   Many did not have the ability to speak English. Many were also working outside their job

description for example, a crane operator was working in the laundry folding clothes.   At

FOB Dwyer, more than 100 individuals were working in this manner in 2012.

**6. DynCorp billed the Government for services, which were not approved and failed to acquire equipment and provide training specifically approved by the Administrative Contracting Officer and funded by the Department of the Army.**

171.   The allegations contained in the paragraphs above are hereby re-alleged and

set forth fully as above.

172.   DynCorp procedures to fund subcontracts and or purchase orders as follows:

(i)     Funding is requested via a Material Requisition ("MR") and a material requisition questionnaire that specifically states what funds are required, what the funds will be used for and the period that the funds will be used;

(ii)    Once the MR is signed by the required DynCorp personnel it is forwarded to the Administrative Contracting Officer ("ACO") for approval or rejection;

(iii)   There may or may not be additional information requested prior to the ACO approving the MR, and

(iv)   Once approved, the MR will go to DynCorp Sourcing, which will create the contractual document (purchase order or subcontract) for the required equipment or services.

173.   For the 1 August 2011 to 31 July 2012 period of performance, approximately $100,000 in funds was requested for a portable X-Ray unit. Approximately $50,000.00 was requested for Cardio-Pulmonary Resuscitation/First Aid ("CPR/FA") training. Funding for other items was also requested.

174.   The funds were annotated on a Material Requisition in November 2011 for approximately $422,000.00.

175.   The Material Requisition was approved by the ACO and transmitted to DynCorp Sourcing.

176.   DynCorp Sourcing did not revise the current subcontract to add the additional funds to the subcontract. Sourcing did not add the requirement for a portable X-Ray machine or the CPR/FA training. The funds were added to a new stand-alone purchase order and the funds were used to pay other outstanding invoices owed to the supplier under an earlier subcontract.

177.   Of the $422,000.00 approved by the ACO, approximately $150,000.00 was designated for services (CPR/FA training) and or equipment (portable X-Ray unit) that were not purchased or provided.

178.   The estimated $50,000.00 for the CPR/FA training was in response to a request sent to Onsite Occupational Health and Safety, Inc. ("OHS") for such an estimate. That estimated cost included training dolls, training material and certification cards. It did not include any additional costs for personnel to conduct the training.

179. The DynCorp Fire Chief was asked if the fire department could conduct the training. He stated that they could not. The Health Safety and Environment section was then asked if they could conduct the training. DynCorp Health Safety and Environment Department ("HSE") estimated it would cost approximately $500,000.00 for HSE to conduct the training. The $350,000.00 was for two expats at $130,000 each, in processing, R&R, travel, and training material. That estimate was approximately $300,000.00 more than the estimate that subcontractor OHS had submitted.

180. For the period of performance 1 August 2012 to 31 July 2013 funds were again requested through another Material Requisition "MR" for a portable X-Ray machine and CPR/FA training.

181. An MR for approximately $686,000.00 was submitted and approved through DynCorp channels to the ACO. Of the $686,000.00 approximately $90,000.00 was for the X-Ray machine and $50,000.00 for the CPR/FA training. The X-Ray machine was then purchased by the supplier, and the supplier submitted the invoice to DynCorp for reimbursement after the current PO was revised to include the X-Ray unit and the CPR/FA training.

182. The alleged justification for this $686,000.00 included approximately $130,000 for dental equipment. Prior to final submission to the ACO the reference to dental equipment was removed from the MR.

183. However, the funds for the dental equipment were not removed. These funds were subsequently used by DynCorp to pay for other OHS invoices.

184. None of the funds were used for dental equipment since no equipment was ever ordered. DynCorp was aware at the time that of the request for approval for the funds that DynCorp was not going to allow OHS to hire a dentist.

185. DynCorp Project Management Office management personnel, as well as Accounting and Finance Project Management personnel were informed that funds were approved and expended for the X-Ray machine and the CPR/FA, but that the equipment and training were not provided.

186. DynCorp Project Management Office and Accounting and Finance Project Management were aware, during the request for and approval of the $686,000.00 that part of it was for equipment and services that had been previously funded but never purchased. DynCorp was also aware that this meant that the company was asking for funding for a second time for the same equipment.

187. The ACO approved funds for a purchase order to acquire X-Ray equipment and provide CPR/FA training. The ACO approved funds were not spent on this equipment and training. OHS wanted invoices paid from an entirely different subcontract. That subcontract did not have sufficient funds to cover their invoices. OHS submitted an invoice to DynCorp to be paid from the recently approved funds.

