UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel*. | § | |
| | § | |
| CHARLES T. HUTCHINS | § | |
| 45441 Bison Court | § | |
| Temecula, California 92592 | § | |
| | § | |
| and | § | |
| | § | |
| JOYCE SUBHI | § | |
| 27 Edgewood Dr. | § | |
| Hurricane, West Virginia 25526 | § | |
| | § | |
| *Qui tam* plaintiffs | § | Case No. 1:15-cv-00355-RMC |
| | § | |
| BRINGING THIS ACTION ON BEHALF OF | § | JURY TRIAL DEMANDED |
| THE UNITED STATES OF AMERICA | § | |
| | § | |
| c/o UNITED STATES ATTORNEY | § | |
| CIVIL PROCESS CLERK | § | |
| United States Department of Justice | § | |
| 950 Pennsylvania Ave., N.W. | § | |
| Washington, D.C. 20530 | § | |
| | § | |
| v. | § | |
| | § | |
| DYNCORP INTERNATIONAL, INC. | § | |
| 655 15th St., N.W. | § | |
| Washington, D.C. 20005 | § | |
| | § | |
| DYNCORP INTERNATIONAL, LLC | § | |
| 1700 Old Meadow Road | § | |
| McLean, Virginia 22102 | § | |
| | § | |
| DELTA TUCKER HOLDINGS, INC. | § | |
|     Former defendant | § | |
| | § | |
| DELTA TUCKER SUB, INC. | § | |
|     Former defendant | § | |
| | § | |
| CERBERUS CAPITAL MANAGEMENT, LP | § | |
|     Former defendant | § | |
| | § | |

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 1**

and                                            §
                                               §
ONSITE OCCUPATIONAL                            §
HEALTH AND SAFETY, INC.                        §
101 N. Hart St.                                §
Princeton, Indiana 46670                       §
                                               §
    *Defendants*                               §

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiffs-Relators Charles T. Hutchins and Joyce Subhi, in accordance with Rule 15

(a)(1), Fed. R. Civ. P., file this First Amended Complaint to remove defendants Delta Tucker

Holdings, Inc., Delta Tucker Sub, Inc., and Cerberus Capital Management, L.P. from this

litigation and to provide further details about the claims they are making on behalf of the United

States.

**INTRODUCTION**

1.      Defendants engaged in numerous practices in violation of the False Claims Act

while charging the United States for goods and services under the LOGCAP IV contract

awarded to DynCorp International, LLC.  The violations include knowingly submitting false or

fraudulent claim for payment or approval to the United States and/or knowingly making, using,

or causing to be made or used, a false record or statement material to a false or fraudulent claim

by

> **a.**      submitting to the United States false DD Form 250[1] for supplies and
> services to obtain unauthorized payment from the United States,
>
> **b.**      submitting false and fraudulent invoices to the United States for payment,

---

[1]      DynCorp International may utilize the Wide Area WorkFlow Receiving Report (WAW RR) because most Department of Defence contracts now require the WAW RR. However, the DynCorp International contract requires to the DD Form 250.  The distinction is unimportant to the allegations made against DynCorp International.

c.      ordering, paying for and billing the United States for vehicles, equipment and services they knew to be duplicative, because each vehicle's stated purpose was already fulfilled by existing subcontracts,

d.      ordering, accepting and billing the United States for vehicles which were not up to specifications required by the military,

e.      paying for and billing the United States for vehicles which were not mission capable,

f.      paying and billing the United States for vehicles which were older than ordered,

g.      falsifying Service Receiving Reports to obtain unauthorized payments from the United States,

h.      paying and billing the United States for vehicles that did not meet specifications,

i.      requesting funding for medical devices, which were not delivered,

j.      billing the United States for unauthorized services,

k.      billing the United States for subcontractor services as purchase order items to obtain higher commissions than authorized for subcontract services,

l.      billing the United States for duplicative or unneeded medical procedures, drugs and material,

m.      billing the United States Government for personnel who were not qualified for the positions hired,

n.      billing the United States for services, which were not approved and failed to acquire equipment and provide training specifically approved by the administrative contracting officer and funded by the department of the army,

o.      billing the United States for medical services that subcontractor was not subcontracted to perform, and

p.      making numerous related fraudulent charges and false claims made to the United States.

2.      Both Plaintiff-Relators suffered retaliation and termination for protesting and

investigating the described practices.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 3**

3.      DynCorp International and Onsite Occupational conspired with unnamed persons and entities to make false claims against the United States. 31 U.S.C. § 3729(a)(1)(C).

**FALSE CLAIMS ACT**

4.      This is an action filed under the *qui tam* provisions of the False Claims Act, 31 U.S.C. Sec. 3729, *et seq*., by Hutchins and Subhi in the name of the United States of America and themselves to recover civil fines and damages arising from illegal activities related to defendants' performance of and billing under the United State Army Logistics Civil Augmentation Program contract (LOGCAP IV) under which they provide United States Department of Defense, Department of Army, coalition forces, and Federal inter-agency with multi-functional logistical services during contingency operations worldwide to support United States national strategic objectives.  The goods and services subject this Complaint were provided to the United States Army in Afghanistan.

5.      The False Claims Act establishes liability for any person who

A.      knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

B.      knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

G.      knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [such a person] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

6.      The terms "knowing" and "knowingly" mean that a person, with respect to information –

(i)      has actual knowledge of the information;

(ii)     acts in deliberate ignorance of the truth or falsity of the information; or

(iii)    acts in reckless disregard of the truth or falsity of the information;
Knowing and knowingly require no specific intent to defraud.

**JURISDICTION AND VENUE**

6.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

7.      This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345.

8.      Venue is proper in this Court pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because the defendants regularly transact business in this District and did so at all times relevant to this Complaint and the False Claims Act confers national jurisdiction. DynCorp International, Inc. and DynCorp International, LLC transact business and maintain offices in this District and committed acts proscribed by 31 U.S.C. § 3729 in this District.

9.      There has been no public disclosure of the allegations contained in this Complaint.

10.     Hutchins and Subhi are original sources of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B).

11.     Hutchins and Subhi have independent knowledge of the information contained herein, and Hutchins and Subhi have voluntarily provided such information the United States.

12.     Hutchins and Subhi have served the United States with the Complaint and information including substantially all the evidence in this matter as required by 31 U.S.C. §

3730(b)(2)(B) and will serve the First Amended Complaint on the United States and the

defendants in accordance with the Order of the United States District Court in November 2017.

**PARTIES**

13.        Charles T. Hutchins of 45441 Bison Court, Temecula, California 92592,

graduated from Seton Hall Law School in 1997, and was licensed to practice law in the State of

New Jersey in 1998.  Hutchins was hired by DynCorp International FZ LLC, a Dubai, U.A.E.

Free Zone Company as of September 2010 as a Subcontracts Senior Manager at Kandahar Air

Field and Camp Leatherneck.  A Subcontracts Senior Manager for DynCorp International is

responsible for managing complex procurement and administration activities for major

government subcontracts consistent with customer requirements, government regulations, and

company policies and procedures. Responsible for the oversight of the duties and performance

of direct reports.  Among other things a subcontracts senior manager assures that DynCorp

International complies with contract requirements so that DynCorp International can represent

to the United States that it is in compliance with the United States' regulatory and contractual

requirements, which is a condition of payment.  In this position, Hutchins agreed to provide

personnel services and additional duties as directed to DynCorp International LLC.  DynCorp

International, Inc., DynCorp International FZ LLC and DynCorp International, LLC were joint

employers of Hutchins.  Hutchins' employment was terminated on August 28, 2012.

14.        Hutchins agreed to provide his services in Afghanistan or in such location as

directed.  Hutchins agreed to perform duties for DynCorp International for the United States

Army LOGCAP IV program.  The normal/standard work week was seven days a week and the

hours were more or less twelve hours a day.  Hutchins worked for DynCorp International out of

Kandahar Air field and Camp Leatherneck as the Subcontracts Senior Manager.  Working for

DynCorp, Hutchins (a) solicited bids, evaluated proposals, negotiated terms and conditions and awarded subcontracts and modifications for dining facilities staffing, waste management and water supply, and labor, (b) managed a team of 18 subcontract managers, administrators and administrative support personnel, (c) supervised an 100% audit of all DynCorp International subcontracts written during first 18 months of the Prime Contract Award, (d) identified deficiencies and implemented plan for file rehabilitation, (e) developed waste management recycling pilot program for FOB Leatherneck, (f) resolved claims disputes with subcontractors, (g) performed post award supervision and administration of labor, dining facility staffing, construction, waste management, leased vehicle and MHE subcontracts, (h) conducted inspections of subcontractor living areas, equipment and facilities, (i) interviewed labor subcontractor employees re possession of passports, signed bi-lingual employment agreements and wage payments to ensure no trafficking in persons standards violated, (j) reviewed information and documents provided to assure compliance with contractual  and regulatory requirements, which was required for payment by the United States, and (k) provided on-going training of subordinates.

15.     Hutchins has worked overseas as a Department of Defense civilian contractor since June 2004 including in Iraq for 52 months, Djibouti seven months and Afghanistan for 24 months.  Hutchins has worked for defense contractors holding job titles including, Subcontracts Senior Manager, Subcontracts Manager, Procurement Manager, Contracts Manager, Acting Procurement Supply and Materials Manager, Subcontracts and Procurement Supervisor and Senior Subcontracts Administrator.  Hutchins was Honorably Discharged from the United States Army in 1991 with six years of Active Duty and Reserve service.  Hutchins is a citizen of the United States.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 7**

16.      Joyce Subhi of 27 Edgewood Drive, Hurricane, West Virginia 25526 graduated from Southern University Law Center in 1986.  Subhi was hired by DynCorp International FZ LLC, a Dubai, U.A.E. Free Zone Company in May 2011 as a LOGCAP IV Senior Subcontract Manager.  A Subcontracts Senior Manager for DynCorp International is responsible for managing complex procurement and administration activities for major government subcontracts consistent with customer requirements, government regulations, and company policies and procedures. Responsible for the oversight of the duties and performance of direct reports.  Among other things a subcontracts senior manager assures that DynCorp International complies with contract requirements so that DynCorp International can represent to the United States that it is in compliance with the United States' regulatory and contractual requirements, which is a condition of payment.  In this position, Subhi agreed to provide personnel services and additional duties as directed to DynCorp International LLC.   DynCorp International, Inc., DynCorp International FZ LLC and DynCorp International, LLC were joint employers of Subhi.  Her employment was terminated in March 2013.  Subhi agreed to provide her services in Afghanistan or in such location as directed.  Subhi agreed to perform duties for DynCorp International for the United States Army LOGCAP IV program.  The normal/standard work week was seven days a week and the hours were more or less twelve hours a day.

17.      Working for DynCorp, Subhi was (a) in charge of coordinating proper oversight of large-scale agreements, sub-contracts and related documents for Accounting, Legal, Program Management, FAR, DFARS and other organizations, (b) oversaw 18 separate waste management contracts with a total value of $68,000,000 annually, (c) trained, motivated and supervised two contract managers and two administrative assistants, (c) closely advised DynCorp International personnel on legal requirements, client contract requirements and

government regulations, (d) regularly performed ethics training and conflict resolution as needed; (e) participated in compliance audits, (f) responded to the Defense Contract Audit Agency and Defense Contract Management Agency requests for information, (g) oversaw, including site visits, a $21,000,000 plus $6,000,000 in extra services Onsite Occupational Sub-Contract with clinics in 19 different locations that provides medical services to over 17,000 company employees and subcontractors in Afghanistan, (h) reviewed information and documents provided to assure compliance with contractual  and regulatory requirements, which was required for payment by the United States, and (i) provided additional oversight and administration of three dining facility providers (Supreme Group, Wamar International and Renaissance Services) in delivering critical services at seven different camps and 15 different dining facilities.

18.      After her active duty and reserve service in the Judge Advocate General's Corps, Subhi has worked overseas as a Department of Defense civilian contractor since November 2003 (Iraq 52 months, Kuwait two months, United Arab Emirates 12 months, Jordan 18 months and Afghanistan 23 months).  Her civilian contractor job titles during this time were Subcontracts Senior Manager, Subcontracts Manager, Senior Commercial Manager, Contracts Compliance Manager, Provincial Reconstruction Development Committee Deputy Program Manager, transportation and delivery Contract and Logistics Manager and Subcontracts Administrator.  Subhi was Honorably Discharged from the United States Army in 1996.  Subhi resides in Hurricane, West Virginia when she is not working abroad.  Subhi is a citizen of the United States.

19.      DynCorp International, Inc. is a Delaware corporation and is the parent company of DynCorp International, LLC and both companies have corporate headquarters at 3190

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 9**

Fairview Park Drive, Suite 700, in Falls Church, Virginia, 22042 and have offices in Fort

Worth, Texas.  In addition DynCorp International, Inc. maintains offices in the District of

Columbia at 655 15th St. NW # 500, Washington, D.C. 20005.  As noted above, DynCorp

International, Inc. is the parent company of DynCorp International, LLC and DynCorp

International, LLC serves as the operating company of DynCorp International, Inc.  DynCorp

International, Inc. is a wholly owned subsidiary of Delta Tucker Holdings, Inc.  In this

Complaint, DynCorp International, Inc. and DynCorp International, LLC are referred to as

DynCorp International.

 20. DynCorp International, LLC is wholly owned by DynCorp International, Inc.

and functions as the operating company of DynCorp International, Inc.  DynCorp International,

LLC at the times pertinent to this Complaint acted as the agent of DynCorp International, Inc. or

the corporate veil between DynCorp International, Inc. and DynCorp International, LLC must

be pierced to prevent DynCorp International, Inc. to avoid responsibility for its wrongful

actions.