188. DynCorp personnel created a separate stand-alone purchase order and allocated the ACO approved X-Ray and CPR/FA training funds to this purchase order. DynCorp then paid OHS invoice.

189. Funding for CPR/FA training was approved, and the funds were spent, but no training was provided. The first MR for 440,000.00 included funds for the portable X-ray

machine however, the X-ray machine was not purchased with these funds. The funds were used to pay for other OHS billed items.

190. DynCorp used the practice of duplicate Material Requisitions to increase contract amount and pay invoices to subcontractors as the ACO would not be able to track all such expenditures.

**7. DynCorp billed the Government for medical services that subcontractor was not subcontracted to perform.**

191. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

192. The OHS subcontract with DynCorp did not include medics at "Band 5" sites (the smallest sites – "Band 1" sites were the largest).

193. OHS provided medics at some "Band 5" sites that had dining facilities as directed by the DynCorp Project Manager for Afghanistan. The salary for the OHS "Band 5" sites was included in the invoices submitted monthly to DynCorp from OHS.

194. The DynCorp Project Management Office was aware that the "Band 5" sites were not included in the OHS subcontract. Several requests were submitted over several months to revise the current subcontract to include the "Band 5" sites and to add additional funding to the current Purchase Order.

195. On multiple occasions, over several years, the DynCorp Subcontracts/Supplier Management Department in Afghanistan requested additional funds to cover the labor cost in the various contractual documents subcontract and or purchase order to cover the amounts submitted by OHS for the salary of OHS employees. OHS included the cost of salaries for the Band 5 DFAC medics.

196.    In September 2011 a material requisition for additional funding for the Band 5 DFAC medics was fully executed. Then, at the directions of DynCorp Project Manager, the material requisition was cancelled.

197.    The material requisition provided for approximately $200,000.00 annually per medic.

198.    No additional funding was added to the contractual documents to get government approval for the Band 5 DFAC medics nor was the subcontract revised to add the medics at Band 5 sites that have DFAC medics.

199.    A medic under these circumstances cost at least $100,000.00 per Band 5 DFAC annually and approximately 5 Band medics were ultimately paid by DynCorp through OHS.

200.    However, that amount was not incorporated into the OHS subcontract. The OHS Subcontract purchase order was not revised to include medics at Band 5 sites with DFAC medics until March 2013. The medics were located at Band 5 sites as early as October 2011.

201.    DynCorp personnel knowingly directed the OHS medics to perform services at locations they were not authorized to provide services. Subcontractor deployed medics to sites in which DynCorp knew they were not authorized or funded to work. OHS submitted invoices to DynCorp for medic services performed. DynCorp paid those invoices and submitted their invoice to the Government for payment.

202.    This pattern repeated and in fact the military requested as many as 12 Fire Medics but did not authorize additional funds for those services. DynCorp agreed to provide the Fire Medics at no cost to the U.S. Government and DynCorp did in fact add cost and billed for the fire medics.

203.   In the OHS subcontract/purchase order there was no funded provisions for EMS medics. There was an expectation that this position would be added, and there was an annotation in the OHS subcontract/purchase order that the requirement for EMS medics was TBD (to be determined).

204.   The U.S. Government subsequently determined there was a need for EMS medics at three locations in the DynCorp Area of Responsibility ("AOR"). The three sites were Delaram II, Dwyer and Leatherneck.

205.   The Government issued a Letter of Technical Direction ("LOTD") that authorized 12 EMS medics (4 at Delaram II, 4 at Dwyer and 4 at Leatherneck). However, no additional funding was authorized by the LOTD. The LOTD specifically stated that no additional funds were required.

206.   DynCorp Sourcing department personnel did not seek additional funds for EMS services. Beginning in or about September 2011, OHS provided 4 medics each at Delaram II, Dwyer and Leatherneck.

207.   DynCorp Sourcing eventually requested additional funds for unspecified costs from the ACO. These unspecified funds were approved.

208.   The Delaram II EMS medic services ceased in or about June 2012, the Dwyer EMS medic services ceased in November 2012 and the Leatherneck EMS medic services ceased in or about April 2013.

209.   All of these charges involved invoicing the U.S. Government for services when there had the Government had not approved that they be authorized for such use.

**8. DynCorp billed the Government for the performance of medical/physical examination services on a more frequent basis than was established in MOD 11 of the U.S. CENTCOM Individual Protection and Individual Unit Deployment Policy.**

210.   The allegations contained in the paragraphs above are hereby re-alleged and

set forth fully as above.