 21. DynCorp International, LLC (d/b/a DynCorp International) of 3190 Fairview

Park Drive, Falls Church, Virginia 22042 and 13500 Heritage Parkway, Fort Worth, Texas

76177 is a Delaware limited liability company and transacts business in Virginia, Texas and the

District of Columbia.   DynCorp International provides goods and services to the Department of

Defense, by and through the Department of the Army under Prime Contract LOGCAP IV,

W52P1J-7-D-0007 ("LOGCAP contract") and did so at all times relevant to the allegations

herein.  DynCorp International, LLC is wholly owned by DynCorp International, Inc. and

functions as the operating company of DynCorp International, Inc.

22.        DynCorp International at the times pertinent to this Complaint acted as the agent

of DynCorp International, Inc. or the corporate veil between DynCorp International, Inc. and

DynCorp International, LLC must be pierced to prevent DynCorp International, Inc. to avoid

responsibility for its wrongful actions.

23.        In the course of its business DynCorp International does not make it clear if the

party acting is an employee, agent or employee of DynCorp International, LLC or a related

entity such as DynCorp International FZ LLC.  However, at all times, the described actions

were all taken in connection with the DynCorp International, LLC LOGCAP contract.

24.        Onsite Occupational Health & Safety, Inc., 101 North Hart St., Princeton,

Indiana 47670, transacts business in the United States, United Arab Emirates and Afghanistan.

Onsite Occupational Health & Safety provides onsite health solutions to construction and

contingency environments in the United States, Afghanistan, and internationally.  The company

offers clinical, medical, primary care, occupational medicine, emergency ambulance, clinical

laboratory, and digital radiology services.  It also provides medical support, medical logistics

and supply, deployment screening and ancillary, and medical staffing services; and onsite

medical/first aid trailer, medical surveillance, and substance abuse testing services.

25.        Onsite Occupational Health & Safety, Inc. has been awarded a subcontract and

task order to provide medical services to support DynCorp International, LLC in the

Afghanistan-South Area of Responsibility under its existing LOGCAP IV contract with the

United States Army.  LOGCAP facilitates the Army's utilization of contractors to support

troops around the globe. These support services include supply operations, field operations,

engineering and construction, communication networks, transportation and cargo, facilities

maintenance, and repair.  Onsite Occupational Health & Safety provides healthcare services for the civilian contractors performing these functions.

### FACTUAL ALLEGATIONS

#### *LOGCAP*

26.      The Logistics Civil Augmentation Program ("LOGCAP") is a program administered by the United States Army to provide contingency support to augment the Army force structure.  The purpose of LOGCAP is to augment deployed Army forces and other designated organizations with sustainment support services as required by mission specific factors.

27.      LOGCAP is an Army regulatory program that includes pre-planned logistics and general engineering/minor construction support augmentation, executed through pre-awarded contracts, to selected logistics civil augmentation program performance contractor companies. LOGCAP's unique power is related to the operational commander's ability to leverage the designated performance contractor's existing global and regional commercial resources through these pre-selected performance contractors, to sustain operations in any environment and during any operational phase.

28.      By design, LOGCAP reduces the need for contracting activities to develop individual contract solutions.  Use of LOGCAP can significantly reduce the contracting activity burden, especially in large scale operations with multiple and often related service requirements. Individual sustainment requirement sets are integrated across the LOGCAP footprint, to achieve economy of scale and other efficiencies without compromising effectiveness, based on established law, policy, and doctrine. While best known for operations in support of United States Forces during Operation ENDURING FREEDOM and Operation IRAQI FREEDOM,

LOGCAP is capable of supporting all Service components, allies, coalition forces, and even other governmental agencies across the range of military operations.

### *DynCorp International and LOGCAP IV*

29.     DynCorp International has been awarded the LOGCAP IV contract and performs the logistic services based on mission specific task order requirements.  DynCorp International was selected through the base contract award process because of its proven large scale, global reach logistic service sector capabilities.  DynCorp International provides logistic and other support services via a mission focused task order for a designated geographical or operational area region.  DynCorp International acts as the single point of accountability for access to sub-contractor support at all tiers.  Additionally, DynCorp, when requested by the LOGCAP forward operator, can support major operational contract support planning and training venues at the theater army and combatant command levels.

30.     DynCorp International contracts with the United States are subject to a multitude of regulatory requirements, including but not limited to the Federal Acquisition Regulation and the Defense Federal Acquisition Regulation Supplement, which set forth policies, procedures and requirements for the acquisition of goods and services by the United States government.  Under United States regulations certain costs, including certain financing costs, lobbying expenses, certain types of legal expenses and certain marketing expenses related to the preparation of bids and proposals are not allowed for pricing purposes and calculation of contract reimbursement rates under cost-reimbursement contracts.  The United States also regulates the methods by which allowable costs may be allocated to United States government contracts.

31.     Performance of the LOGCAP contract is handled the DynLogistics segment of DynCorp International, LLC the operating company of DynCorp International, Inc., which is a wholly owned subsidiary of Delta Tucker Holdings, Inc.

32.     Regarding its LOGCAP contract, Delta Tucker Holdings stated in its Form 10-K for the fiscal year ended December 31, 2016, filed with the Securities and Exchange Commission, page 7:

> *Logistics Civil Augmentation Program IV ("LOGCAP IV")*: The LOGCAP IV contract was awarded to us in April 2008 and is a part of our DynLogistics segment. We were selected as one of the three prime contractors to provide logistics support under the LOGCAP IV contract. LOGCAP IV is the U.S. Army component of the DoD's initiative to award contracts to U.S. companies with a broad range of logistics capabilities to support U.S. and allied forces during combat, peacekeeping, humanitarian and training operations. This IDIQ contract has a term of up to ten years. In December 2012, customer negotiations resulted in the elimination of the award fee component for option years beginning in 2012 and continuing for the remaining contract periods. The remaining task orders under the LOGCAP IV contract are now either firm fixed price or cost-reimbursable-plus-fixed-fee.

33.     In its 2016 Form 10-K, Delta Tucker Holdings stated that LOGCAP IV has a $5 billion ceiling per year over 10 years and gave the estimated total value of the contract as $6.56 billion.  Form 10-K, page 9.  In June 2017, DynCorp International was awarded a twelve month task order extension to continue to provide base life support and maintenance in Afghanistan under the LOGCAP IV contract.

34.     Pursuant to its LOGCAP contract, DynCorp International provided goods and services to the United States in Afghanistan.  Many of those goods and services were provided to Army forward operating bases located throughout Afghanistan.

35.     DynCorp International provided goods and services directly to the United States and received funds from the United States and handles subcontracts under the LOGCAP

contract program for which it received a fee or commission from the United States above the subcontractor costs.

36.     Hutchins and Subhi were involved in the DynCorp International contracting, supply and billing processes for the goods and services provided directly to the United States by DynCorp International and for goods and services provided to the United States through subcontracts.

### *DD Form 250*

37.     Under its Prime Contract and DFARS 252.246-7000, DynCorp International is required to prepare and furnish to the United States under the clause of the Prime Contract entitled "Material Inspection and Receiving Report" which is known as DD Form 250.  The DD Form 250 and the WAWF RR are multipurpose reports used

> (1)     To provide evidence of Government contract quality assurance at origin or destination;
>
> (2)     To provide evidence of acceptance at origin, destination, or other;
>
> (3)     For packing lists;
>
> (4)     For receiving;
>
> (5)     For shipping;
>
> (6)     As a contractor the WAWF RR, WAWF RRR, or DD Form 250 alone cannot be used as an invoice, however the option exists to create an invoice from the Receiving Report or a Combo (Invoice and Receiving Report) both of which minimize data entry); and
>
> (7)     As commercial invoice support.

38.     In its DD Form 250, the authorized representatives of DynCorp International assured the United States of that the services and goods met the Contract Quality Assurance, relating back to DynCorp's Prime Contract LOGCAP IV - W52P1J-7-D-0007, or accepted the listed items with the statement that such assurance "has been made by me or under my

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 15**

supervision and they conform to the contract, except as noted herein or on supporting

documents."  The instructions for the completion of DD Form 250 state that "The words

'conform to contract' contained in the printed statements in Blocks 21a and 21b relate to quality

and the quantity of the items on the report.  Do not modify the statements. Enter notes taking

exception in Block 16 or on attached supporting documents with an appropriate block cross-

reference."[2]  With regard to the goods and services described in this Complaint, the statements

made by DynCorp International violated the False Claims Act, 31 U.S.C. § 3729.

39.     DynCorp International made additional assurances and statements to the United

States regarding the goods and services described in this Complaint and such statements

violated the False Claims Act.

40.     Each month, the approved charges for which DynCorp International sought

reimbursement, plus its fees or commissions, from the United States were sent to the DynCorp

International department for contracts and procurement in Fort Worth, Texas, which was headed

by Krista Robinson, DynCorp International Vice President for Sourcing.  Robinson and Rhett

Hymas coordinated with and provided information necessary to bill the United States for

LOGCAP goods and services provided directly by DynCorp International and through its

subcontractors.

41.     As statements made to the United States, the statements made by the DynCorp

International representatives on behalf of DynCorp International are subject to the provisions of

18 U.S.C. §§ 287, 1001.

---

[2]    Regarding WAW RR, the applicable regulations Appendix F: Material Inspection and
Receiving Report, F-301(b)(20) state that "The words "conform to contract" contained in the
text above the signature block in the WAWF RR Header Tab relate to quality and to the
quantity of the items on the report. Enter notes taking exception in Misc. Info Tab comment
field or on attached supporting documents with an appropriate block cross-reference."

42.     The DynCorp International billing process for goods and services it provided to the United States requires the verification of expenses for goods and services provided to the United States directly by DynCorp International and by DynCorp International subcontractors, which in the case with the LOGCAP contract that is the subject of this lawsuit, is primarily performed by DynCorp International personnel in Afghanistan, including Hutchins and Subhi.

43.     The DynCorp International billing process for subcontractors required that DynCorp International represent or certify to the United States that DynCorp International had properly paid a subcontractor prior to invoicing the United States and that the supplies or services provided by the subcontractor were in compliance with the terms of DynCorp International contract with the United States.  Subcontractors would submit invoices to DynCorp International.  DynCorp International personnel, including Hutchins and Subhi, would review the invoices for accuracy with regard to what goods and services both in terms of whether payment was received and whether the charges were correct for which the subcontractors were seeking payment and seek to resolve any discrepancies with the subcontractors.  In the event of disputes that were not resolved, DynCorp International personnel, including Hutchins and Subhi, would request that the subcontractors submit invoices for undisputed sums so those sums could be paid.  Approved invoices were sent to DynCorp's offices in Fort Worth, Texas.

44.     Each subcontracts manager and supplier management manager completed a monthly performance survey for each subcontractor or supplier which tracked the subcontractor's performance, product quality and billing information, among other things.

45.     After the process was completed each month, the approved charges for which DynCorp International sought reimbursement and its fees or commission from the United States

were sent to DynCorp's offices in Fort Worth, Texas.  There, Robinson and Hymas coordinated

with and provided information necessary for DynCorp International LOGCAP IV Program

Management to bill the United States for LOGCAP program goods and services provided

directly by DynCorp International and through its subcontractors and vendors.

### *DynCorp International in Afghanistan*

46.        DynCorp International began operations in Southern and Southwestern

Afghanistan under the LOGCAP contract on August 1, 2009.  The first year period of

performance ended on July 31, 2010.  Subsequent one year options periods were approved by

the United States Military for August 1, 2010 to July 31, 2011; August 1, 2011 to July 31, 2012

and August 1, 2012 to July 31, 2013.  Separate Task Orders under this Prime Contact were

awarded to support DynCorp International operations in Fort Worth, Texas; Kuwait; Dubai,

United Arab Emirates and Afghanistan.  In its 2016 Form 10-K, the parent of DynCorp

International reports that performance under the LOGCAP contract continues.

47.        During the period of time pertinent to this Complaint, DynCorp International had

more than 17,000 employees and subcontractors working for it in Afghanistan.

48.        LOGCAP performance contractors may deploy personnel and lease or buy

equipment from all over the world within the terms and conditions of the base contract and task

order(s), often in very large quantities.  Because of the importance and potential scale of

LOGCAP support, the performance contractor personnel and equipment plans must be closely

integrated into the overall operational plan.  In some operations, deploying LOGCAP related

equipment and personnel can be a mission critical component of the reception, staging, and

onward movement of military forces into the operational area.  In any case, the sequence of

LOGCAP performance contractor and selected sub-contractor personnel and equipment must be

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 18**

carefully planned to ensure this key support structure is in place in time to meet these reception, staging, and onward movement requirements.

49.       Assigned to locations in Afghanistan, Subhi and Hutchins served as LOGCAP forward operators for DynCorp International.  Both Hutchins and Subhi worked for DynCorp International at Kandahar Air Field for a time.  The circumstances regarding the false claims alleged in this Complaint are based on personal knowledge of the described acts obtained by Hutchins and Subhi as employees of DynCorp International assigned to Afghanistan or from statements made to them by authorized representatives of DynCorp International.

50.       Separate task orders under this Prime Contact were awarded to support DynCorp International operations in Fort Worth, Texas; Kuwait; Dubai, United Arab Emirates and Afghanistan.  Under the LOGCAP contract, DynCorp International was paid to provide logistical support to the United States Military in Afghanistan, and other locations.  DynCorp International LOGCAP IV Project Management office in Afghanistan are and were located at Kandahar Air Field.