211.   MOD 11 of the U.S. CENTCOM Individual Protection and Individual/Unit Deployment

Policy ("MOD 11") provides the directive to DynCorp concerning annual medical

examination requirements for all personnel deployed to Afghanistan.  The time frame

found in MOD 11 is a 15-month window as follows:

> 15.C.2.C. GOVERNMENT CIVILIAN EMPLOYEES, VOLUNTEERS, AND DOD CONTRACTOR
> PERSONNEL, WHO DEPLOY FOR MULTIPLE TOURS, FOR MORE THAN 12 MONTHS TOTAL, MUST BE RE-EVALUATED FOR FITNESS TO DEPLOY. PERIODIC HEALTH SURVEILLANCE REQUIREMENTS AND PRESCRIPTION NEEDS ASSESSMENTS SHOULD BE RECENT ENOUGH SO AS TO REMAIN CURRENT THROUGH THE DEPLOYMENT PERIOD. **AN EXAMINATION WITH ALL MEDICAL ISSUES AND REQUIREMENTS ADDRESSED WILL REMAIN VALID FOR 15 MONTHS FROM THE DATE OF THE PHYSICAL. SEE TAB A AND REF D, J, K, L AND M FOR FURTHER GUIDANCE.**

MOD 11 of the U.S. CENTCOM Individual Protection and Individual/Unit Deployment Policy, 15.C.2.C [Emphasis in the original]

212.   DynCorp project management in Afghanistan instituted a policy that all personnel

traveling through Dubai, on return from R&R or for other reasons would be stopped in

Dubai and have their annual physical conducted there if such personnel's most recent

physical examination was nine months or older.

213.   DynCorp unilaterally changed the fifteen-month window stated in MOD 11 on or about

September 2012. As a result DynCorp stopped all personnel in Dubai to obtain a physical

when the individuals had a physical of nine months old.

214. There were also reports of some personnel being stopped in Dubai prior to the ninth month despite several meetings and calls and emails informing DynCorp management departments that until February 2013.

215. This arbitrary decision effectively moved the requirement of a physical exam to once every nine months. This change, in conjunction with the holding of DynCorp personnel over in Dubai who were returning from R&R or other travel, generated hundreds of thousands of dollars in additional costs for more frequent examinations, hotel accommodations, food and transportation. The returning employees were on the clock when they arrived in Dubai, so time spent there was billable to the Government.

216. A number of employees reported that they would not be permitted to have their annual physical examination conducted in the United States by their own physicians and submit the reports to DynCorp when they passed back through Dubai in route to Afghanistan.

217. If this were permitted, all of the costs for these examinations would have been paid for by the employees' insurance on policies that the U.S. Government was already subsidizing.

218. DynCorp personnel traveling back to Afghanistan through Dubai were stopped and, despite having copies of physical completed in the U.S., they were required to remain in Dubai and go through another examination in Dubai.

219. For the vast number of DynCorp employees there was no need for a physical to be conducted in Dubai. Physicians were available on the bases in Afghanistan. On the bases the cost to conduct such an examination would be, if anything, less than in Dubai and of course any additional costs for housing would not be incurred.

220. When an employee was stopped in Dubai and had to spend more time in Dubai for a physical they could not work in Dubai, but would incur expenses with respect to hotels and meals.

221. Physical examinations conducted in Dubai meant at a minimum an employee was not available to work for from 4-7 days as their transport back to theater was interrupted.

222. This is exactly what happened to Plaintiff-Relator Joyce Subhi who was held up in Dubai for a physical she could easily have obtained in Afghanistan. While in Dubai she was not able to work, but was paid for her time. This, of course, was against Ms. Subhi's express wish.

**9. DynCorp subcontractor administered inoculations and vaccines that were expired and/or were pediatric doses. This required the re-administration of these inoculations and vaccines to workers upon their arrival in Afghanistan.**

223. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

224. MOD 11 also requires that certain inoculations and vaccines be administered to civilians prior to their arrival in Afghanistan to work.

225. These inoculations and vaccines are very expensive and include hepatitis and chicken pox. To facilitate the medical processing of foreign national workers, DynCorp set up processing facilities in India (DIDC – India) and United Arab Emirates (DIDC – Dubai).

226. Each worker carried their own medical records when they flew to Afghanistan. The medical records or copies of the medical records were given to subcontractor OHS who reviewed the medical records of each new worker.

227. Beginning as early as 2011, the DynCorp processing facilities in Dubai and India administered hundreds of inoculations and vaccines that were expired and or were for pediatric doses and therefore not the proper amount for adults.

228. Upon the arrival of the workers in Afghanistan OHS would collect and review each workers medical record for compliance with MOD 11 requirements.