51.       Under the LOGCAP Contract, DynCorp International awarded subcontracts and managed the subcontractors to obtain services and equipment on behalf of the United States.

52.       DynCorp International repeatedly and continually abused its authority as LOGCAP IV Prime Contractor to present false charges to the United States and violated of the False Claims Act.

### *Waste Management*

53.       When DynCorp International commenced services in the summer of 2009 under the LOGCAP Contract, DynCorp International subcontracted out waste management services (black water/sewage removal, grey water removal from showers & sinks and solid

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 19**

waste/garbage removal) plus water delivery services (potable/drinkable water and non-potable water for showers, toilets and sinks) to third party subcontractors.

54.     Over 20 camps and bases were in need of waste management and water delivery services.  Services included (a) trash removal, including providing trash bins and dumpsters, emptying bins and dumpsters twice daily; (b) portable toilet services.  Services included supplying portable toilets, cleaning portable toilets twice daily, resupplying with blue chemical, toilet paper and hand sanitizer; (c) removal of grey water (shower and sink water); (d) removal of black water (sewage/human waste) from black water holding tanks; (e) supplying potable/drinkable water; and (f) supplying non-potable water for showers, toilets, sinks, car washes, dust suppression, etc.

55.     Under its LOGCAP contract, DynCorp International had the responsibility to acquire, normally on a cost reimbursement basis plus an agreed upon fee or commission, property and services in support of contract performance for the United States and for the performance of the contract.  DynCorp's property responsibilities included care and maintenance of Government Furnished Equipment and contractor-acquired property.

56.     Most LOGCAP related equipment falls into this category.  Contractor-acquired, government-owned leases or purchases can sometimes require a long lead time, regardless of where the equipment is procured.  Some equipment, such as fire engines and specialized crash-fire-rescue equipment, large fleets of line-haul and fuel trucks, or rough-terrain cargo handlers, may require up to a year for delivery.  Indeed, such vehicles simply may not be available through commercial sources to meet short military timelines.

57.     LOGCAP performance contractors will most often lease equipment because LOGCAP uses operations and maintenance funds rather than other procurement authority funds.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 20**

Budget planning for procurement funds to replace leased equipment with purchased equipment should be considered for multi-year operations.  Leased equipment can be a source of significant cost during retrograde because it often must be returned to "rent-ready" condition and returned to point of origin.

58.      The subcontracts DynCorp International awarded and administered included the provision of services utilizing waste management vehicles, water delivery vehicles and wastewater removal vehicles in Afghanistan were awarded shortly after the award of the LOGCAP IV prime contract in the summer of 2009.  DynCorp International double-billed the United States for leased waste management vehicles, water delivery vehicles and wastewater removal vehicles in Afghanistan by leasing equipment and vehicles to attempt to provide such services itself for a period of almost two years.

### *DynCorp International Self-Performs Waste Management*

59.      DynCorp International leased vehicles ostensibly to make it possible to self-perform this work at an additional cost to the United States of more than $20,000,000 in addition to the cost of utilizing existing DynCorp's subcontractors to perform the same work, subcontracts which had been entered and were being fulfilled at the time DynCorp International improperly leased vehicles for its own use, and that use which did not occur.

60.      In or about September 2011, DynCorp International began shipping waste management vehicles and equipment leased to DynCorp International via air transport into Kandahar Air Field, Afghanistan.  DynCorp International did not notify or get prior approval for leasing these vehicles and equipment or shipping these vehicles and equipment into Afghanistan by the United States Administrative Contracting Officer in Houston, Texas.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 21**

61.     DynCorp International did not have any personnel in Afghanistan authorized to operate any of these vehicles when the vehicles arrived or at any time subsequent to the arrival of these waste management vehicles.  In or about October 2011, DynCorp International commenced invoicing the United States for these waste management vehicles knowing that these vehicles could not be operated and knowing that all of the waste management and water delivery services were subcontracted out to third-party contractors

62.     DynCorp International ordered vehicles and equipment and charged the United States for the vehicles and equipment knowing DynCorp International was not able to self-perform any of the services the vehicles and equipment were ostensibly ordered to help perform.

63.     The subcontractors who performed the waste management services under contracts with DynCorp International included Ecolog International FZ, Unity Logistics & Supply Co., Beverly Sue Global Services, LLC, Separ Motamadem Construction and Fakhrizada Construction Company.  DynCorp International subcontracted with these companies to perform waste management and water delivery services at more than 20 different Camps and Forward Operating Bases in the South and Southwest areas of Afghanistan beginning in the summer of 2009.

64.     Beginning in or about August 2009, the waste management subcontractors invoiced DynCorp International at the end of each month.  DynCorp International paid the waste management subcontractors monthly and billed the United States for reimbursement and charged award fees or commissions pursuant to the LOGCAP contract.  DynCorp International was aware at all times of the goods and services provided by waste management subcontractors and that DynCorp International was billing the United States monthly for their services.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 22**

65.     The waste management subcontractors utilized their own vehicles and equipment and personnel and did not need vehicles or personnel from DynCorp International to provide the required services.  These same subcontractors also had back-up or replacement waste management vehicles staged in Afghanistan to quickly respond to malfunctioning equipment (as was required in their subcontracts).

66.     The use of DynCorp International leased waste management vehicles and equipment by the waste management subcontractors would have required written authorization from the Army approving the assignment of such vehicles to a subcontractor, no such authorization was obtained.  To the extent that the waste management subcontractors used DynCorp International vehicles to provide services under their subcontracts, the use should have resulted in back charges and reimbursements to the United States, no such back charges and reimbursements were made in plaintiffs' experience.

67.     In early October 2011, Robinson and other LOGCAP IV Program in Fort Worth, Texas, and LOGCAP IV Project Management personnel in Afghanistan informed DynCorp International subcontract senior managers and supplier management managers in Afghanistan, a group which included plaintiffs, that it was DynCorp's intention to self-perform the waste management and water delivery services then being provided by subcontractors.  DynCorp International management  personnel, including Robinson, stated that DynCorp International hoped to make more money by self-performing these services than DynCorp International made through subcontractors.  Under the LOGCAP IV contract, it was DynCorp's right to attempt to self-perform, provided DynCorp International could demonstrate that it would be cost effective.

68.     In or about October or November of 2011, after DynCorp International notified the United States that it intended to self-perform the waste management and water delivery

services, the United States instructed DynCorp International to perform cost analysis

comparisons for each of the Camps and Forward Operating Bases.  DynCorp International

Deputy Program Manager Richie Hayes at DynCorp's Kandahar Air Field Project Management

Office led a cost analysis meeting attended by Subhi in late 2011.

69.      Hayes pushed for cost analysis exercises to continue even after it was clear that

DynCorp's costs would make self-performing impossible to justify to the United States.  Subhi

participated in several cost analysis exercises regarding this project.

70.      One analysis of which plaintiffs are aware indicated that DynCorp International

would have to charge the United States an additional $1,200,000 per year to self-perform the

required waste management and water delivery services for Forward Operating Base Spin

Boldak as opposed to the subcontractors continuing to perform those services.

71.      DynCorp International conducted similar cost analyses for other sites.  In the

case of Forward Operating Base Shindand, the cost analysis indicated it would also cost more

than an extra $1,000,000 per year to self-perform.

72.      DynCorp International conducted similar cost analyses for other sites.

DynCorp's analysis showed that it would cost the United States $1,000,000 to $1,400,000 more

per site per year than it was costing the United States with the current waste management

subcontractors retained by DynCorp International.

73.      At or about the same time, DynCorp International requested the approval and

assignment of labor codes from the United States for drivers and assistants for each of the waste

management and water delivery vehicles.  In or about May 2012, the United States denied

DynCorp's request to self-perform the waste management and water delivery services and also

denied DynCorp's request for labor codes for personnel to operate this equipment.

74.     DynCorp International had as many as 27 camps and forward operating bases in the theater during this period of time that were subject to this attempted change of having DynCorp International self-perform under the LOGCAP IV contract.

75.     It was immediately apparent that DynCorp International could not compete with the local subcontractors on the basis of what DynCorp International would have to charge the United States for these services. Ecolog, for example, was paying employees local wages, not wages for United States employees, and, thus, could provide services at a much lower cost. Ecolog already had vehicles, replacement vehicles, equipment and supplies based in theater and did not need to incur any new costs to purchase or lease such equipment or any ancillary equipment. For these and other reasons DynCorp International could not provide the waste management services at a competitive price.

76.     Prior to notifying the United States of its intent to self-perform the waste management and water delivery services and without requesting prior approval for funding of such a large expenditure from the United States Administrative Contracting Officer in Houston, Texas, DynCorp International executed leases for as many as 220 waste management and water delivery vehicles, worth millions of dollars, and shipped them by air transport to Kandahar Air Field in Afghanistan.

77.     These actions were orchestrated by Robinson and other Program Management personnel in their Fort Worth, Texas offices. All the while, DynCorp International knew it had subcontractors in place performing all of the waste management and water delivery services so that these vehicles were not needed.

78.     DynCorp International leased dozens of tanker trucks (for grey water, black waste, potable water and non-potable water), portable toilet service trucks, and garbage trucks.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 25**

The leased waste management and water delivery vehicles began arriving in Afghanistan in early October 2011.

79.     Hutchins was at Camp Leatherneck at this time and was notified by Project Management at Kandahar Air Field of their pending arrival.  Most arrived by air transport in Afghanistan in October and November 2011.

80.     DynCorp International failed to order trash cans, trash bins, dumpsters or portable toilet units (lead time was four to six months).  DynCorp International had millions of dollars of equipment that no one was trained or authorized to operate, and did not have any portable toilets for the soldiers or civilian support personnel, and did not have any trash cans or dumpsters for the waste and trash.

81.     In September 2011, Shriti Nair, with DynCorp International procurement in Dubai, United Arab Emirates, began shipping to Afghanistan water delivery trucks, which handled both potable and non-potable water, SST trucks (designed to service portable toilets), garbage trucks, black water removal tanker trucks and grey water removal tanker trucks.

82.     DynCorp International leased vehicles for these purpose from AMECO in South Carolina and FAMCO (a.k.a. Al Futtaim Auto & Machinery Co. and Naseeb General Trader) in Dubai.

83.     DynCorp International issued purchase order LG40032418 with an approved order dated November 2, 2011 with AMECO for $1,385,226.  The purchase order includes 12-month leases on numerous vehicles.  With regard to Forward Operating Base Spin Boldak, the following trucks were leased: (a) line item 8,  3,000 gallon potable water truck, and (b) line items 9, 11 14  4,000 gallon non-potable water trucks.

84.      Under DynCorp International Purchase Order LG40030861 the company leased one trash truck, the equipment annual lease amount was $101,400.

85.      The cost to transport one leased water tanker truck from Dubai, UAE to Afghanistan by air (mobilization cost) was $82,000.  The cost to return leased water tanker truck to Dubai was $42,000.  Billing to acquire and lease this water tanker truck was $226,200 from about 1 November 2011 through 31 August 2012, a truck that DynCorp International was not authorized to lease or use and which was not used.  These water tanker truck charges were billed to and paid by the United States monthly.

86.      The following DynCorp International purchase orders are known to relate to the lease of equipment and vehicles to permit DynCorp International to self perform – which it had no authorization to do, which were not used by DynCorp, for which claims for reimbursement were submitted to the United States and for which DynCorp International received reimbursement plus its fees and commissions:  LG40032418, LG40032420, LG40032429, LG40032460, LG40032462, LG40030861, LG40032144, LG40002003, LG40032002, LG40032417, LG40032416, LG40032414, LG40032412, LG40032411, LG40032410, LG40032409, LG40030994, LG40029899, LG40030368, LG40029876, LG40033631, LG40042409, and LG40036628.

87.      Other than ordering the tanker trucks and garbage trucks, DynCorp International was unable to make any real attempts to self-perform.

88.      DynCorp International eventually ordered some trash dumpsters, however, DynCorp International did not know what kind of dumpsters were required for the trucks it had leased.  So when the dumpsters arrived they were meant for frontloading trucks not the back loaded trucks that had been ordered by DynCorp International.  Even if DynCorp International

were otherwise in a position to self-perform garbage services using those trucks they would have needed different dumpsters.

89.        In or about January 2012, DynCorp International Supplier Management Director Dan Scott in Afghanistan, directed Hutchins and other supplier managers to ask waste management subcontractors like Ecolog to sell their chemical latrines, dumpsters and trash bins to DynCorp International so that DynCorp International could self-perform these services.  All waste management subcontractors denied the request.

90.        DynCorp, at the direction of Robinson and other DynCorp International LOGCAP IV Program managers, leased more than 200 waste management and water delivery trucks as if DynCorp International was going to self-perform.  After paying the monthly lease rates to the leasing companies, these costs were invoiced by DynCorp International to and paid for by the United States.  This equipment was never used on the forward bases from the time the equipment arrived through the end of July 2013

91.        The unused waste management and water delivery vehicles were allocated between more than 20 camps and forward operating bases, which had a large amount of activity unrelated to the vehicles so the lack of use of the vehicles went largely undetected.  Since the subcontractors were performing the services there was nothing much for personnel on the base to notice about these trucks in any event.