229. OHS determined, from annotations in the medical records, that hundreds of workers were given pediatric-size doses of the required immunizations and that hundreds of workers were given immunizations that were expired. OHS correctly determined that these workers were not in compliance with MOD 11 requirements.

230. The workers subsequently had to receive new immunizations in Afghanistan at a cost of many hundreds of thousands of dollars to the U.S. Government.

231. When contacted by DynCorp representatives in Afghanistan medical personnel in the India and Dubai processing centers justified the use of pediatric size doses by stating that the Indian workers were very small people.

232. Additionally, they stated that the vaccines were still good even though the effective date listed on the vaccine had expired.

233. Prior to the re-administration of the correct immunizations, there were outbreaks of both chicken pox and hepatitis at different camps in Afghanistan, at the cost of many hundreds of the thousands of dollars for quarantine of exposed workers, sterilization of entire dining facilities, burning of exposed food supplies, burning of contaminated bedding, burning of contaminated clothing, medical treatment of those in quarantine and air transportation of workers out of Afghanistan once they were medically cleared to fly.

234. There was no refund to the government as a result of the faulty immunizations initially provided to the workers.

**10. DynCorp acts of retaliation, defamation and wrongful termination of Plaintiff-Relator Hutchins culminating on August 2012.**

235. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

236. DynCorp fired Relator Hutchins for complaining about many of the fraudulent activities and investigating the allegations discussed herein.

237. Indeed, DynCorp's termination of Relator Hutchins in August 2012, occurred just days after Hutchins transmitted evidence to DynCorp project management and Camp Leatherneck site management that DynCorp fraudulently invoiced the United States Government $100,000.00 over six months for seven "dead-lined/not mission capable" buses, and Hutchins commenced a limited follow-up audit of the waste management and water delivery vehicles referenced above.

238. It is clear from these events that management knew of the fraudulent billings and sought to prevent Hutchins from obtaining further documentation of that fraud.

239. DynCorp HR Regional Manager Linda Wrubbel informed Hutchins in August 2012 that she had acquired an internal "trouble-makers list" that contained Hutchins' name.

240. Hutchins also questioned DynCorp Project Controls department personnel at Camp Leatherneck regarding the invoicing of these costs to the Department of the Army (constituting double-billing).

241. In June 2012, Relator Hutchins was informed that his Employment Agreement would not be renewed despite a glowing evaluation from his supervisor at Camp Leatherneck.

242.    On 28 August 2012, Relator Hutchins, after attempting to expand a government over-billing audit relating to billing fraud to the Department of Defense, was terminated for an unspecified violation of DynCorp's Code of Conduct.

**11. DynCorp wrongful termination of Relator Subhi on April 17, 2013.**

243.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

244.    DynCorp hired plaintiff-Relator Joyce Subhi in May 2011 as a Supplier Management Manager. She arrived at the DynCorp project offices at Kandahar Air Field in June 2011. Ms. Subhi worked under the general supervision of Relator Hutchins until early October 2011 when Hutchins was transferred to Camp Leatherneck.

245.    Relator Subhi was ultimately fired for complaining about many of the issues raised above including, but not limited to, the hiring of personnel who were clearly not qualified for the positions that DynCorp hired them to fill.

246.    Indeed, she directly confronted DynCorp management specifically about this issue as related above.

247.    Relator Subhi was promoted to Senior Supplier Management Manager in March 2012. She functioned as DynCorp's Lead Manager for Waste Management Services in 2012 and 2013. From December 2012 to January 2013 she also served as the acting director of Supplier Management.

248.    Ms. Subhi on numerous occasions addressed the issues concerning OHS and the fact that OHS was performing outside the Scope of work for their contract; that OHS was invoicing for medics that were not included in the Scope of Work and that DynCorp had agreed they would not charge the U.S. Government for the cost associated with the EMS

Medic and the Medics at Band 5 sites as well as the fact that DynCorp was providing physical to subcontract workers where there contract required them to provide physicals for their personnel and on one occasion the Project PM directed  that all of a DFAC subcontractor personnel have their physical redone by OHS because there was some questions concerning the validity of the physicals submitted to OHS.

249. DynCorp should have recouped the cost from the subcontractor.

250. In April 2013 Ms. Subhi was terminated under a pretext for an alleged ethics violation. The ethics violation was that her son, Richard Howard, was working in the same department. However, it is not unusual for family members to work together at DynCorp. In the same Supplier Management Department, Mario Galiouras was working side-by-side with Debbie Coco, his aunt. There are several dozen other examples of multiple members of the same family working for DynCorp in Afghanistan.