92.        The vehicles simply sat at the forward operating bases.  On some isolated occasions some vehicles were used for other services such as sucking up water off the ground after some rains.  The on-site waste management subcontractors had previously and could still perform such services when circumstances warranted without any use of the DynCorp International vehicles.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 28**

*Concealment*

93.        In the early spring of 2012, DynCorp International was initially asked by the
Administrative Contracting Officer about all these vehicles sitting idle at all the bases and
camps, DynCorp International responded that the vehicles were there for DynCorp International
to self-perform the waste management and water delivery services and that the details were
being worked out with the United States.  DynCorp International did not tell the United States
that DynCorp International had been invoicing the United States for these vehicles ever since
they landed in Afghanistan.

94.        When DynCorp International Project Management at Kandahar Air Field learned
that a local Administrative Contracting Officer had been asking questions about the use of the
DynCorp International waste management and water delivery vehicles and indicated the
intention of checking the mileage on these vehicles on various bases, DynCorp International
Project Management took steps to conceal the fact that DynCorp International had ordered
vehicles which had no purpose by directing workers to drive the vehicles around the bases to
add miles to the odometers to make it look like the vehicles were being used.  The purpose was
to deceive the United States so that the United States would continue to pay DynCorp
International for the unauthorized and unneeded vehicles.

95.        Pursuant to provisions contained in numerous purchase orders for the lease of
waste management and water delivery vehicles, DynCorp, not the leasing companies, was
responsible for the maintenance of the DynCorp International waste management and water
delivery vehicles.  Even at the largest bases, DynCorp International did not have the equipment,
facilities, parts or trained technicians to keep the vehicles operational and fully mission capable.
DynCorp International did not have trained and approved drivers for the vehicles.  DynCorp

International did not have the required equipment, including trash cans or dumpsters or portable toilets to properly utilize the vehicles.

96.     These vehicles were, in fact, not mission capable and could not be operated on any of the bases.  DynCorp International was not permitted by its contract with the United States to invoice the United States for this "Not Mission Capable" equipment.  DynCorp International was not permitted to invoice the United States for millions of dollars in equipment that did not have prior approval to lease from the Administrative Contracting Officer in Houston, Texas.  DynCorp International was not permitted to invoice the United States a duplicate or double charge of equipment and services that were already being performed by multiple waste management subcontractors throughout DynCorp's area of operations.

97.     DynCorp International subcontract management and supplier management personnel, including Subhi, were aware of efforts to put miles on the vehicles so that the vehicles would appear to have had some use.  These issues were discussed in several conference calls between DynCorp International managers in Afghanistan in the spring of 2012, April and/or May.

98.     Such conference calls included the discussion of an Ecolog truck breaking down temporarily at Camp Spin Boldak in April or May 2012.  Ecolog employees were allowed to drive a DynCorp International waste management vehicle in place of the Ecolog vehicle.  The vehicle had been leased ostensibly for DynCorp's self-performance, in place of Ecolog's vehicles.

99.     When Ecolog's truck broke down Ecolog management at Camp Leatherneck immediately directed the movement of one of their back-up trucks to Spin Boldak to replace the inoperative truck in accordance with the provisions of their subcontract.  Hutchins, then

stationed at Camp Leatherneck, had almost daily contact with Ecolog management and was briefed daily as to the Spin Boldak truck status.  There was no crisis at Spin Boldak and there was no need to use DynCorp's surplus waste management vehicles.

100.     At another site in April or May 2012, Ecolog workers were allowed to use the leased vehicles and while a DynCorp International employee was operating the vehicle itself, the Ecolog personnel would provide the required services, such as lifting the trash bins or hooking the bins to the truck, sweeping debris, cleaning the ground area.

101.     Ecolog should have been required to provide trucks and/or reimburse DynCorp International for using trucks, which should in turn have been forwarded to the United States.

102.     No such back charges were issued.  There never was an immediate need for the use of the DynCorp International trucks, as Ecolog had a good reputation for relocating its own vehicles to cover when such vehicles were needed at another base.

103.     No DynCorp International personnel had been approved to drive the leased vehicles for any purpose.  In the early summer of 2012, the United States Department of the Army declined to create DynCorp International job classifications for drivers and driver's helpers to operate the equipment.  DynCorp International had leased vehicles for which it had no authorized drivers or helpers.

104.     Despite lacking approval Administrative Contracting Officer funding approval to lease these vehicles, and lacking trained and authorized personnel to operate these vehicles, and lacking the resources to properly maintain these vehicles and lacking dumpsters, trash cans and portable toilets to have something to service, DynCorp International maintained what amounted to a fleet of duplicative vehicles in theater for at least two years, at an added cost to the United States of an amount exceeding $38,000,000.

### *Returning Vehicles and Equipment*

105.　　　In or about August 2013, when DynCorp International Project Management at Kandahar Air Field finally took action to attempt to return the vehicles, DynCorp International incurred additional costs that were billed to and paid by the United States.  The waste management and water delivery trucks had entered Afghanistan by air transport on C-130 aircraft beginning in early October 2011.  As a result, there was no documentation to show import duties had been paid to the government of Afghanistan.  Indeed, such duties had not been paid.  To return these trucks, DynCorp International had to pay customs to the government of Afghanistan to send them back out of the country, as they could not find air transport to return the trucks.  Those costs, including the taxes, were passed through to the United States.

106.　　　The issue of the import/export taxes was discussed at numerous meetings weekly with charts and graphs showing the progress.  These taxes amount to additional costs for unneeded, duplicate vehicles.

107.　　　DynCorp International leased more than 200 waste management and water delivery vehicles which were not used for any real purpose.  They were ordered as if DynCorp International was going to self-perform, which DynCorp International never had permission to do.  Most of these vehicles arrived by air transport in Afghanistan in October and November 2011.

### *DynCorp International Billing*

108.　　　As early as March of 2012, Hutchins attempted to find out how DynCorp International could be paying for the duplicate vehicles and/or how they could be billing the United States without attracting scrutiny and raising awkward questions.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 32**

109.        Hutchins asked a female member of the DynCorp's Project Controls Department at Camp Leatherneck (believed to be Tonya Coffey).  She reported that the lease costs for this equipment was being passed through to the United States under a DynCorp International generic equipment billing code.

110.        The same information was addressed during meetings that Subhi participated in with Project Management personnel at Kandahar Air Field attended by in early 2013.  It was agreed that as long as the vehicles were not being used they would be billed under a generic equipment billing code, but once these waste management vehicles were put in service they would be billed on a separate descriptive line-item on the monthly invoice to the United States.

111.        DynCorp International leased and invoiced the United States for waste management and water delivery vehicles for which it had no authorization from the United States to acquire. Even if these vehicles were authorized, DynCorp International could not invoice the United States because the vehicles were "Not Mission Capable" (no trained or authorized operators and no trash cans, dumpsters or portable toilets).  In fact, DynCorp International repeatedly invoiced the United States for the vehicles and equipment and the United States paid these false claim invoices.

112.        Each month, the vehicle leasing subcontractors submitted invoices to DynCorp International for payment of these vehicles. DynCorp International Accounting and Finance personnel at Kandahar Air Field paid these invoices or forwarded them to corporate offices in Fort Worth, Texas for payment. DynCorp International Program Management personnel in Fort Worth, Texas, in conjunction with DynCorp International Accounting and Finance personnel in Fort Worth, Texas, then invoiced the United States through an itemized invoice that allocated charges to Prime Contract line items.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 33**

113.     The waste management subcontractors billed under a different line item for waste management and water delivery services from the line items used by DynCorp International for its leases and related expenses.  According to Coffey, a DynCorp International Project Controls manager stationed at Camp Leatherneck in 2012, DynCorp's lease costs for the waste management and water delivery vehicles were being concealed within and passed through to the United States under DynCorp's generic company equipment billing code.  Waste Management services provided by DynCorp International subcontractors were simultaneously being invoiced to the United States under specific Waste Management and Water Delivery services billing codes.

114.     In addition to billing the equipment and leases to the United States when they were duplicative of service subcontracts, DynCorp International obtained a commission estimated between two percent (2%) and three and a half percent (3.5%) each month on all of these payments and would receive an additional one percent (l%) to seven percent (7%) each quarter at an Award Fee Board based upon the evaluation of DynCorp's job performance.  Each quarterly Award Fee evaluation was made by the United States without the knowledge that the government was being billed millions of dollars for equipment that had no purpose in theater.

115.     On or about 1 August 2012 the periods of performance for all of these waste management and water delivery vehicles were extended for an additional twelve months even though DynCorp International knew in June 2012 that they were not going to be performing waste management and water delivery services, and that labor codes for drivers and helpers were not approved.

116.     For 23 waste management and water delivery purchase orders for the period of 1 November 2011 through 31 July 2012 (nine months), the United States paid $14,311,560.60.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 34**

The contracts were extended for the period of 1 August 2012 through 31 July 2013 (12 months), based on the known numbers for the preceding period, the charges for the extended contracts would exceed $19,000,000. Collectively, the false claims submitted by DynCorp International to the United States for unauthorized and duplicate waste management and water delivery vehicles exceeded $33,393,641.40.

117.     Additional purchase orders would have been awarded for similar vehicles for the other bases. The number of additional purchase orders that Hutchins and Subhi do not yet have information for will likely exceed 20.

118.     Mobilization costs are not reflected for most of the 23 purchase orders described above, it is likely that separate purchase orders were issued for mobilization and the removal from Afghanistan costs.

### *Not Fully Mission Capable Vehicles*

119.     DynCorp International billed the United States for leased SUVs, pick-up trucks, flatbed trucks, buses, construction equipment, material handling equipment and other leased vehicles as fully mission capable that were not fully mission capable. The leased equipment and vehicles were not up to specification, violated safety codes and falsified Service Received Reports were created to justify billing the equipment and vehicles as fully mission capable.

120.     The United States does not knowingly pay for leased equipment or vehicles that are not mission capable. A cracked windshield, transmission problems, flat tire, missing side mirror, worn out brakes, non-functional seat belts, burned out head-lights, malfunctioning turn signals or inoperable stop lights are some of the defects that will cause a piece of equipment to be down-graded to "Not Mission Capable." Not Mission Capable vehicles and equipment cannot be operated on US military camps and forward operating bases.

121.     DynCorp International billed and received payment from the United State for vehicles, which were not mission capable through numerous subcontracts including subcontracts with AMECO and Naseeb.  DynCorp International Supplier Management personnel and other company employees at DynCorp's LOGCAP IV Project Management offices at Kandahar Air Field falsified documents so as to get vehicle leasing subcontractors paid for vehicles that were Not Mission Capable.  This conduct began at least as early as early 2012 and included Mario Galiouras, Dejan Lovric and Oldrich Valceus.

122.     In or about August 2011, DynCorp International procurement personnel, including Shriti Nair, operating from Dubai, United Arab Emirates, and Robinson directing her procurement staff in Fort Worth, Texas, negotiated purchase orders with subcontractor AMECO, and perhaps other vehicle leasing contractors, for the lease of material handling equipment, heavy equipment cranes, forklifts, front-end material handling equipment and vehicles such as loaders, dump trucks, flatbed trucks, bull dozers, pick-up trucks, SUVs and other vehicles.  DynCorp International agreed to the provision that AMECO would be paid each month for the full-month's lease amount regardless of whether their equipment was "Fully Mission Capable" or not during the entire month.

123.     Such vehicles are required to be maintained, according to the LOGCAP contract. LOGCAP IV Performance Work Statement, Paragraph 5.13 provides:

> The Contractor shall provide equipment, supplies, personnel, and management required to perform equipment and vehicle maintenance services IAW AR 750-1 and/or the manufacturer's suggested maintenance instructions. The Contractor shall adhere to the assignment of maintenance priorities IAW, The Army Maintenance Management System (TAMMS).

124.     In most cases, DynCorp International would require the leasing company to maintain the vehicles.  However, DynCorp International had the discretion to agree with a

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 36**

leasing company to pay the established lease rate even if the vehicle is not "Fully Mission Capable" for any part of a month or for the entire month. DynCorp International was not authorized, however, to bill the United States for the entire monthly lease amount if a vehicle was not "fully mission capable" for the entire month.

### *DynCorp International Bills and Collects for Non Mission Capable Vehicles and Equipment*

125.     Beginning in 2011, DynCorp International repeatedly billed the United States for material handling equipment, construction equipment, SUVs, pick-up trucks, buses and other equipment and vehicles that was not mission capable for a portion of or for the entire preceding month.. This equipment and vehicles were staged on more than 20 Camps and Forward Operating Bases throughout the south and southwestern portions of Afghanistan. This equipment and vehicles had been leased from AMECO, and other companies.

126.     DynCorp International circumvented its established procedures in the payment of invoices to AMECO. Normally, at the end of each month the vehicle leasing company will submit a Service Received Report for all vehicles listed on a particular purchase order. Each vehicle would be listed separately and identified by VIN number or serial number.

127.     The Service Received Report would be transmitted through the subcontracts department to the DynCorp International maintenance or service manager at the camp or Forward Operating Base where the material handling equipment and/or vehicle(s) were being used. At each camp and forward operating base DynCorp International maintenance managers or service managers take a daily inventory of all equipment and vehicles on their site that they are responsible for. Each piece of equipment and each vehicle has its own service or maintenance file and contains a daily report as to whether the equipment was Mission Capable or Not Mission Capable for that day. Other information collected would include the mileage on

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 37**

the vehicle and perhaps the status of any efforts to repair Not Mission Capable equipment and/or vehicles.  Information of the status of parts orders may also be included.

128.    The maintenance manager would review his maintenance records for the previous month for each individual piece of material handling equipment or vehicle and make one of three notations: (a) The equipment or vehicle was Fully Mission Capable for the entire month; (b) The equipment or vehicle was Not Mission Capable for the entire month; (c) The equipment or vehicle was Partly Mission Capable meaning it was fully mission capable for less than the full month.