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

### COUNT ONE

### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Presenting False Claims for Payment

251. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

252. This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

253. As set forth above, DynCorp engaged in numerous practices in violation of the Federal False Claims Act including, but not limited to, ordering vehicles they knew were duplicative because any need for such vehicles was already provided by existing subcontracts, accepting and ordering vehicles which were not up to specifications

required by the military, paying for vehicles which were not mission capable and paying for vehicles which were older than ordered, requesting funding for medical devices, which were not delivered, charging for services not authorized by the military, charging for duplicative or unneeded medical procedures, drugs and material, charging for services as if they were a good in order to increase the amount of money DynCorp could obtain, charging the government for personnel who were not qualified for the position hired, and numerous related fraudulent charges made to the United States.

254.   Defendant OHS also knowingly engaged in activity outside the scope of its contracts and was paid for work, which was misrepresented to the United States.

255.   Each of the above actions involves funds provided through the LOGCAP contract and necessarily causes a submission of a false claim to the Government in violation of the False Claims Act 31 U.S.C § 3729(a)(1)(A).

256.   In addition any charges for award fees and commissions which were inflated as a result of the actions taken by DynCorp to inflate their charges to the United States create false claims in violation of 31 U.S.C § 3729(a)(1)(A).

257.   In carrying out these wrongful acts, the Defendants engaged in a protracted course and pattern of fraudulent conduct and material to false claims for payment that Defendants presented or caused to be presented to the United States.

258.   As a result of the Defendants' continuing and ongoing fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims.

259.   By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

260.    Damages to the United States are continuing and ongoing, and include, but are not limited to, the full amount it has paid on any such fraudulent claims and any related claims.

261.    Defendants are liable to the United States for three times the full amount of these damages.

262.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand, five hundred dollars to eleven thousand dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

**COUNT TWO**

**Violations of 31 U.S.C. § 3729(a)(1)(B)**
**Use of False Statements and False Certifications**

263.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

264.    This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

265.    As set forth above, Defendants knowingly made, and or caused to be made and, false statements and false certifications in order to obtain payment for vehicles they knew were duplicative because any need for such vehicles was already provided by existing subcontracts, vehicles which were not up to specifications required by the military, vehicles which were not mission capable and paying for vehicles which were older than ordered, funding for medical devices, which were not delivered, charging for services not authorized by the military, charging for duplicative or unneeded medical procedures, drugs and material, charging for services as if they were a good in order to increase the amount of money DynCorp could obtain, for work conducted by personnel who were not

qualified for the position hired, and numerous related fraudulent charges made to the United States.

266.   Each and every false statement on an invoice, and the falsification of supporting material such as Service Received Reports for vehicles, is also a false statement or record used to support a false claim.

267.   Each such false statement is a violation of False Claims Act 31 U.S.C § 3729(a)(1)(B).

268.   Such violations also incur liability of three times the amount of damages to the United States as well as civil fines of between $5,500 and 11,000.

**COUNT THREE**

**Violations of 31 U.S.C. § 3730(h)**
**Retaliation against the Relators**

269.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

270.   As stated above, both the Plaintiff-Relators protested to management when they discovered fraudulent activity.

271.   Each Plaintiff-Relator specifically confronted management with issues involving fraudulent activity in the performance of the LOGCAP IV contract.

272.   As a result, each of the Plaintiff-Relators suffered retaliation including but not limited to being terminated by DynCorp

273.   Each  Plaintiff-Relator is entitled to two times back pay, reinstatement and special damages and attorneys fees under the False Claims Act 31 USC § 3730(h).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relators, on behalf of themselves, and the United States, request that judgment be entered in their favor and against Defendants as follows:

(a) That the Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

(b) That this Court enter judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990 for each violation of 31 U.S.C. § 3729;

(c) That Plaintiff-Relators be awarded an amount that the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(d) That Plaintiff-Relators be granted a trial by jury;

(e) That Plaintiff-Relators, the United States, be awarded pre-judgment interest;

(f) That the Plaintiff-Relators, be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d).

(g) That the Plaintiff-Relators each be awarded retaliation damages pursuant to 31 U.S.C. § 3730(h) including, but not limited to, reinstatement with the same seniority status they each previously enjoyed two times the back pay, interest on back pay and compensation for special damages as well as litigation costs and reasonable attorneys fees.

(h) The United States, the Plaintiff-Relators recover such other relief as the Court deems

just and proper.

## **JURY TRIAL DEMANDED**

Respectfully submitted,

Anthony C. Munter
DC Bar No. 483823

PRICE BENOWITZ, LLP
409 7TH Street, N.W.
Washington, DC 20004
Phone: (202) 417-6000
Fax:    (202) 664-1331
*Attorney for Plaintiff-Relators*

March 12, 2015