128.    The vehicles leased ranged from brand new to eight or nine years old.  The equipment leases, if they involved more than $25,000, had to be reviewed and approved by the Administrative Contracting Officer in Houston, Texas.

129.    The Administrative Contracting Officer had to rely on the DynCorp International records in making an approval determination as no other record was submitted.  The age, mileage and overall condition of the vehicles to be leased and its records would be the representations on DynCorp International purchase orders and other contract documents.  Such statements were false and were relied upon the United States in the Administrative Contracting Officer's approval determination and in the United States decision to pay invoices from DynCorp International.

130.    The probability that a vehicle would remain in a mission capable status would be based upon the age and condition of the equipment when received, how frequently it was used, how hard it was used, the environmental conditions it was operating in, the skill of the operator, the original quality of the equipment, and a number of other factors.  Most equipment was Not Mission Capable at least some of the time.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 38**

131.     If equipment or a vehicle was not fully mission capable for any portion of the month the service manager would annotate in a comments block on the Service Received Report how many days the equipment or vehicle was not mission capable.

132.     The maintenance manager would sign the Service Received Report and forward it to the Site Manager for his/her review and signature.

133.     The subcontracts department would then return the fully executed Service Received Report back to the equipment leasing company, which would then generate and submit an invoice for payment based upon the pro-rated monthly lease rate.  For example, if a crane that leased for $20,000 per month was only mission capable for half of the month the equipment leasing company would only be allowed to invoice for $10,000 for that piece of equipment for that month.

134.     However, with AMECO vehicles and other leased vehicles, no Service Received Report was submitted to DynCorp International to evaluate the mission capable status of that equipment or vehicle.  Rather, an invoice was submitted to DynCorp International at the end of each month listing each piece of equipment and/or leased vehicle from a particular purchase order with the monthly lease rate for each piece of equipment and/or vehicle.

135.     On the invoice, each vehicle would be listed separately and identified by VIN number or serial number.  With AMECO vehicles, the DynCorp International maintenance manager was directed only to verify that the equipment was present on his camp or Forward Operating Base.  The invoice was signed and transmitted to DynCorp International Accounting and Finance for payment in full.

136.     The DynCorp International maintenance managers or service managers did not consult their maintenance records to determine the mission capable status of each vehicle and

piece of equipment for the month and did not complete a Service Received Report so DynCorp International Accounting and Finance did not have the needed information to adjust the contractors' invoices for vehicles that were not Mission Capable for any number of days or for the entire month.  The result was that the United States was billed for and paid more than required based on DynCorp's failure to transmit the "mission capable" status of such vehicles to DynCorp's accounting and finance department each month.

137.     Beginning in 2011, DynCorp International procurement and sourcing entered into numerous lease agreements with AMECO, and possibly other vehicle leasing subcontractors, to lease material handling equipment, construction equipment, buses, trucks, SUVs and other vehicles that required DynCorp International personnel to provide all maintenance and repairs.

138.     These agreements were made without verifying whether the sites where the equipment or vehicles would be used had the resources including facilities, equipment, parts, diagnostic software and trained manpower to perform the maintenance or the repairs in a timely manner.

139.     For example, DynCorp International executed purchase order number LG40032410 with AMECO that was prepared by DynCorp International employee Nair in Dubai, UAE, for Forward Operating Base Delhi.  The purchase order had a total value of $353,176 and a period of performance of 1 November 2011 through 31 July 2011.

140.     None of the DynCorp International sites had all the facilities, equipment, parts, fluids, diagnostic software and trained manpower needed to maintain the vehicles so material handling equipment and leased vehicles would sit "dead-lined" for extended periods of time for as long as several months.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 40**

141.       These vehicles were not mission capable but were being billed to the United

States as if they were.

*DynCorp International Accepts Vehicles from Vendors and Bills the United*
*States Government for Vehicles and Material Handling Equipment, Which are*
*Significantly Older than Represented on Invoices.*

142.       When DynCorp International solicited bids for leased vehicles the specifications

and features include the year of the vehicles (i.e. 2009 or newer).  After negotiations were

complete and a vendor was selected a package of documents was sent to the Administrative

Contracting Officer in Houston, Texas for review and approval.

143.       The Administrative Contracting Officer approval for leases and associated costs,

were based upon the determination that the lease amount was fair and reasonable, the overall

best value, and in the best interests of the United States.

144.       Such a decision was made in reliance upon DynCorp International

representations that the vehicle specifications provided in the package of documents was what

was delivered to DynCorp International on behalf of the United States in Afghanistan.

145.       However, it was apparent to Hutchins that such representations were falsified.

In fact, in February or March 2012, Hutchins participated in a conference call where DynCorp

International Supplier Management personnel at Kandahar Air Field where questioned about the

acceptance of vehicles and material-handling equipment that did not meet the specifications

listed on the purchase orders.

146.       Questions were asked during a conference call with DynCorp International

Supplier Management officials at Kandahar Air Field were directed primarily at Glenn Farnam,

Director of Supplier Management, and Mario Galiouras, Subcontracts Senior Manager, and

focused on the justifications and rationale for delivery by the leasing subcontractors, and

acceptance by DynCorp International of vehicles that were older than listed on the purchase orders.

147.     Galiouras indicated that he was aware of this discrepancy, but that it was nothing to worry about.  He added his opinion that the year indicated on the purchase order was actually more of a general guideline rather than a hard and fast requirement.  Galiouras did not have a college degree, did not have any training in procurement or contracting law, did not have any training in other legal areas, and did not have any formal training in the Federal Acquisition Regulation.

148.     It was suggested to Farnam and Galiouras by the Subcontract Senior Managers and Supplier Management Mangers that called in for the conference call that the lease prices needed to be adjusted downward due to the nonconformance.  Nothing was done to inform the United States of the "discrepancies," to obtain a back-charge for amounts already paid or even insist that leasing companies only provide vehicles and equipment that met the specifications they agreed to in their proposals and in the contracts they signed.

149.     For example, DynCorp International listed a 2011 Toyota Hilux on Purchase order LG4007361 from Safi Sultani Construction Co. with VIN number of KZN1679070215.  The vehicle was leased for $1,773.27 per month in July of 2011.  Upon inspection, the vehicle was really a 2007 model.

150.     Shir Ahman Kaimi provided a forklift with serial number DL1155HJZ1241136 for $48,820 for 29 November 2011 to 28 April 2012, which was supposed to be a 2005 model.  It was actually a 2001 model forklift.

151.     Numerous charges for vehicles that were considerably older than proposed by the leasing companies in their proposals, and represented on DynCorp International purchase

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 42**

orders, were paid by DynCorp International to leasing companies, including Shir Ahman Kaimi,

Naseeb General Trader and Bahir Zaland Company. DynCorp International then invoiced the

United States, month after month after month, for these non-conforming vehicles and

equipment.

152.     In total, at least 67 vehicles acquired by DynCorp International were of a

different year from what was authorized by the United States.  The following DynCorp

International purchase orders relate to the vehicles of which plaintiffs are aware:  LG40005647,

LG40033613 References PO # LG40010279, LG40033615 References PO # LG40028722,

LG40014556, LG40007361, LG40036739, LG40028720, LG40036477, LG40034368, and

LG40028721.  Vendors include: Hikmat HSCC, Memar, Safi Sultani, Zaland, Naseeb, and

SAK.  The line item total value for the vehicles equals $1,785,822.75.

### DynCorp International Billed the Government for Bus Leases, Which Did Not Meet Purchase Order Specifications

153.     The Department of the Army Performance Work Statement for the August 1,

2011 to July 31, 2012, Period of Performance directed DynCorp International to lease seven 50-

passenger buses, with fire extinguishers, to transport military personnel on Camp Leatherneck

in Afghanistan.

154.     On or about September 20, 2011, DynCorp International issued Purchase Order

LG40029880 to Naseeb Trading Company in Dubai, United Arab Emirates to lease seven 50-

passenger buses through 31 July 2012.

155.     The buses arrived at Camp Leatherneck between October 29, 2011 and

November 8, 2011, the seventh bus arrived at Kandahar on October 29, 2011, and subsequently

moved to Camp Leatherneck.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 43**

156.     When the buses arrived at Camp Leatherneck, beginning in October 2011, it was apparent that the bus seating was inadequate to accommodate the physical size and weight of United States military personnel and their weapons and other gear.

157.     No fire extinguishers were provided in the buses.  Naseeb General Trader proposed to reconfigure the seats so as to allocate more space for the military personnel.

158.     One of the seven buses was reconfigured in late February or early March of 2012 reducing seating capacity from 50 to 43.  Hutchins at Camp Leatherneck was directed by Farnam or Galiouras to inspect and photograph the reconfigured bus.  Hutchins noted that the reconfigured bus only had 43 seats instead of the 50 seats specified by the Army and on the purchase order.  Hutchins transmitted the photos to Galiouras at Kandahar Air Field several days later.  Galiouras ordered the configuration of the remaining buses on March 14, 2012.

159.     It was subsequently brought to Galiouras' attention by Hutchins that the purchase order lease price needed to be adjusted downward to reflect the reduced capacity of the seven buses. Galiouras did not have the authority to revise the contract or enter into discussion concerning reduction in the contract price.  These actions would need to be addressed with DynCorp International Sourcing at Fort Worth, Texas.  No request for such an adjustment was ever made.

160.     The United States was billed as if the buses had the required 50 seats and had the fire extinguishers that were specified in the purchase order.

161.     On or about 30 July 2012 Naseeb shipped seven replacement Toyota Coaster buses to Camp Leatherneck from Kandahar as an interim transportation solution.  A technical inspection of these buses was conducted upon their arrival at Leatherneck and each bus was found to be defective in one or more categories and each failed said technical inspection.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 44**

162.     DynCorp International was aware of the situation and did not modify the contract and recover the cost associated with the reduction in the Scope of Work to 43 seats from 50 seats.  No fire extinguishers, as required in the Scope of Work were ever provided.

163.     DynCorp International invoiced the United States for seven 50-seat buses (with fire extinguishers) when Naseeb General Trader provided seven 43-seat buses without fire extinguishers.

164.     The bus lease payments were approved through a Service Receiving Records signed by Dejan Lorvic, fleet management maintenance supervisor at Kandahar.  The fully mission capable status reported by Lorvic was not based on first-hand knowledge or information obtained by Lorvic from the end user at Camp Leatherneck.  Lorvic had no knowledge of the service status of the buses when he certified that the buses were fully mission capable, in fact, the buses were not fully mission capable.

165.     In other instances, when reviewing invoices for the lease of the buses, the service receiving report was signed by Keith Browning, deputy regional manager at Camp Leatherneck. Browning marked the status column for buses as not mission capable and someone put a pen written check in the fully mission capable box.  The invoices for the buses leases, marked by Browning as not mission capable were paid by DynCorp International and billed to the United States.

166.     Other instances occurred in which false service receiving reports were prepared and submitted for payment.

167.     Upon direction from more senior management, Hutchins conducted an investigation of the circumstances of the seven 50 seat buses.  In a Memorandum dated August 12, 2012, addressed to Jim DeLong, LOGCAP IV Project Manager and Mo Young, Deputy

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 45**

Project Manager, with copies to J.D. McCoy, Hub LNK Regional Manager, and Sam Clear, LNK Site Manager, Hutchins detailed the improprieties related to the DynCorp International LG40029880 related to the seven 50 seat buses.  DynCorp International terminated Hutchins' employment on August 28, 2012.

168.     Some of the buses were eventually used, but only for a short periods of time, because the tube-aluminum frame of the seats were not made to handle the weight of American soldiers and buckled under their weight.  Also, the backs to the seats were not attached firmly and started to separate from the tube-aluminum frames.

169.     This problem was identified in the late May - early June 2012 time frame by DynCorp International service and maintenance personnel at Camp Leatherneck.   The problem had not been resolved when Hutchins left the theater at the end of August 2012.

### *DynCorp International Falsified Service Receiving Reports*

170.     A number of DynCorp International personnel at Kandahar Air Field in Afghanistan falsified DynCorp International Service Receiving Reports indicating that heavy equipment and leased vehicles were "Fully Mission Capable" during the entire preceding invoicing period when, in fact, the equipment and/or vehicles was/were not fully mission capable.  These individuals included Galiouras, Lovric and Valceus.  None of these individuals was authorized to sign the Service Received Reports and they did not have any information on the daily status of the vehicles and equipment.  This information, annotated on vehicle maintenance records at each site, was in the possession of the service managers or maintenance managers at each site. These were the only people authorized to sign the Service Received Reports.

171.     In August 2012, at the specific direction of DynCorp International Project Management at Kandahar Air Field, Hutchins reviewed one Naseeb purchase order (Purchase Order # LG40029880) for seven buses on Camp Leatherneck to confirm whether or not the military was being invoiced for these "Dead-Line/Out-of-Service/Not Mission Capable buses. Hutchins discovered that approximately $100,000 in monthly lease payments for these seven buses was billed to the Department of the Army over a six-month period when these buses were not mission capable.

172.     DynCorp International Supplier Management and Fleet Management personnel at Kandahar Air Field falsified the status of the vehicles to get the vendor paid for Not Mission Capable buses.  The DynCorp International Accounting and Finance department verified that the amounts had been paid to the vendor and that the United States had been billed for these amounts.

173.     Hutchins summarized his findings in a memorandum and transmitted it to DynCorp International Project Management at Kandahar Air Field and to DynCorp International Site Management at Camp Leatherneck.  The review encompassed the period of 1 January 2012 through 30 June 2012. The memorandum was sent on August 18, 2012, by Hutchins to DeLong (DynCorp International LOGCAP IV Project Manager), Young (DynCorp International LOGCAP IV Deputy Project Manager), McCoy (DynCorp International Hub Leatherneck Regional Manager) and Clear (DynCorp International Leatherneck Site Manager).

174.     On or about 20 August 2012, Hutchins attempted to expand this review to select subcontract line items from other heavy equipment and leased vehicle purchase orders.  On 23 August 2012, Hutchins sent his request for information and copies of documents to DynCorp International Accounting and Finance at Kandahar Air Field and to DynCorp International Fleet

Management to Hymas, Emir Idrizovic and Kevin Wade.  On 26 August 2012, Hutchins sent

his request for information and documents to DynCorp International Accounting and Finance,

Service and Management at Camp Leatherneck to Ron King.   DynCorp International

Accounting and Finance did not provide the requested information and documents and informed

Supplier Management and Project Management.

175.      On August 28, 2012, the day of his termination, Hutchins was told by the

DynCorp International Camp Leatherneck Human Resources Manager Mike Harless that he had

just seen an email directive sent out to DynCorp International personnel instructing them not to

respond to any of Hutchins' requests for information.  Hutchins never saw this email and does

not know who sent it.  A couple of weeks earlier, Hutchins had been informed by Linda

Wrubbel, who was visiting Camp Leatherneck, that she had received a DynCorp International

"trouble-maker" list that included Hutchins name.  She did not say who sent it to her and she

did disclose the names of the other individuals on this list. Wrubbel was DynCorp's Regional

Human Resources manager in Afghanistan.

176.      DynCorp's refusal to even answer basic questions about the use of these service

received documents and plaintiff-relators' additional experience with DynCorp's management

of vehicles leads to conclusion that the practice of using falsified Service Received Reports was

widespread.

177.       Hutchins was terminated on August 28, 2012, the reason given to Hutchins for

his termination was an unspecified violation of DynCorp's Code of Conduct.  Of course,

Hutchins disputes any such violation and alleges DynCorp International terminated him in

retaliation for protesting fraudulent activity and the submission of false claims to the United

States.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 48**

***DynCorp International Billed the Government for Subcontract Services as
Purchase Order Items to Obtain Higher Commissions than Authorized for
Subcontract Services***

178.     DynCorp International switched conventional service subcontracts onto purchase
orders beginning on 1 April 2011 so DynCorp International could invoice the Department of the
Army at a higher commission rate.  The decision to make these changes was made at or near the
beginning of January 2011.  The decision was made at DynCorp International corporate offices
in Fort Worth, Texas.

179.     This switch was not approved, either in advance or after-the-fact by the Army
Sustainment Command or the Defense Contract Management Authority.  The change was never
incorporated into the Prime Contract.

180.     Robinson, DynCorp International Vice President of Sourcing, proposed the plan,
according to A.W. Short, the former DynCorp International Vice President and LOGCAP
Program Manager.  He called it "her brain child."

181.      Hutchins acting as the DynCorp International Director of Subcontracts in
Afghanistan from February 2011 through June 2011 participated in approximately 25
conference calls and meetings in March 2011 and April 2011 between DynCorp International
Project Management including, among others, Hank Miller, DynCorp International project
manager at Kandahar Air Field in Afghanistan and Robinson in Texas where this, and other
substantive changes, were discussed and debated.  A.W. Short while visiting Afghanistan
participated in several of the conference calls.

182.     Traditionally, goods that are purchased such as tires, chairs, beds, and tools are
compensated at approximately a three and one half percent commission or surcharge.

183.        Services for labor, such as waste management, dining facilities services, and vehicle leases, heavy equipment leases, and construction are compensated at approximately a two percent surcharge or commission.

184.        Items purchased (as contrasted with leased or rented) through purchase orders were compensated at a higher percentage rate of commission because of the disproportionate amount of work required to acquire the items as contrasted with the total value of the item purchased.  Service subcontracts were generally of a substantially greater dollar amount.

185.        The more that DynCorp International was able to submit invoices as purchase orders, instead of service subcontracts, the higher its commissions would be. However, putting services on a purchase order instead of within a subcontract does not substantially change the essence of the activity.  In their proposal to the United States DynCorp International set forth what rates DynCorp International would charge the United States for services and for purchases.

186.        DynCorp International did not submit the required plan to change acquisitions to purchase order for approval by the Administrative Contracting Officer as required by the LOGCAP IV contract.  Instead, at the end of each month, DynCorp International submitted an invoice to the United States for payment of purchase orders, subcontracts and other costs such as DynCorp International employee wages, company equipment and vehicles, for example, that they had paid during the previous month.

187.        DynCorp International could have and should have gone to the United States Army Sustainment Command requested a change to the Prime Contract in order to change the commission rates that were negotiated prior to the award of the Prime Contract to DynCorp International.  During that original negotiation process DynCorp International proposed to the United States Army that they would invoice the United States approximately three and a half

percent (3.5%) for purchase order commissions and approximately two percent (2.0%) commissions for subcontracted services commissions. The actual amounts are contained within DynCorp's proposal that was accepted by the United States.

188.     DynCorp International did not submit or otherwise inform the United States of their plan to engage in this practice. This is a change that needed to be reviewed and approved by the Army Sustainment Command as a change order, modification or revision to the prime contract and it is not likely the Army would have approved such a large change from DynCorp's accepted proposal.

189.     By putting subcontracted services onto a purchase order, rather than onto a subcontract, DynCorp International unilaterally and unlawfully altered the commissions' schedule without notice to or permission from the United States. DynCorp International thereby made tens of millions of dollars more since it received the extra one and a half percent (1.5%) commission on multiple contracts.

190.     Hutchins had several discussions regarding exactly this change during conference calls from DynCorp's Kandahar Air Field office to Robinson, DynCorp International vice president for contracts and procurement in Fort Worth, Texas, in February and March 2011.

191.     Hutchins repeatedly asked Robinson if the Prime Contract had been changed to reflect the change in commissions invoicing. Robinson said "no," but that she had told the Administrative Contracting Officer.

192.     Hutchins advised Robinson stated that the Administrative Contracting Officer did not have the authority to change the terms of the Prime Contract. Hutchins warned

Robinson that these additional costs being invoiced to the United States Army could be recovered from DynCorp International in the future and could include penalties.

193.     The Project Manager, Deputy Project Mangers, and other support staff were all present on the conference call.  The conference calls were held in the offices of DynCorp's LOGCAP IV Project Manager at Kandahar Air Field.  At the time of these conference calls Hutchins was the acting Procurement and Subcontracts Director for DynCorp International at Kandahar Air Field.

194.     No documentation was provided to support the position that the United States ever agreed to such changes to the contract commission rates.

195.      It is estimated that for the period 1 April 2011 through 31 July 2017 the excess commission charges for the listed items below exceeded $21,000,000: (a) Dining Facility Contracts (Cooks, Bakers, Servers, etc.), (b) Labor Services (Plumbers, Carpenters, Electricians, HVAC Techs, Unskilled, Etc.), (c) Construction Services, (d) Miscellaneous Services (IT, Freight, Commo, etc.), (e) Waste Management Services, and (f) Vehicles & Construction Equipment Leases.

### DynCorp International Billing for Employees Who Did Not Meet the Specifications, Qualifications and Experience for the Jobs for Which They were Hired to Perform, and or Were Working at Jobs Below the Pay Scale They Were Hired to Perform

195.     DynCorp International hired and billed the United States for employees who did not meet the specifications, qualifications and experience for the jobs for which they were hired to perform, and or were working at jobs below the pay scale they were hired to perform.  The United States paid these excess personnel expenses.

196.     In response to internal complaints about this practice, Wrubbel, DynCorp International Regional Human Resources manager in Afghanistan, conducted an investigation

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 52**

of the Subcontracts Department, also called Supplier Management, beginning in December 2011 and concluding in February 2012.

197.     Wrubell told Hutchins that Human Resources generated a report in February 2012 showing that more than 80% of the department staff did not meet the job qualification requirements of education and experience and were not qualified for the positions for which they were hired.

198.     This problem was repeated in each DynCorp International department in Afghanistan.  Wrubbel told Hutchins about the results of her investigation on or about end of June or early July 2012.

### Employment Requirement: Have Pulse, Be Able to String Together a Sentence in English and Be Enthusiastic

199.     For the report, Wrubbel had interviewed Scott, the DynCorp International Supplier Management Director in Afghanistan.  When asked about the hiring criteria for the Subcontracts Department personnel, Scott stated that his requirements were that the person have a pulse, be able to string together a sentence in English and be enthusiastic.

200.     Scott was allowed to resign in February 2012, but none of the unqualified personnel he hired were terminated or transferred to another position.  Nor was the United States reimbursed for the excess charges.

201.      Subhi had filed complaints with Human Resources regarding the Supplier Management office personnel.  She reported an office meeting during which Scott commented on the type of people he wanted working in the office.  Scott did not include anything about qualifications.  Subhi was present at this meeting and, after about 40 minutes,  Subhi raised her hand and asked about qualifications.  Scott stated it was his meeting and his time to talk.

### 90% of the Employees Were Not Qualified

FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 53

202.      Subhi reported this incident to Wrubbel.  Wrubbel said that 90% of the employees were not qualified, but felt they could not get rid of everyone.  So they were just going to keep everyone.  Wrubbel also told  Subhi about Scott's statements regarding an employee only needing a pulse.

203.      The Department had grown to include approximately 20 people and Scott was in charge for about eight months from late June 2011 to February 2012.

204.      These positions involved include senior managers at relatively high pay rates. For example, the United States agrees to pay a DynCorp International Senior Subcontracts Manager $167,000 per year (including uplifts), there are education requirements such as a college degree and experience requirements generally four to six years which are specified.

205.      The majority of the personnel hired had no contract administration experience and no college degree.  Education requirements and experience requirements for each job specification are set forth in the Prime contract.  Compensation rates are also established in these documents.

206.      Similarly, hundreds of workers from the Philippines, India, Bosnia, Nepal, Kenya, were hired under labor subcontracts, who did not meet the hiring criteria.

207.      Many of these workers did not have the ability to speak English.  Many were also working outside their job description for example, a crane operator was working in the laundry folding clothes.  At Forward Operating Base Dwyer, more than 100 individuals were working in this manner in 2012.

### *DynCorp International and Onsite Occupational Billed the Government For Services, Which Were Not Approved and Failed to Acquire Equipment and Provide Training Specifically Approved by the Administrative Contracting Officer and Funded by the Department of the Army*

207.     DynCorp International procedures to fund subcontracts and or purchase orders as follows: (a) Funding is requested via a material requisition and a material requisition questionnaire that specifically requires a statement of what funds are required, what the funds will be used for and the period that the funds will be used; (b) Once the Material Requisition is signed by the required DynCorp International personnel it is forwarded to the Administrative Contracting Officer for approval or rejection; (c) There may or may not be additional information requested prior to the Administrative Contracting Officer approving the Material Requisition, and (d) Once approved, the material requisition will go to DynCorp International Sourcing, which will create the contractual document (purchase order or subcontract) for the required equipment or services.

208.     In the 1 August 2011 to 31 July 2012 period, approximately $100,000 in funds were requested for a portable X-Ray unit.  Approximately $50,000 was requested for Cardio-Pulmonary Resuscitation/First Aid training.  Funding for other items was also requested.

209.     The funds were annotated on a Material Requisition in November 2011 for approximately $422,000.

210.     The Material Requisition was approved by the Administrative Contracting Officer and transmitted to DynCorp International Sourcing.

211.     DynCorp International Sourcing did not revise the current subcontract to add the additional funds to the subcontract.  Sourcing did not add the requirement for a portable X-Ray machine or Cardio-Pulmonary Resuscitation/First Aid training.  The funds were added to a new stand-alone purchase order and the funds were used to pay other outstanding invoices owed to the supplier under an earlier subcontract.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 55**

212.     Of the $422,000 approved by the Administrative Contracting Officer, approximately $150,000 was designated for services (Cardio-Pulmonary Resuscitation/ First Aid training) and or equipment (portable X-Ray unit) that were not purchased or provided.

213.     The estimated $50,000 for the Cardio-Pulmonary Resuscitation/First Aid training was in response to a request sent to Onsite Occupational for such an estimate.  That estimated cost included training dolls, training material and certification cards.  It did not include any additional costs for personnel to conduct the training.

214.     The DynCorp International Fire Chief was asked if the fire department could conduct the training.   He stated that they could not.  The Health Safety and Environment section was then asked if they could conduct the training.  DynCorp International Health Safety and Environment Department estimated it would cost approximately $500,000 for the Health Safety and Environment Department to conduct the training.   The $350,000 was for two expats at $130,000 each, in processing, rest and recuperation, travel, and training material.  That estimate was approximately $300,000 more than the estimate that subcontractor Onsite Occupational had submitted.

215.     For the period of performance 1 August 2012 to 31 July 2013 funds were again requested through another Material Requisition for a portable X-Ray machine and Cardio-Pulmonary Resuscitation/First Aid training.

216.     A Material Requisition for approximately $686,000 was submitted and approved through DynCorp International channels to the Administrative Contracting Officer.  Of the $686,000 approximately $90,000 was for the X-Ray machine and $50,000 for the Cardio-Pulmonary Resuscitation/First Aid training.  The X-Ray machine was then purchased by the supplier, and the supplier submitted the invoice to DynCorp International for reimbursement

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 56**

after the current purchase order was revised to include the X-Ray unit and the Cardio-Pulmonary Resuscitation/First Aid training.

217.     The alleged justification for this $686,000 included approximately $130,000 for dental equipment.  Prior to final submission to the Administrative Contracting Officer, the reference to dental equipment was removed from the material requisition.

218.     However, the funds for the dental equipment were not removed.  These funds were subsequently used by DynCorp International to pay for other Onsite Occupational invoices.

219.     None of the funds were used for dental equipment since no equipment was ever ordered.  DynCorp International was aware at the time that of the request for approval for the funds that DynCorp International was not going to allow Onsite Occupational to hire a dentist.

220.     DynCorp International Project Management Office management personnel, as well as Accounting and Finance Project Management personnel were informed that funds were approved for the X-Ray machine and the Cardio-Pulmonary Resuscitation/First Aid training, but that the equipment and training were not provided.

221.     Both the DynCorp International Project Management Office and Accounting and Finance Project Management were aware, during the request for and approval of the $686,000 that part of it was for equipment and services that had been previously funded but never purchased.  DynCorp International was also aware that this meant that the company was asking for funding for a second time for the same equipment.

222.     The Administrative Contracting Officer approved funds for a purchase order to acquire X-Ray equipment and provide Cardio-Pulmonary Resuscitation/First Aid training.  The Administrative Contracting Officer approved funds were not spent on this equipment and

training.  Onsite Occupational wanted invoices paid from an entirely different subcontract.  That subcontract did not have sufficient funds to cover their invoices.  Onsite Occupational submitted an invoice to DynCorp International to be paid from the recently approved funds.

223.     DynCorp International personnel created a separate stand-alone purchase order and allocated the Administrative Contracting Officer approved X-Ray and Cardio-Pulmonary Resuscitation/First Aid training funds to this purchase order.  DynCorp International then paid the Onsite Occupational invoice.

224.     Funding for Cardio-Pulmonary Resuscitation/First Aid training was approved, and the funds were spent, but no training was provided.  The first Material Requisition for $440,000 included funds for the portable X-ray machine however, the X-ray machine was not purchased with these funds.  The funds were used to pay for other Onsite Occupational billed items.

225.     DynCorp International used the practice of duplicate Material Requisitions to increase contract amount and pay invoices to subcontractors as the Administrative Contracting Officer would not be able to track all such expenditures.

### DynCorp International and Onsite Occupational Billed the Government for Medical Services that Subcontractor Was Not Subcontracted to Perform

226.     The Onsite Occupational subcontract with DynCorp International did not include medics at "Band 5" sites (the smallest sites - "Band 1" sites were the largest).

227.     Onsite Occupational provided medics at some "Band 5" sites that had dining facilities as directed by the DynCorp International Project Manager for Afghanistan.  The salary for the Onsite Occupational.  "Band 5" sites was included in the invoices submitted monthly to DynCorp International from Onsite Occupational.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 58**

228.     The DynCorp International Project Management Office was aware that the "Band 5" sites were not included in the Onsite Occupational subcontract. Several requests were submitted over several months to revise the current subcontract to include the "Band 5" sites and to add additional funding to the current Purchase Order.

229.     On multiple occasions, over several years, the DynCorp International Subcontracts/Supplier Management Department in Afghanistan requested additional funds to cover the labor cost in the various contractual documents subcontract and or purchase order to cover the amounts submitted by Onsite Occupational for the salary of Onsite Occupational employees. Onsite Occupational included the cost of salaries for the Band 5 dining facility medics.

230.     In September 2011, a Material Requisition for additional funding for the Band 5 dining facility medics was fully executed. Then, at the directions of DynCorp International Project Manager, the material requisition was cancelled.

231.     The material requisition provided for approximately $200,000 annually per medic.

232.     No additional funding was added to the contractual documents to get government approval for the Band 5 dining facility medics nor was the subcontract revised to add the medics at Band 5 sites that have dining facility medics.

233.     A medic under these circumstances cost at least $100,000 per Band 5 dining facility annually and approximately five Band 5 medics were ultimately paid by DynCorp International through Onsite Occupational.

234.     However, that amount was not incorporated into the Onsite Occupational subcontract. The Onsite Occupational subcontract purchase order was not revised to include

medics at Band 5 sites with dining facility medics until March 2013.  The medics were located at Band 5 sites as early as October 2011.

235.       DynCorp International personnel knowingly directed the Onsite Occupational medics to perform services at locations they were not authorized to provide services. Subcontractor deployed medics to sites in which DynCorp International knew they were not authorized or funded to work.  Onsite Occupational submitted invoices to DynCorp International for medic services performed.  DynCorp International paid those invoices and submitted the invoice to the United States for payment.

236.       The submission for payment by the United States of the above described charges and invoices relate to Onsite Occupational were false claims made against the United States.

237.       This pattern repeated, and, in fact, the military requested as many as 12 Fire Medics but did not authorize additional funds for those services.  DynCorp International agreed to provide the Fire Medics at no cost to the United States and DynCorp International did, in fact, add costs and billed the United States for the fire medics.

238.       In the Onsite Occupational subcontract/purchase order there was no funded provisions for emergency medical services medics.  There was an expectation that this position would be added, and there was an annotation in the Onsite Occupational subcontract/purchase order that the requirement for emergency medical services medics was to be determined.

239.       The United States subsequently determined there was a need for emergency medical services medics at three locations in the DynCorp International Area of Responsibility. The three sites were Delaram II, Dwyer and Leatherneck.

240.       The Government issued a Letter of Technical Direction that authorized 12 emergency medical services medics (four at Delaram II, four at Dwyer and four at

Leatherneck).  However, no additional funding was authorized by the Letter of Technical

Direction.  The Letter of Technical Direction specifically stated that no additional funds were

required.

241.      DynCorp International Sourcing department personnel did not seek additional

funds for emergency medical services.  Beginning in or about September 2011, Onsite

Occupational provided four medics each at Delaram II, Dwyer and Leatherneck.

242.      DynCorp International Sourcing eventually requested additional funds for

unspecified costs from the Administrative Contracting Officer.  These unspecified funds were

approved and used to pay for the unapproved medics providing emergency medical services.

243.      The Delaram II emergency medical services ceased in or about June 2012, the

Dwyer emergency medical services ceased in November 2012 and the Leatherneck emergency

medical services ceased in or about April 2013.

244.      All of these charges involved invoicing the United States for services that had

not been authorized by the United States to be provided.  DynCorp International had paid for

such unauthorized services from funds approved by the United States for use for other purposes.

The invoices for unapproved services and using funds approved for other purposes constitute

false claims made against the United States.

245.      DynCorp International does not have the authority to decide on behalf of the

United States what charges and bills should be paid by the United States.  The submission for

payment of unauthorized charges and bills to the United States constitutes false claims.

### *DynCorp International and Onsite Occupational Billed the United States for the Performance of Medical/Physical Examination Services on a More Frequent Basis than was Established in MOD 11 of the CENTCOM Individual Protection and Individual Unit Deployment Policy*

246.     MOD 11 of the United States CENTCOM Individual Protection and

Individual/Unit Deployment Policy ("MOD 11") provides the directive to DynCorp

International concerning annual medical examination requirements for all personnel deployed to

Afghanistan.  The time frame found in MOD 11 is a 15-month window as follows:

> 15.C.2.C. GOVERNMENT CIVILIAN EMPLOYEES, VOLUNTEERS, AND
> DOD CONTRACTOR PERSONNEL, WHO DEPLOY FOR MULTIPLE
> TOURS, FOR MORE THAN 12 MONTHS TOTAL, MUST BE RE-
> EVALUATED FOR FITNESS TO DEPLOY.  PERIODIC HEALTH
> SURVEILLANCE REQUIREMENTS AND PRESCRIPTION NEEDS
> ASSESSMENTS SHOULD BE RECENT ENOUGH SO AS TO REMAIN
> CURRENT THROUGH THE DEPLOYMENT PERIOD. **AN EXAMINATION
> WITH ALL MEDICAL ISSUES AND REQUIREMENTS ADDRESSED
> WILL REMAIN VALID FOR 15 MONTHS FROM THE DATE OF THE
> PHYSICAL**.  **SEE TAB A AND REF D, J, K, L AND M FOR FURTHER
> GUIDANCE.**

Emphasis in original.  MOD 11 of the United States CENTCOM Individual Protection and

Individual/Unit Deployment Policy, 15.C.2.C [Emphasis in the original].

247.     DynCorp International project management in Afghanistan instituted a policy

that all personnel traveling through Dubai, on return from rest and recuperation or for other

reasons would be stopped in Dubai and have their annual physical conducted there if such

personnel's most recent physical examination was nine months or older.

248.     DynCorp International unilaterally changed the fifteen-month window stated in

MOD 11 on or about September 2012.   As a result DynCorp International stopped all personnel

in Dubai to obtain a physical when the individuals had a physical of nine months old.

249.     There were also reports of DynCorp International personnel being stopped in

Dubai prior to the ninth month of service even though DynCorp International management had

been advised of this illegal process in several meetings and through calls and emails informing

DynCorp International management departments of the illegality.  This practice continued until

at least February 2013.  The practice resulted in the United States being billed for and paying

for services and goods that were not authorized and excess fees and commisions to DynCorp

International.

250.      This arbitrary decision effectively moved the requirement of a physical exam to

once every nine months.  This change, in conjunction with the holding of DynCorp International

personnel over in Dubai who were returning from rest and recuperation or other travel,

generated hundreds of thousands of dollars in additional costs for more frequent examinations,

hotel accommodations, food and transportation.  The returning employees were on the clock

when they arrived in Dubai, so time spent there was billable to the Government.  The

submission for payment of these extra, unauthorized charges constitutes false claims.

251.      Several employees reported that they would not be permitted to have their annual

physical examination conducted in the United States by their own physicians and submit the

reports to DynCorp International when they passed back through Dubai in route to Afghanistan.

252.      If this were permitted, all of the costs for these examinations would have been

paid for by the employees' insurance on policies that the United States was already subsidizing.

The submission for payment of these extra, unauthorized charges constitutes false claims.

253.      DynCorp International personnel traveling back to Afghanistan through Dubai

were stopped and, despite having copies of physical completed in the United States, they were

required to remain in Dubai and go through another examination in Dubai.

254.      For the vast number of DynCorp International employees there was no need for a

physical to be conducted in Dubai.  Physicians were available on the bases in Afghanistan.  On

the bases the cost to conduct such an examination would be, if anything, less than in Dubai and

of course any additional costs for housing and food would not be incurred. The submission for payment of these extra, unauthorized charges constitutes false claims.

255.     When an employee was stopped in Dubai and had to spend more time in Dubai for a physical they could not work in Dubai, but would incur expenses with respect to hotels and meals.

256.     Physical examinations conducted in Dubai meant, at a minimum, an employee was not available to work for from four to seven days as their transport back to theater was interrupted.

257.     This is exactly what happened to Subhi who was held up in Dubai for a physical she could easily have obtained in Afghanistan. While in Dubai she was not able to work, but was paid for her time.

### *DynCorp International Subcontractor Onsite Occupational Administered Inoculations and Vaccines that were Expired and/or were Pediatric Doses. This Required the Re-Administration of these Inoculations and Vaccines to Workers Upon Their Arrival in Afghanistan*

258.     MOD 11 also requires that certain inoculations and vaccines be administered to civilians prior to their arrival in Afghanistan to work.

259.     These inoculations and vaccines are very expensive and include hepatitis and chicken pox. To facilitate the medical processing of foreign national workers, DynCorp International set up processing facilities in India and United Arab Emirates.

260.     Each worker carried their own medical records when they flew to Afghanistan. The medical records or copies of the medical records were given to subcontractor Onsite Occupational Health & Safety who reviewed the medical records of each new worker.

261.       Beginning as early as 2011, the DynCorp International and Onsite Occupational processing facilities in Dubai and India administered hundreds of inoculations and vaccines that were expired and or were for pediatric doses and therefore not the proper amount for adults.

262.       Upon the arrival of the workers in Afghanistan Onsite Occupational would collect and review each workers medical record for compliance with MOD 11 requirements.

263.       Onsite Occupational determined, from annotations in the medical records, that hundreds of workers were given pediatric-size doses of the required immunizations and that hundreds of workers were given immunizations that were expired.  Onsite Occupational correctly determined that these workers were not in compliance with MOD 11 requirements.

264.       The workers subsequently had to receive new immunizations in Afghanistan at a cost of many hundreds of thousands of dollars to the United States.  The submission of the first charges for immunizations constitutes false claims.

265.       When contacted by DynCorp International and Onsite Occupational representatives in Afghanistan, medical personnel in the India and Dubai processing centers justified the use of pediatric size doses by stating that the Indian workers were very small people.

266.       Additionally, they stated that the vaccines were still good even though the effective date listed on the vaccine had expired.

267.       Prior to the re-administration of the correct immunizations, there were outbreaks of both chicken pox and hepatitis at different camps in Afghanistan, at the cost, at the least, of many hundreds of thousands of dollars for the (a) quarantine of exposed workers, (b) sterilization of entire dining facilities, (c) burning of exposed food supplies, (d) burning of contaminated bedding, (e) burning of contaminated clothing, (f) medical treatment of those in

quarantine and (g) air transportation of workers out of Afghanistan once they were medically cleared to fly.

268.     There was no refund to the government as a result of the faulty immunizations initially provided to the workers.

269.      Subhi on numerous occasions addressed with DynCorp International management personnel the issues concerning Onsite Occupational Health & Safety and the facts that (a) Onsite Occupational Health & Safety was performing services and providing goods outside the Scope of Work for its contract with DynCorp International; (b) Onsite Occupational Health & Safety was invoicing for medics that were not included in the Scope of Work and for which DynCorp International had agreed with the United States would not be charged to the United States; (c) Onsite Occupational Health & Safety was improperly invoicing for the cost associated with the emergency medical services Medic and the Medics at Band 5 sites, (d) DynCorp International was providing physicals to subcontract workers where its LOGCAP contract required it to provide physicals for its personnel and on one occasion the Project Manager directed that all of a OFAC subcontractor personnel have their physical redone by Onsite Occupational Health & Safety because there was some questions concerning the validity of the physicals submitted to Onsite Occupational Health & Safety.

270.     DynCorp International made false claims to the United States for the described false and unapproved charges submitted by OnSite Occupational.  Rather than charging the United States, DynCorp International should have recouped the cost from Onsite Occupational.

271.     All conditions precedent to recovery by the United States and plaintiff-relators have occurred or been performed.

### *DynCorp International Intentional Acts of Retaliation with Termination of Hutchins on August 28, 2012*

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 66**

272.     DynCorp International, Inc., DynCorp International FZ LLC and DynCorp International, LLC were joint employers of Hutchins.  DynCorp International fired Hutchins for complaining about many of the fraudulent activities and investigating the allegations discussed herein.

273.     Upon direction from more senior management, Hutchins conducted an investigation of the circumstances of the seven 50 seat buses.  DynCorp's termination of Hutchins in August 2012, occurred just days after Hutchins transmitted evidence to DynCorp International project management and Camp Leatherneck site management that DynCorp International fraudulently invoiced the United States Government $100,000.00 over six months for seven "dead-lined/not mission capable" buses, and Hutchins commenced a limited follow-up audit of the waste management and water delivery vehicles referenced above.

274.     DynCorp International management knew of the fraudulent billings and sought to prevent Hutchins from obtaining further documentation of that fraud.

275.     DynCorp International HR Regional Manager Wrubbel informed Hutchins in August 2012 that she had acquired an internal "trouble-makers list" that contained Hutchins' name.

276.     Hutchins also questioned DynCorp International Project Controls department personnel at Camp Leatherneck regarding the invoicing of these costs to the Department of the Army (constituting double-billing).

277.     In June 2012, Hutchins was informed that his Employment Agreement would not be renewed despite a glowing evaluation from his supervisor at Camp Leatherneck.

278.     On 28 August 2012, Hutchins, after attempting to expand his government over billing, was terminated for an unspecified violation of DynCorp's Code of Conduct.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 67**

***DynCorp's Wrongful Termination of  Subhi on April 17, 2013***

279.        DynCorp International, Inc., DynCorp International FZ LLC and DynCorp International, LLC were joint employers of Subhi.  DynCorp International hired Subhi m May 2011 as a Supplier Management Manager.  She arrived at the DynCorp International project offices at Kandahar Air Field in June 2011.  Subhi worked under the general supervision of Hutchins until early October 2011 when Hutchins was transferred to Camp Leatherneck.

280.        Subhi was ultimately fired for complaining about many of the issues raised above including, but not limited to, the hiring of personnel who were clearly not qualified for the positions that DynCorp International hired them to fill and the issues related to medical care provided.

281.        Indeed, she directly confronted DynCorp International management specifically about this issue as related above.

282.        Subhi was promoted to Senior Supplier Management Manager in March 2012. She functioned as DynCorp's Lead Manager for Waste Management Services in 2012 and 2013. From December 2012 to January 2013, she also served as the acting director of Supplier Management.

283.        Subhi on numerous occasions addressed the issues concerning Onsite Occupational Health & Safety.

284.        In April 2013, Subhi was terminated under a pretext of an alleged ethics violation.  The ethics violation was that her son, Richard Howard, was working in the same department.  However, it is not unusual for family members to work together at DynCorp International.  In the same Supplier Management Department, Mario Galiouras was working

side-by-side with Debbie Coco, his aunt.  There are several dozen other examples of multiple

members of the same family working for DynCorp International in Afghanistan.

## COUNT ONE - VIOLATIONS OF THE FALSE CLAIMS ACT

285.     This is a claim for treble damages and civil penalties under the False Claims Act,

31 U.S.C. § 3729(a).

286.     As set forth above, DynCorp International and Onsite Occupational engaged in

numerous practices in violation of the False Claims Act including, but not limited to,

> **a.**     submitting false DD Form 250[3] for supplies and services to obtain unauthorized payment from the United States,

> **b.**     submitting false and fraudulent invoices to the United States for payment,

> **c.**     ordering, paying for and billing to the United States for vehicles, equipment and services they knew to be duplicative, because each vehicle's stated purpose was already fulfilled by existing subcontracts,

> **d.**     ordering, accepting and billing to the United States for vehicles which were not up to specifications required by the military,

> **e.**     paying and billing to the United States for vehicles which were not mission capable,

> **f.**     paying and billing to the United States for vehicles which were older than ordered,

> **g.**     falsifying Service Receiving Reports to obtain unauthorized payment from the United States,

> **h.**     paying and billing to the United States for vehicles that did not meet specifications,

> **i.**     requesting and obtaining funding from the United States for medical devices, which were not delivered,

> **j.**     charging the United States for unauthorized services,

---

[3]     DynCorp International may utilize the Wide Area WorkFlow Receiving Report because most contracts now require the WAWF RR.  The DynCorp International contract refers to the DD Form 250.  The distinction is unimportant to the allegations made against DynCorp International.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 69**

**k.**     billing the United States for subcontract services as purchase order items to obtain higher commissions than authorized for subcontract services,

**l.**     charging the United States for duplicative or unneeded medical procedures, drugs and material,

**m.**     charging the United States for personnel who were not qualified for the positions hired,

**n.**     charging the United States for services, which were not approved and failed to acquire equipment and provide training specifically approved by the administrative contracting officer and funded by the department of the army,

**o.**     charging the United States for medical services that subcontractor was not subcontracted to perform, and

**p.**     making numerous related fraudulent charges made to the United States.

**240.**    Onsite Occupational also knowingly engaged in activity outside the scope of its contracts and was paid for work, which was misrepresented to the United States.

**241.**    Each of the above actions involves funds provided through the LOGCAP contract and necessarily causes a submission of a false claim to the United States in violation of the False Claims Act 31 U.S.C § 3729(a)(1)(A-B, E and G).

**242.**     In addition any charges for award fees and commissions which were inflated as a result of the actions taken by DynCorp International to inflate their charges to the United States create false claims in violation of 31 U.S.C § 3729(a)(1)(A-B, E and G).

**243.**     In carrying out these wrongful acts, defendants engaged in a protracted course and pattern of fraudulent conduct, the submission of false documents supporting claims for payment from the United States and the submission and presentment of false claims for payment to the United States.

**244.**     In carrying out these wrongful acts, defendants participated in a conspiracy to make false claims for payment from the United States.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 70**

245.    As a result of defendants' continuing and ongoing fraudulent and or illegal conduct, the United States has paid directly or indirectly thousands of false claims.

246.    By reason of defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

247.    Damages to the United States are continuing and ongoing, and include, but are not limited to, the full amount it has paid on any such fraudulent claims and any related claims.

248.    Defendants are liable to the United States for three times the full amount of these damages.

249.    Defendants are liable for expenses, fees and costs, which include reasonable expenses the court finds to have been necessarily incurred, plus reasonable attorney's fees and costs.

250.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act, of five thousand five hundred to eleven thousand dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.  Each DD Form 250 and each invoice submitted to the United States was a false claim.

**COUNT TWO - VIOLATIONS OF 31 U.S.C. § 3730(H)**

251.    DynCorp International, Inc., DynCorp International FZ LLC and DynCorp International, LLC were joint employers of Hutchins and Subhi.

252.    As stated above, both Hutchins and Subhi protested to management when they discovered fraudulent activity.

253.    Hutchins and Subhi each specifically confronted management with issues involving fraudulent activity in the performance of the LOGCAP IV contract.

254.    As a result, Hutchins and Subhi each suffered retaliation including but not limited to being terminated by DynCorp International.

255.    Hutchins and Subhi each is entitled to recover from DynCorp International all relief necessary to make each of them because they were discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of their lawful acts done in furtherance of an action under False Claims Act, 31 USC § 3730 or other efforts to stop one or more violations of 31 U.S.C. Subchapter III.

256.    Hutchins and Subhi each is entitled under the False Claims Act, 31 USC § 3730(h) to reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**DAMAGES**

257.    Plaintiffs cannot provide a full estimate of damages suffered by the United States as a result of the described False Claims Act, but can provide estimates for described periods of time for certain categories of damages.  Based on information and belief, the described False Claims Act violations continued after Subhi and Hutchins were terminated.  Discovery will permit the computation of the full damages suffered by the United States for each category of False Claims Act violation.  The listed items provide a minimum of the damages suffered by the United States.

258.    Additionally, a count taken of supplies and services submitted to the United States in the DD Form 250 and in invoices will provide the number of false claims to which the civil penalties should be applied.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 72**

259.    For 23 purchase orders for the period of 1 November 2011 through 31 July 2012 (nine months) for unauthorized and excess vehicle and equipment leases, the United States paid $14,311,560.60.  The contracts were extended for the period of 1 August 2012 through 31 July 2013 (12 months), based on the known numbers for the preceding period, the charges for the extended contracts would exceed $19,000,000.

260.    For the period 1 April 2011 through 31 July 2017 the excess commission charges for the listed items exceeded $21,000,000.

261.    The excess charges on purchase orders for Dining Facility Services exceeds $2,300,000.

262.    The excess charges on purchase orders for Labor Services (carpenters, electricians, plumbers, mechanics, janitors, HVAC technicians, etc.) exceeds $4,700,000.

263.    The excess charges on purchase orders for Waste Management and Water Delivery Services (black water/sewage removal, grey water/shower & sink water removal, potable/drinkable water delivery, non-potable/non-drinkable water delivery, solid waste/trash removal, and portable toilet servicing) exceeds $1,800,000.

264.    The excess charges on Construction Services purchase orders exceeds $500,000.

265.    The excess charges on purchase orders for leased equipment (cranes, backhoes, forklifts, graders, dump trucks, etc.) and vehicles (SUVs, pick-up trucks, gators and buses) leased exceeds $33,000,000.  Not included in this estimate are mobilization and demobilization costs and taxes.

266.    The excess charges on purchase orders for Miscellaneous Service purchase orders exceeds $2,700,000.

267.    Not included in these damages estimates are damages related to not fully mission capable vehicles, lease of old vehicles, falsified service receiving reports, hiring and retention of unqualified and overpaid personnel, payment for unused medical services and equipment, improper and inadequate medical services, and expired or low does inoculations and vaccines.

268.    In addition to the monthly commissions of approximately 2% (subcontracts) and 3.5% (purchase orders) DynCorp International received periodic (every 3 months or every 6 months) performance-based award fee bonuses that were based upon the inflated amounts invoiced during the preceding period.  These performance-based award fees could range from an additional 3% to 7% (approximate).  This sum will be determined.

269.    Damages were suffered as a result of the above described illegal actions of DynCorp International and Onsite Occupational in the form of charges for supplies and services not provided, supplies and services not authorized, and supplies and services that were defective.  In addition, as such illegal actions caused the United States to pay for non-productive time expended by its employees, DynCorp's employees and subcontractors because such persons were unable to work for periods of time that, had the supplies and services been properly provided, the persons would have been able to perform their proper functions, and for unnecessary room and board, plaintiffs sue for such consequential damages suffered by the United States.

270.    Hutchins and Subhi estimate that actual damages sought in this lawsuit will be at least $90,000,000.

271.    In addition, Hutchins and Subhi seeks statutory damages for their retaliation losses.

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 74**

**CERTIFICATION**

272.     Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**PRAYER FOR RELIEF**

Plaintiff-Relators, on behalf of themselves, and the United States, request that judgment be entered in their favor and against Defendants as follows:

(a)     judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions,

(b)     plus a civil penalty of $21,916 per violation plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990, 31 U.S.C. § 3729;

(c)     Plaintiff-Relators be granted a trial by jury;

(d)     the United States be awarded pre-judgment and post judgment interest;

(e)     Plaintiff-Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

(f)     Plaintiff-Relators each be awarded retaliation damages pursuant to 31 U.S.C. § 3730(h) including, but not limited to, reinstatement with the same seniority status they each previously enjoyed, two times the back pay, interest on back pay and

compensation for special damages as well as litigation costs and reasonable attorneys

fees as well as relators' fees of 30%.

(g)     The United States and Plaintiff-Relators recover such other relief as the

Court deems just and proper.

Respectfully submitted,


s/ J. Michael Weston
_____
J. Michael Weston (*pro hac vice* application pending)
Texas Bar No. 21232100
Bennett, Weston, LaJone & Turner, P.C.
1603 LBJ Freeway, Suite 280
Dallas, Texas 75234
(214) 691-1776
FAX (214) 373-6810
Jmweston@bennettweston.com


s/ Edward A. McConwell
_____
Edward A. McConwell
Kansas Bar No. 6454
District Court Bar No. 324236
DC Fed Court No. KS0001

s/ Laura L. McConwell
_____
Laura L. McConwell (*pro hac vice* application pending)
Kansas Bar No. 14166

McConwell Law Offices
5201 Johnson Drive, Suite 300
Mission, Kansas 66202
(913) 262-0605
FAX (913) 262-0652
ed@mcconwell.com

**FIRST AMENDED COMPLAINT AND JURY DEMAND – Page 76**