## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA      )
*ex rel.* CHARLES HUTCHINS AND     )
JOYCE SUBHI,          )
                       )
       **Plaintiff-Relators,**     )
                       )
         **v.**             )       **Civil Action No. 15-355 (RMC)**
                       )
DYNCORP INTERNATIONAL,      )
INC., *et al.*,             )
                       )
       **Defendants.**       )
_____ )

## OPINION

Charles Hutchins and Joyce Subhi sue their former employer DynCorp International, Inc., and related entities under the False Claims Act, alleging that DynCorp falsified invoices; billed at unreasonable rates; charged the federal government for services not performed; provided sub-par goods and services, or failed to provide them at all; hired unqualified individuals; and otherwise submitted unwarranted claims for payment for providing logistical and operational support to the United States Army. Plaintiffs also allege retaliation. After the United States declined to intervene, DynCorp moved to dismiss for failure to state a claim and a lack of sufficient particularity in alleging fraud. Having reviewed the record carefully, the Court finds that only one of Plaintiffs' many alleged claims states a plausible violation of the False Claims Act. Plaintiffs' other claims allege possible contract breaches but not fraud. Finally, because Plaintiffs did not engage in protected activities prior to their separations from DynCorp, there is no evidence of retaliation. The motion to dismiss will be granted in part and denied in part.

# I.  BACKGROUND

The United States Army administers the Logistics Civil Augmentation Program (LOGCAP) through which it contracts with private-sector companies to provide "contingency support to augment the Army force structure" in various military operations, including active combat in Afghanistan and Iraq.  Am. Compl. [Dkt. 24] ¶ 26.  Defendant DynCorp International Inc. is a global government services provider, which provides base operations, supply chain management, and infrastructure support.  Defendant DynCorp International LLC is a wholly-owned subsidiary of DynCorp International Inc. and provides operational support to U.S. forces in combat, peacekeeping, humanitarian, and training missions around the world, including Afghanistan.  Referred to herein as "DynCorp," the DynCorp International companies were awarded an Army contract in April 2008, known as LOGCAP IV, to "provide[] logistic and other support services via a mission focused task order for a designated geographical or operational area region," including providing goods and services to camps and forward operating bases in Afghanistan.  *Id.* ¶¶ 29, 32, 34.  This contractual relationship between DynCorp and the U.S. Army was governed by the Federal Acquisition Regulation (FAR), 48 C.F.R. 1.000 *et seq.*, and the Defense Federal Acquisition Regulation Supplement (DFARS), 48 C.F.R. 201 *et seq*.  *Id.* ¶ 30.

Plaintiffs Charles T. Hutchins and Joyce Subhi are former employees of DynCorp.  Mr. Hutchins was hired by DynCorp in September 2010 as a senior manager of subcontracts ("subcontracts senior manager") at Kandahar Air Field and Camp Leatherneck in Afghanistan.  *Id.* ¶ 13.  Ms. Subhi was hired in May 2011 as a subcontracts senior manager primarily in Afghanistan.  *Id.* ¶ 16.  A subcontracts senior manager is responsible for "managing complex procurement and administrative activities for major government subcontracts consistent with customer requirements, government regulations, and company policies and procedures,"

which includes ensuring "that DynCorp International complies with contract requirements so that DynCorp International can represent to the United States that it is in compliance with the United States' regulatory and contractual requirements." *Id.* ¶¶ 13, 16. Mr. Hutchins and Ms. Subhi were terminated from employment with DynCorp in 2012 and 2013, respectively. *Id.* ¶¶ 177, 280.

Plaintiffs argue that they have personal knowledge of the alleged facts, unless otherwise noted in the Amended Complaint. Pls.' Mem. in Opp'n (Opp'n) [Dkt. 42] at 3. They also assert that they "are experts in the areas about which they complain and worked," and, finally, that each of them is an attorney with "training in how to construe statutory language, regulations and contractual provisions."[1] *Id.*

### A. The Terms of DynCorp's LOGCAP IV Contract

The LOGCAP IV contract between DynCorp and the U.S. Army specified that DynCorp would provide services and equipment to support the Army's operations in Afghanistan. In this lawsuit, Mr. Hutchins and Ms. Subhi allege that DynCorp failed to provide the services required under the contract, failed to furnish equipment that met the standards required by the contract, and otherwise fell short of contractual requirements, but, nonetheless, submitted claims for, and received, the corresponding contractual payments from the Army.

---

[1] Mr. Hutchins states that he is a Seton Hall Law School graduate and was admitted to practice in New Jersey in 1998. Am. Compl. ¶ 13. The Court notes two additional facts: (1) As of the date of this opinion, Mr. Hutchins' license to practice in New Jersey remains administratively revoked for non-payment of bar dues; and (2) Mr. Hutchins was publicly reprimanded for threatening to present criminal charges to gain an improper advantage in a civil proceeding. *See In re Hutchins*, 831 A.2d 552 (N.J. Sup. Ct. 2003).

## 1. *Waste Management*

Plaintiffs contend that DynCorp improperly billed the Army for waste management and related services that were not approved, were duplicative, or were otherwise improper. DynCorp has provided waste management services at over 20 bases in Afghanistan since August 2009 under the LOGCAP IV contract. *Id.* ¶¶ 54, 64. This work was initially subcontracted to various non-DynCorp contractors that supplied their own vehicles, equipment, and personnel; each subcontractor billed DynCorp monthly and, after paying the subcontractors, DynCorp sought reimbursement from the Army. *Id.* ¶¶ 64-65.

DynCorp began taking steps to perform these waste management services itself, instead of using subcontractors, in September 2011. *Id.* ¶ 60. About that time, it leased and shipped waste management equipment and vehicles to Kandahar Air Field. *Id.* The Amended Complaint alleges that DynCorp employees discussed its intention to self-perform waste management services in that month and that DynCorp "hoped to make more money by self-performing these services." *Id.* ¶ 67. The Amended Complaint additionally alleges that Ms. Subhi attended a cost-analysis meeting sometime in late 2011 and that one analysis indicated an additional cost to the Army of $1,200,000/year for DynCorp waste management services at one base and an additional $1,000,000/year for similar DynCorp services at another base. *Id.* ¶¶ 68-72. Plaintiffs allege that DynCorp intended to perform waste management services for at least 27 bases in Afghanistan. *Id.* ¶ 74.

In order to perform such services itself, DynCorp allegedly executed leases for hundreds of waste management and water delivery vehicles, "worth millions of dollars," and had them shipped to Kandahar Air Field before DynCorp notified the Army of its intention to self-perform, and without requesting prior approval from the Army's Administrative Contracting

Officer (ACO).[2]  *See id.* ¶¶ 76-77.  Plaintiffs identify multiple purchase orders that allegedly

pertain to these activities but identify relevant leased goods on only two of them:  purchase order

LG40032418 for $1,385,226 and approved on November 2, 2011, to lease numerous vehicles,

including some at Spin Boldak, a base in Afghanistan; and purchase order LG40030861 for

$101,400, to lease one trash truck.  *Id.* ¶¶ 83-86.

DynCorp notes that Plaintiffs allege that the waste management vehicles and

equipment were flown on C-130 military aircraft to U.S. military bases in Afghanistan from

subcontractors in South Carolina and Dubai.  *Id.* ¶¶ 82, 105.  It asserts that such transport would

have been well-known to the Army, because it would require military coordination and

authorization.  DynCorp Mem. at 12.  Plaintiffs allege that DynCorp failed to get prior approval

from the "Administrative Contracting Officer *in Houston, Texas*."  *Id.* ¶ 60 (emphasis added);

*see also id.* ¶ 76.  DynCorp argues that Plaintiffs do not, and cannot, allege that there was no

government approval, from either the Administrative Contracting Officer in Afghanistan or

another official.[3]

---

[2] Plaintiffs refer interchangeably to a generic Administrative Contracting Officer and an
Administrative Contracting Officer in Houston, Texas.  *See, e.g.*, Am. Compl. ¶¶ 128-29.
DynCorp notes that the Army also had an Administrative Contracting Officer in Afghanistan but
that Plaintiffs fail to identify to which Administrative Contracting Officer they refer throughout
the Amended Complaint.  Mem. of Law in Supp. of Defs.' Mot. to Dismiss (DynCorp Mem.)
[Dkt. 38-1] at 4.

[3] Plaintiffs allege that subcontracts valued at "$25,000 had to be reviewed and approved by the
Administrative Contracting Officer in Houston, Texas."  Am. Compl. ¶ 128.  While a complaint
is normally granted the presumption of factual accuracy on a motion to dismiss, *see Sissel v.
Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014), in this instance the Court
observes that the governing provision in the LOGCAP IV contract regarding subcontracts states
that DynCorp must obtain the written consent of the Administrative Contracting Officer before
placing "any subcontract over $550,000."  *See* Ex. A., DynCorp Mem., LOGCAP IV Contract
[Dkt. 38-1] at 52.  This provision does not distinguish between the Administrative Contracting
Officers in Houston and Afghanistan.  *Id.*  Because the LOGCAP IV contract is referenced in the
Amended Complaint, the Court may consider its terms without changing Defendants' motion
into a motion for summary judgment.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059

According to the Amended Complaint, Mr. Hutchins learned from an unidentified member of the Projects Control Department at Camp Leatherneck in March 2012 that DynCorp was using a generic equipment billing code for the leased waste management vehicles. *Id.* ¶¶ 108-09. At the same time, DynCorp was allegedly billing the Army—using specific "Waste Management and Water Delivery services billing codes"—for the same services performed by subcontractors. *Id.* ¶ 113. Ms. Subhi later learned of this alleged double billing in early 2013. *Id.* ¶ 110.

According to the Amended Complaint, when DynCorp Project Management at Kandahar Air Field learned that an Administrative Contracting Officer was asking about the additional vehicles in the Spring of 2012, DynCorp attempted to conceal the fact that the vehicles were not being used "by directing workers to drive the vehicles around the bases to add miles to the odometers to make it look like the vehicles were being used." *Id.* ¶ 94. Allegedly, DynCorp management was aware of these efforts, as they were discussed in several conference calls in April or May of 2012. *Id.* ¶ 97. Plaintiffs also allege, however, that DynCorp was asked by the Administrative Contracting Officer about "all these vehicles sitting idle at all the bases and camps" and DynCorp responded that they were brought to Afghanistan so that DynCorp itself could perform waste management and water delivery services. *See Id.* ¶ 93.

The Amended Complaint recounts two instances of subcontractor workers driving the vehicles leased for self-performance by DynCorp in April or May 2012. *Id.* ¶¶ 98-100. It alleges that the subcontractor should have, but did not, reimburse DynCorp for use of the DynCorp-leased vehicles and that, ultimately, the Army paid twice for the necessary vehicles,

_____

(D.C. Cir. 2007). Where allegations are contradicted by authentic writings incorporated into a complaint, the writings are credited. *See Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010).

because it reimbursed DynCorp for leased vehicles and for subcontractor services that should have included payment for necessary vehicles. *Id.* ¶¶ 101-02. Plaintiffs allege that permitting subcontractors to drive the DynCorp-leased vehicles served to conceal the fact that the DynCorp vehicles were a duplicative and unwarranted cost. *Id.* ¶ 99.

In or about August 2013, DynCorp billed the Army for costs associated with returning the vehicles, which included import and export taxes that were passed on to the United States, even though the Army had denied DynCorp's request to self-perform in May 2012. *Id.* ¶¶ 73, 105-06. Plaintiffs allege that DynCorp had no authority to invoice the Army for these duplicative vehicles and equipment. *Id.* ¶ 96.

The Amended Complaint further alleges that these additional vehicles and equipment cost the Army "more than $20,000,000 in addition to the cost of utilizing existing DynCorp's subcontractors to perform the same work." *Id.* ¶ 59. Plaintiffs also allege that DynCorp billed the Army an extra $38,000,000 for DynCorp to maintain a "duplicative fleet." *Id.* ¶ 104. "For 23 waste management and water delivery purchase orders for the period of November 2011 through 31 July 2012," Plaintiffs allege the Army paid DynCorp $14,311,560.60. *Id.* ¶ 116. When those contracts were extended through July 31, 2013, the charges exceed $19,000,000. *Id.* Plaintiffs conclude that "the false claims submitted by DynCorp International to the United States for unauthorized duplicate waste management and water delivery vehicles exceeded $33,393,541.40." *Id.*

### 2. *Vehicles and Equipment*

#### a. Bus Leases

By way of a Work Performance Statement issued for August 1, 2011, to July 31, 2012, the Army directed DynCorp to lease seven 50-seat passenger buses for transporting military personnel at Camp Leatherneck. *Id.* ¶ 153. DynCorp leased the seven 50-seat passenger

buses from Nasseb Trading Company on September 20, 2011, and they arrived at Camp
Leatherneck beginning in October 2011. *Id.* ¶¶ 154-56. However, the buses lacked fire
extinguishers and had to be reconfigured to "accommodate the size and weight" of military
personnel and their equipment, leaving them with 43 seats. *Id.* ¶ 158. Mr. Hutchins sent
photographs of the first reconfigured bus to Mario Galiouras, Subcontracts Senior Manager, who
ordered the remaining buses reconfigured in the same fashion. *Id.* Mr. Hutchins also informed
Mr. Galiouras sometime after March 14, 2012 that "the purchase order lease price needed to be
adjusted downwards to reflect the reduced capacity of the seven buses," but such an adjustment
was never made. *Id.* ¶ 159.

Instead, Plaintiffs allege, DynCorp billed the Army as if the buses had 50 useable
seats and had arrived with fire extinguishers. *Id.* ¶ 160. Dejan Lorvic, Fleet Management
Maintenance Supervisor at Kandahar Air Field, and Keith Browning, Deputy Regional Manager
at Camp Leatherneck, allegedly signed Service Received Reports, which reported the buses as
mission capable, without first-hand knowledge of the buses' operating status. *Id.* ¶¶ 164-65. In
2012, DynCorp Project Management directed Mr. Hutchins to "investigat[e] the circumstances
of the seven 50 seat buses." *Id.* ¶¶ 167, 171. Mr. Hutchins then sent a memorandum[4] to Jim
DeLong, DynCorp LOGCAP IV Project Manager; Mo Young, Deputy Project Manager; J.D.
McCoy, Hub Leatherneck Regional Manager; and Sam Clear, Leatherneck Site Manager, on
August 18, 2012, that "detailed the improprieties related to the DynCorp International
LG40029880 related to the seven 50 seat buses." *Id.*

---

[4] The Amended Complaint describes a memorandum *dated* August 12, 2018, Am. Compl. ¶ 167,
and another memorandum *transmitted* August 18, 2018. *Id.* ¶ 173. Because the subject matter
and receiving personnel are the same, *see id.* ¶ 171, it would appear that, despite the different
dates, there is only one memorandum.

On August 23 and 26, 2012, Mr. Hutchins asked DynCorp for additional information and documents regarding other purchase orders for leased vehicles and equipment. *Id.* ¶ 174. He was terminated before he received that information. *Id.*

### b. Vehicles and Equipment That Were Not Mission Capable

As required, DynCorp created records for each piece of equipment or vehicle, including Service Received Reports, maintenance records, and the maintenance manager's certification of mission capable status. *Id.* ¶¶ 125-29. Defects that could cause a piece of equipment to be downgraded to "Not Mission Capable" include "a cracked windshield, transmission problems, flat tire, missing side mirror, worn out brakes, non-functional seat belts, burned out head-lights, malfunctioning turn signals, or inoperable stop lights." *Id.* ¶ 120. Plaintiffs allege that "[b]eginning in 2011" and continuing, DynCorp billed the Army for leased material handling equipment, construction equipment, SUVs, pick-up trucks, buses, and other equipment and vehicles that were not mission capable for at least a portion of the preceding month. *Id.* ¶¶ 119, 125. These records were relied upon by the Administrative Contracting Officer to approve or deny DynCorp leases of specific vehicles. *Id.* ¶ 129. Plaintiffs allege that DynCorp representations on "purchase orders and other contract documents" were "false and were relied upon by the United States in the Administrative Contracting Officer's approval determination and in the United States [sic] decision to pay invoices." *Id.* Specifically, Plaintiffs allege that DynCorp managers failed to review maintenance records to determine if vehicles or pieces of equipment were actually mission capable, and did not complete the required Service Received Report, so that the DynCorp accounting department did not reduce contractors' invoices for vehicles or equipment that were Not Mission Capable during all or part of the prior month. *Id.* ¶ 136.

This scheme is alleged to have begun as early as 2011 at more than 20 camps and forward operating bases throughout the south and southwestern portions of Afghanistan and to have involved Mr. Galiouras, Oldirch Valceus,[5] and Dejan Lovric, Fleet Management Maintenance Supervisor. *Id.* ¶¶ 121, 125. Through this alleged subterfuge, Plaintiffs contend that DynCorp billed the Army for "leased SUVs, pick-up trucks, flatbed trucks, buses, construction equipment, material handling equipment and other leased vehicles as fully mission capable that were not fully mission capable" because they were "not up to specification, violated safety codes, and falsified Service Received Reports were created to justify billing the equipment and vehicles as fully mission capable." *Id.* ¶ 119.

DynCorp responds that Plaintiffs provide no specific references during their unstated time period as to what vehicles or equipment were not mission ready or "exactly what that means in a war zone, where equipment is highly likely to be expected to suffer some damage without being rendered unsatisfactory." DynCorp Mem. at 20.

c. Older Vehicles

In order to obtain approval of vehicle leases by the Administrative Contracting Officer, DynCorp provided a "package of documents" with details about the specific vehicles and equipment to be leased, including their age. *Id.* ¶ 142-43. In a conference call in February or March 2012 on which Mr. Hutchins participated, unnamed personnel were "questioned about acceptance of vehicles and material-handling equipment that did not meet the specifications listed on the purchase orders." *Id.* ¶ 145. Mr. Galiouras is alleged to have responded that he knew that some vehicles were older than shown on the purchase order but that "the year indicated on the purchase order was actually more of a general guideline rather than a hard and

---

[5] No title was provided for Mr. Valceus.

fast requirement." *Id.* ¶ 147. Plaintiffs broadly allege that there were at least 67 vehicles that were manufactured in a different year from the year that was detailed on the purchase order; they specifically identify ten such purchase orders for a total value of $1,785,822.75. *Id.* ¶ 152. Plaintiffs specify two discrepancies among the ten: Purchase Order LG4007361 for a 2011 Toyota Hilux that was leased for $1,773.27 per month in July 2011 but was actually a 2007 model; and a 2005 forklift leased from November 29, 2011 to April 28, 2012 that was actually a 2001 model. *Id.* ¶¶ 149-50.

### 3. *Medical*

#### a. Physicals and Vaccines

An Order of the Central Command—the CENTCOM Individual Protection and Individual/Unit Deployment Policy ("MOD 11")—required that "[g]overnment civilian employees, volunteers, and DoD contractor personnel . . . must be reevaluated for fitness to deploy. . . . An examination with all medical issues and requirements addressed will remain valid for 15 months from the date of the physical." *Id.* ¶ 246 (capitalization and emphasis omitted). Beginning in September 2012 and continuing through February 2013, DynCorp stopped all personnel traveling through Dubai for an annual physical if their most recent physical examination was 9 months or older. *Id.* ¶¶ 247-49. Plaintiffs allege that DynCorp management was aware that this was contrary to the 15-month window specified in MOD 11, as it was discussed in meetings, phone calls, and emails. *Id.* ¶ 248. DynCorp billed the Army for these physical examinations, for the billable time employees spent being examined, and for any hotels and meals they required. *Id.* ¶¶ 249-50, 255-56. Ms. Subhi was "held up" in Dubai for a physical and was paid for that time even though she was unable to work. *Id.* ¶ 257. Plaintiffs allege that these physicals could have been conducted, at lower cost, by physicians on base in Afghanistan. *Id.* ¶ 254.

DynCorp responds that it needed to ensure that every employee in theatre had had a physical examination within the past 15 months and that, to comply, it required those employees who traveled through Dubai and whose last physical examination was nine months or more before that trip, to undergo a physical examination. DynCorp argues that its practical policy applied only to those persons entering Afghanistan from Dubai, not all employees, and that Plaintiffs do not allege any misrepresentation by DynCorp to the government. DynCorp Mem. at 37.

MOD 11 also requires that certain inoculations and vaccines be administered, including vaccines for hepatitis and chicken pox. Am. Compl. ¶¶ 258-59. DynCorp provides these services at processing facilities in India and Dubai. *Id.* ¶ 259. Plaintiffs allege that beginning "as early as 2011," these processing facilities administered "hundreds of inoculations and vaccines that were expired or were for pediatric doses," and, therefore, not in compliance with MOD 11. *Id.* ¶¶ 261-63. Local medical personnel allegedly justified pediatric doses "by stating that the Indian workers were very small people" and that the expired vaccines were "still good." *Id.* ¶¶ 265-66. These employees were subsequently re-vaccinated, which Plaintiffs assert cost "many hundreds of thousands of dollars to the United States." *Id.* ¶ 264. Plaintiffs do not allege that the Army was misled by this situation but, rather, that it should have received a refund. *Id.* ¶ 268.

b. Equipment and Training

When it needed funds for medical services and equipment, DynCorp requested monies from the Army by way of a material requisition form. *Id.* ¶ 207*.[6] From August 1,

---

[6] In their Amended Complaint, Plaintiffs have labeled two consecutive paragraphs 207. They also have two consecutive paragraphs labeled ¶ 6, 128, and 195. Any references to the second, mislabeled paragraph will include an asterisk (*e.g.*, ¶ 207*).

2011, to July 31, 2012, DynCorp requested $100,000 in funds for a portable X-ray unit and $50,000 for Cardio-Pulmonary Resuscitation/First-Aid training.  *Id.* ¶ 208.  The additional funds were not added to a subcontract, but instead to standalone purchase orders, allowing DynCorp to use the funds to pay other outstanding invoices.  *Id.* ¶ 211.  Plaintiffs allege that the requested training and equipment were never purchased.  *Id.* ¶ 213.

DynCorp again requested funds between August 1, 2012, and July 31, 2013, for Cardio-Pulmonary Resuscitation/First Aid training and a portable X-ray machine, totaling $140,000.  *Id.* ¶¶ 215-16.  An X-ray machine was purchased with these funds.  *Id.* ¶ 216.  These line items were included in a $686,000 Material Requisition, $130,000 of which was for dental equipment.  *Id.* ¶ 217.  Plaintiffs allege the dental equipment was removed from the material requisition form, but the $130,000 was not subtracted and was used to pay other invoices.  *Id.* ¶¶ 217-19.  Plaintiffs also allege that Project Management was aware that both requests for funds had been approved, but that no equipment was provided.  *Id.* ¶¶ 220-21.  Plaintiffs contend DynCorp "used the practice of duplicate Material Requisitions to increase contract amounts and pay invoices to subcontractors as the Administrative Contracting Officer would not be able to track all such expenditures."  *Id.* ¶ 225.  In addition, the Amended Complaint alleges that DynCorp created a separate purchase order for the X-ray and Cardio-Pulmonary Resuscitation/First Aid Training, which was approved by the Administrative Contracting Officer and used to pay a DynCorp subcontractor, Onsite Occupational Health and Safety.  *Id.* ¶ 223.

DynCorp rejects these allegations, pointing out that the central purpose of LOGCAP is to "reduce the contracting activity burden, especially in large scale operations with multiple and often related service requirements."  *Id.* ¶ 28; *see* DynCorp Mem. at 18.  It argues that this contract purpose, "combined with Hutchins' admission that the Army has reviewed and

rejected these claims, negate any reasonable inference of scienter or materiality." DynCorp Mem. at 18 n.14.

### c. Billing for Unauthorized Services

DynCorp contracted with Onsite Occupational Health and Safety to provide medical services to bases and camps throughout Afghanistan, but that subcontract did not include medics at the smallest sites, denoted "Band 5" sites. Am. Compl. ¶¶ 226-27. However, the Amended Complaint alleges that DynCorp's Project Manager for Afghanistan directed Onsite Occupational to provide medics at those Band 5 sites that had dining facilities. *Id.* Salaries for such personnel were included in monthly invoices submitted to, and paid by, DynCorp. *Id.* On several occasions, DynCorp attempted to "add additional funding to the current Purchase Order" for these services but was unsuccessful. *Id.* ¶ 228. Plaintiffs allege that Fire Medics were sent to some of the Band 5 sites as early as 2011 but "the Onsite Occupational subcontract purchase order was not revised to include medics at Band 5 sites with dining facilities until March 2013." *Id.* ¶ 234. Therefore, the Amended Complaint alleges, Onsite Occupational "deployed medics to sites in [sic] which DynCorp International knew they were not authorized or funded to work." *Id.* ¶ 235. "DynCorp . . . paid those invoices and submitted the invoice to the United States for payment." *Id.*

According to the Amended Complaint, "the military requested as many as 12 Fire Medics but did not authorize additional funds for those services." *Id.* ¶ 237. DynCorp agreed to provide the 12 Fire Medics at no cost to the Army but it allegedly "did, in fact, add costs and billed the United States." *Id.* Furthermore, Onsite Occupational provided emergency medical services at additional multiple camps, from September 2011 through April 2013, but DynCorp is alleged to have never requested additional funding and merely invoiced the Army without authorization. *Id.* ¶¶ 239-44.

The Amended Complaint alleges that "[a]ll of these charges involved invoicing the United States for services that had not been authorized . . . . DynCorp International had paid for such unauthorized services from funds approved by the United States for other purposes." *Id.* ¶ 244. It also alleges that "DynCorp International Sourcing eventually requested additional funds for unspecified costs . . . [and they] were approved and used to pay for the unapproved medics providing emergency medical services." *Id.* ¶ 242.

### 4. *Commission Rates*

According to Plaintiffs, DynCorp Vice President of Sourcing, Krista Robinson, changed DynCorp processes as of April 1, 2011, so that DynCorp began submitting purchase orders for payment in lieu of payments under service subcontracts because the former returned higher commissions to DynCorp. *Id.* ¶ 185. The change was not submitted for approval to the Administrative Contracting Officer. *Id.* ¶¶ 180, 186. Mr. Hutchins, who was "acting Procurement and Subcontracts Director . . . at Kandahar Air Field" at the time, alleges that he was repeatedly told by Vice President Robinson that the LOGCAP IV contract had not been changed and that the Administrative Contracting Officer had been informed of the change in practice. *Id.* ¶¶ 193, 191. Mr. Hutchins objected, telling Ms. Robinson that the Administrative Contracting Officer did not have the authority to change the terms of the contract. *Id.* ¶ 192. Plaintiffs allege that DynCorp made "tens of millions of dollars more since it received the extra one and a half percent commission on multiple contracts." *Id.* ¶ 189. Specifically, "excess commission charges . . . exceeded $21,000,000" for (a) dining and facility contracts, (b) labor services, (c) construction services, (d) miscellaneous, (e) waste management services, and (f) vehicles and construction leases. *Id.* ¶ 195.

DynCorp responds that Plaintiffs "acknowledge that the alleged change in commissions invoicing was brought to the attention of the Administrative Contracting Officer by

a [DynCorp] employee (thereby defeating scienter) and that the bills were paid by the government (thereby defeating materiality)." DynCorp Mem. at 17.

### 5. Personnel

Mr. Hutchins alleges that he was told by Linda Wrubbel, Regional Human Resources Manager in Afghanistan, that a February 2012 report showed that more than 80% of the Subcontracts Department "did not meet the job qualification requirements of education and experience and were not qualified for the positions for which they were hired." Am. Compl. ¶¶ 195*-97. Ms. Wrubbel had interviewed the Supplier Management[7] Director in Afghanistan, Dan Scott (who resigned in 2012), for her report and was told that "his hiring requirements were that the person have a pulse, be able to string together a sentence in English and be enthusiastic." *Id.* ¶¶ 199-200.

Ms. Subhi complained to Human Resources about Supplier Management officer personnel, specifically regarding Mr. Scott's conduct. Ms. Wrubbel later told her that "90% of the employees were not qualified, but [she] felt they could not get rid of everyone." *Id.* ¶ 202. Plaintiffs also allege further deficiencies in personnel, including various persons hired from the Philippines, India, Bosnia, Nepal, and Kenya, who did not fulfill the hiring criteria and many of whom could not speak English. *Id.* ¶¶ 205-07. Plaintiffs allege that "At Forward Operating Base Dwyer, more than 100 individuals were working in this manner in 2012." *Id.* ¶ 207. Plaintiffs do not identify which employees were unqualified, nor which provisions of the LOGCAP IV contract specified these employee qualifications.

DynCorp notes that Plaintiffs provide no specifics and that they do not "address whether the government understood or consented to any allegedly unqualified hires as a

---

[7] Supplier Management is also known as the Subcontracts Department. Am. Compl. ¶ 196.

necessary and practical result of the contemporaneous surge of personnel in the Afghanistan war zone." DynCorp Mem. at 17.

**B. Termination**

Mr. Hutchins was terminated on August 28, 2012, for an "unspecified violation of DynCorp's Code of Conduct." Am. Compl. ¶ 177. He was terminated shortly after he followed the directions of "more senior management" and submitted the memorandum discussed above, which detailed problems with the leases of the seven buses that had no fire extinguishers and, after re-configuration for combat soldiers and equipment, insufficient seats. *Id.* ¶¶ 159, 167, 173. That memorandum included a discussion of $100,000 in monthly lease payments that were billed to the Army before the buses were mission capable. *Id.* ¶ 171. About a week later, Mr. Hutchins requested documents regarding "select subcontract line items from other heavy equipment and leased vehicle purchase orders," which he did not receive. *Id.* ¶ 174. On August 28, 2012, the day he was terminated, Mr. Hutchins alleges that Ms. Wrubbel informed him that his name was on a "trouble-maker list" and that DynCorp personnel were directed by email not to respond to his request for information. *Id.* ¶ 175.

Ms. Subhi was terminated in April 2013 and was told that it was because her son worked in the same department as she did, an alleged ethics violation. *Id.* ¶ 284. She contends that this reason was a pretext to hide retaliation, since other relatives worked in the same departments, and that the real reason for her termination was her complaints related to "the hiring of personnel who were clearly not qualified for positions that DynCorp International hired them to fill and the issues related to medical care provided." *Id.* ¶¶ 280, 284. Ms. Subhi had filed complaints with Human Resources about the Supplier Management staff, including Mr. Scott, who was "allowed to resign" in February 2012 after hiring unqualified personnel. *Id.* ¶¶ 200-01. Ms. Subhi alleges that she also complained about subcontractor Onsite Occupational Health and

Safety for performing work beyond its contract, invoicing DynCorp for medics without authorization, and providing unnecessary and duplicative physicals to personnel. *Id.* ¶ 269.

DynCorp responds that Plaintiffs were merely performing their jobs as Senior Subcontracts Managers, took no actions beyond those duties, and gave it no warning that either one thought it had engaged in activities protected by the False Claims Act. Without such notice, DynCorp argues it could not have "retaliated." For merely doing their jobs, DynCorp states that Plaintiffs are not entitled to claim statutory violations. DynCorp Mem. at 38.

### C. Procedural Background

Plaintiffs filed their initial Complaint on March 12, 2015. Compl. [Dkt. 1]. The United States declined to intervene on May 15, 2017. United States' Notice of Election to Decline Intervention [Dkt. 10]. After multiple extensions of time to complete service, the Court ordered Plaintiffs to complete service on all defendants no later than November 30, 2017. 8/23/2017 Order [Dkt. 21]. Plaintiffs then filed the Amended Complaint on November 7, 2017.[8] Am. Compl. [Dkt. 24]. DynCorp moved to dismiss on January 15, 2018. DynCorp Defs.' Mot. to Dismiss (Mot.) [Dkt. 38]. Plaintiffs opposed on January 29, 2018, Opp'n, and DynCorp replied on February 5, 2018. Reply Mem. in Support of DynCorp Defs.' Mot. to Dismiss (Reply) [Dkt. 43]. The motion to dismiss is ripe for review.

---

[8] All claims against putative defendants Delta Tucker Holdings, Inc., Delta Tucker Sub, Inc., and Cerberus Capital Management, L.P. were dismissed by the Court on February 14, 2018 for Plaintiffs' failure to respond to the Court's Order to file proof of service. 2/14/2018 Minute Order. Plaintiffs voluntarily dismissed all claims against Onsite Occupational Health and Safety, without prejudice, on February 27, 2018. Notice of Voluntary Dismissal [Dkt. 46].

## II. LEGAL STANDARDS

### A. Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual information, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A court must assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in favor of the plaintiff. *See Sissel*, 760 F.3d at 4. A court need not accept inferences drawn by a plaintiff if such inferences are not supported by the facts set out in the complaint. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Further, a court does not need to accept as true legal conclusions set forth in a complaint. *See Iqbal*, 556 U.S. at 678. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### B. Alleging Fraud

Complaints brought under the False Claims Act must comply with the requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002). Rule 9(b) requires that a "party state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, "Rule 9(b) is still subject to the general short and plain statement command set out in Rule 8." *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 152 (D.D.C. 2010).

Taken together, Rules 8 and 9(b) require that "the pleader state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" and "identify individuals allegedly involved in the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004). The circumstances must be pled with sufficient particularity that a defendant can "defend against the charge and not just deny that they have done anything wrong," *id.* at 1259 (quoting *United States ex rel. Lee v. Smithkline Beecham, Inc.*, 245 F.3d, 1048, 1052 (9th Cir. 2001)), but "[w]hat allegations are needed to invest the complaint with indicia of reliability . . . depend on the nature of the fraud alleged." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015).

## C. Form of Pleadings

The Federal Rules of Civil Procedure also impose certain requirements on the form of pleadings. Under Rule 10(b): "A party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. P. 10(b).

## III. ANALYSIS

The Amended Complaint, which is lengthy and somewhat torturous, contains only two counts: Count One alleges that DynCorp committed fraud in violation of 31 U.S.C. § 3729(a) and Count Two alleges that DynCorp retaliated against Plaintiffs in violation of § 3730(h). Am. Compl. ¶¶ 288-86, 240a-56a.[9]

---

[9] On page 69 of the Amended Complaint, Plaintiffs restart their numbering at paragraph 242. For the purposes of this opinion, the Court will refer to the second set of paragraphs numbered 242-272 as 242a-272a.

**A. Alleged False Claims Act Violations**

The False Claims Act permits suit by individual persons, called "relators," on behalf of the United States, to collect from those who have allegedly submitted false claims for payment from the United States. Therefore, Plaintiffs will be referred to as Plaintiff-Relators hereafter. The statute gives rise to several distinct theories of liability. A defendant may be liable under the "Presentment Provision" of the False Claims Act if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The elements of a presentment claim are: (1) the defendant presented, or caused to be a presented, a claim for payment or approval to the federal government; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false when it was submitted. *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 198-99 (D.C. Cir. 1995). "Although the statute does not state that the falsity must have been material, many courts have read into the statute a materiality requirement." *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 98 (D.D.C. 2017); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("[T]he common law could not have conceived of fraud without proof of materiality.").

Alternatively, a defendant may be liable under the "False Statement" Provision of the False Claims Act if it "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The Supreme Court has instructed that "instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively enforced through strict enforcement of the Act's materiality and scienter requirements." *Escobar*, 136 S. Ct. at 2002 (internal marks omitted). The elements of a false statement claim are: (1) the defendant made or used a record or statement; (2) the record or statement was false;

(3) the defendant knew it was false; and (4) the record or statement was material to the false or fraudulent claim. *United States ex rel. Tran v. Comp. Scis. Corp.*, 53 F. Supp. 3d 104, 123 (D.D.C. 2014). Under the False Claims Act, a defendant acts "knowingly" if: (1) it had "actual knowledge of the information"; (2) acted in "deliberate ignorance of the truth or falsity of information"; or (3) acted "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). In this context, a record or statement is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

False Claims Act violations may be "direct," that is, "factually false claims," or "indirect," that is, "implied false certifications." A "direct false claim" is one "in which a contractor or other claimant submits information that is untrue on its face." *Kellogg Brown & Root*, 800 F. Supp. 2d at 154. A claim or record may be false because it includes "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* Courts distinguish such "factually false claims" from claims that are "not allowed under the contract" because otherwise "the difference between a breach of contract claim and an FCA claim could evaporate." *Id.* at 155; *see also Escobar*, 136 S. Ct. at 2003 ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (internal marks and citations omitted). A defendant must have "actually submitted false demands for payment, rather than merely non-conforming goods." *Totten*, 286 F.3d at 544.

For liability under the False Claims Act to arise under an "implied false certification" theory, a party may allege that a defendant submitted requests for payment that failed to disclose a material violation of a statute, regulation, or contractual requirement. Under

this theory of liability, the submission of a demand for payment is an "implied certification of compliance" such that "failure to disclose . . . [is] a misrepresentation that renders the claim false or fraudulent." *Escobar*, 136 S. Ct. at 1993. The claim must not only request payment, but also make "specific representations about the goods or services provided; and . . . defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001.

In order the establish knowledge, the plaintiff must prove "that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010). If a complaint does not allege any of the relevant contract provisions that were violated by defendant, a plaintiff-relator may have failed to make a claim of implied false certification. *See, e.g.*, *United States, ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 60-61 (D.D.C. 2017) (denying claim under the False Claims Act because plaintiff did not "identify applicable regulations or contract provisions that [defendant] violated, which it then failed to disclose to the government"); *United States v. Toyobo*, 811 F. Supp. 2d 37, 46 (D.D.C. 2011) (denying claim under the False Claims Act because the government did not allege that "any of the relevant contracts contained express provisions requiring five-year warranties against defects").

Mr. Hutchins and Ms. Subhi allege that DynCorp's failure to provide adequate equipment and services as required by the LOGCAP IV contract constituted violations of the False Claims Act; their theories of liability vary according to the nature of the allegations. In their opposition brief, Plaintiff-Relators argue that "[d]irect false claims" are found at Amended

Complaint paragraph 1, subparagraphs a-c, i-l, n, and o[10] and that "[f]alse claims that involve a certification" are found at paragraph 1, subparagraphs d-f, h, and m.[11]  Because presentment claims under § 3729(a)(1)(A) and false statement claims under § 3729(a)(1)(B) follow "essentially the same legal analysis," the Court will consider them together.  *Tran*, 53 F. Supp. 3d at 123.[12]

### 1.  Counts 1(A) and 1(B):  Submission of False Reports and Invoices[13]

Relators allege that DynCorp submitted and received payment for false reports and invoices in violation of the False Claims Act.  Specifically, Count 1(A) alleges that DynCorp submitted "false DD Form 250 [sic] for supplies and services to obtain unauthorized payment from the United States."  Am. Compl. ¶ 286.  Count 1(B) alleges that DynCorp "submit[ed] false and fraudulent invoices to the United States for payment."  *Id.*  In their Opposition, Plaintiff-Relators distinguish further among their claims, although the Amended Complaint does not.

---

[10] As identified, Paragraph 1 of the Amended Complaint alleges that DynCorp submitted direct false claims by:  (a) submitting "false DD Form[s] 250 for supplies and services"; (b) submitting "false and fraudulent invoices"; (c) billing for duplicative vehicles; (i) "requesting funding for medical devices, which were not delivered"; (j) billing for "unauthorized services"; (k) billing "for subcontractor services as purchase order items"; (l) billing "for duplicative or unneeded medical procedures, drugs and material"; and (o) billing for "medical services that subcontractor was not subcontracted to perform."

[11] As identified, Paragraph 1 of the Amended Complaint alleges that DunCorp submitted false certifications by (d) billing for "vehicles which were not up to specifications"; (e) billing "for vehicles which were not mission capable"; (f) billing "for vehicles which were older than ordered"; (h) billing for "vehicles that did not meet specifications" [sic]; and (m) billing "for personnel who were not qualified."

[12] Elsewhere in the Amended Complaint, Plaintiff-Relators allege violations of subsections § 3729(a)(1)(E) and (G).  *See* Am. Compl. ¶¶ 241a-42a.  There are no factual allegations to support these allegations.

[13] Paragraph 286 of the Amended Complaint alleges specific violations of the False Claims Act in 16 subparagraphs (¶¶ 286 (a)-(p)).  *See* Am. Compl. ¶ 286.  The Motion to Dismiss does not address each subparagraph individually, but the Court will address each.

DynCorp argues that Plaintiff-Relators have failed to make these allegations with sufficient particularity to satisfy Rule 9(b).

A successful claim under the False Claims Act must plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Totten*, 286 F.3d at 551-52. A plaintiff advancing a False Claims Act allegation "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278; *see also Williams*, 389 F.3d at 1256 (noting pleader must state the time, place, and content of false misrepresentations).

The Amended Complaint states that DD Form 250 is a "multipurpose report" used by authorized DynCorp personnel to certify to the Army that "services and goods met the Contract Quality Assurance"; the Amended Complaint alleges that DynCorp statements on these forms violated the False Claims Act. Am. Compl. ¶¶ 37-39. This broad allegation could encompass *any* submission of a DD Form 250 during the course of the LOGCAP IV contract because the Amended Complaint does not allege what reports were falsified, what unauthorized payments were made, or other necessary circumstances. To the extent that these allegations pertain to specific reports or statements, they are described in more detail in other allegations related to specific orders, charges, and payments for goods and services described elsewhere in the Amended Complaint and addressed in the Court's discussion below. Similarly vague are the allegations in Count 1(B) that DynCorp submitted fraudulent invoices. Here too, the Amended Complaint fails to allege a fact-specific cause of action for false and fraudulent invoices, and is, at best, duplicative of other allegations in Counts 1(C)-(P). Counts 1(A) and 1(B) will be dismissed as lacking sufficient particularity.

*2. Count 1(C): Duplicative Billing for Vehicles, Equipment, and Services*

Plaintiff-Relators allege that DynCorp submitted direct false claims by "ordering, paying for and billing to the United States for vehicles, equipment and services they knew to be duplicative, because each vehicle's stated purpose was already fulfilled by existing subcontracts." *Id.* ¶ 286. Specifically, the Amended Complaint alleges that DynCorp began subcontracting with third parties for waste management services in the summer of 2009. *Id.* ¶ 53. These subcontracts "included the provision of services utilizing waste management vehicles, water delivery vehicles and wastewater removal vehicles." *Id.* ¶ 58. Despite these existing subcontracts, DynCorp allegedly leased vehicles, "ostensibly to make it possible to self-perform this work," beginning in September 2011. *Id.* ¶¶ 59-60. Plaintiff-Relators contend that doing so constituted a false claim because the lease fees and shipment charges for the DynCorp-leased vehicles were not authorized under DynCorp's LOGCAP IV contract and were duplicative of services for which the Army was already paying; in addition, the vehicles were sometimes driven by unauthorized personnel. *Id.* ¶¶ 60-62. The vehicle leases also allegedly resulted in a waste of government money because the Army denied DynCorp's request to self-perform the services in question around May 2012, and the leased vehicles, which were duplicative to begin with, had to be shipped out of Afghanistan at Army expense. DynCorp contends that these allegations fail to state a claim because they make "no plausible allegation of scienter" and fail to "satisfy the heightened materiality standard of the FCA."[14] DynCorp Mem.

---

[14] As a general matter, DynCorp argues that none of these claims can be material because, per Mr. Hutchins, after months of review "the U.S. army [sic] did not seemed [sic] concerned" and the Department of Justice tried "to dissuade Hutchins from going forward with [this] case." *See* DynCorp Mem. at 26-27; DynCorp Mot. for Recons. [Dkt. 20] at 2-3. While DynCorp is not inaccurate, the False Claims Act clearly permits a relator to proceed even if the United States declines to participate. *See* 31 U.S.C. § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action.").

at 28. DynCorp adds that Plaintiff-Relators fail to cite any provision of the LOGCAP IV contract to support their allegation that DynCorp needed authorization before leasing the vehicles. *Id.* at 28-29.

In assessing allegations of "direct" false claims, courts must distinguish "factually false claims" from claims that are "not allowed under the contract," otherwise "the difference between a breach of contract claim and an FCA claim could evaporate." *Kellogg Brown & Root*, 800 F. Supp. 2d at 155; *see also Escobar*, 136 S. Ct. at 2003. To establish a plausible violation of the False Claims Act, there must be an allegation of an actual demand for money and "'false records or statements' used to induce such claims." *Totten*, 286 F.3d at 551.

The Court finds no plausible allegation of falsity related to the initial leasing of the waste management vehicles. Even if DynCorp failed to obtain prior approval for some or all of the leases and related charges,[15] there is no credible allegation that doing so constituted a false claim. DynCorp further notes that Plaintiff-Relators do not allege that the Army was unaware of DynCorp's intention to self-perform the waste and water services or its vehicle and equipment leases to perform, inasmuch as all of it was delivered by military planes.

However, DynCorp's arguments leave unclear what performance the Army was paying for *after* DynCorp's proposal to self-perform was denied in spring 2012, and cannot be reconciled with Plaintiff-Relators' allegations that DynCorp took steps to conceal the alleged double-billing and the wastefulness of the leases, for example by "directing workers to drive the vehicles around the bases to add miles to the odometers to make it look like the vehicles were

---

[15] DynCorp argues that consent was not needed for subcontracts less than $550,000 in value. *See* DynCorp Mem. at 28-29; *see also* LOGCAP IV Contract at 52. But Plaintiff-Relators allege that the vehicle leases were "worth millions of dollars." Am. Compl. ¶ 76.

being used." Am. Compl. ¶ 94. These efforts to conceal also paint DynCorp's use of generic billing codes in a harsh light. *See id.* ¶¶ 109-10. Although not strictly disallowed by the LOGCAP IV contract, charging the vehicles to the generic billing code may have allowed DynCorp to avoid explicit revelation of duplicative vehicle leases "worth millions of dollars." *Id.* ¶ 76; *cf. Escobar*, 136 S. Ct. at 1994 ( "[C]ertain misrepresentations by omission can give rise to FCA liability"). In the context of a motion to dismiss, a plaintiff is entitled to the reasonable inferences that may arise from the facts it alleges. *See Sissel*, 760 F.3d at 4. Plaintiff-Relators here are entitled to the reasonable inference from their allegations that DynCorp attempted to conceal from the Administrative Contracting Officer that, even after DynCorp's proposal was denied in spring 2012, the vehicles were *still* in Afghanistan, *still* unused, and *still* being charged to the Army.

Plaintiff-Relators will be permitted to proceed to discovery on Count 1(C).

### 3. *Counts 1(D), 1(E), 1(F), and 1(H): Billing the Army for Inadequate Vehicles*

Plaintiff-Relators allege that DynCorp knowingly paid for and billed the Army for vehicles which were "not up to specifications required by the military" (Counts 1(D) and 1(H)), "not mission capable" (Count 1(E)), and "older than ordered" (Count 1(F)). Am. Compl. ¶ 286. Numerous allegations throughout the Amended Complaint relate to the insufficiency of vehicles for which DynCorp allegedly billed the Army. The Court considers each in turn.

First, Plaintiff-Relators allege that DynCorp knowingly billed the Army for seven 50-seat buses, despite the fact that the buses had to be reconfigured to accommodate the size and weight of Army personnel and their gear so that the buses only had 43 seats per bus. The Amended Complaint also alleges that the buses were delivered without required fire extinguishers. DynCorp responds that Plaintiff-Relators' complaint about buses is financially immaterial to its contract with the Army and thus fails to make out a claim. *See* DynCorp Mem.

28

at 32. While Plaintiff-Relators provide specificity and knowledge of the buses, the modifications described do not rise to the level of a "material" false claim; it is also implausible that the Army did not know of the buses' reconfigurations, considering that Army soldiers could not, and then could, use them; and there is no allegation that DynCorp attempted to conceal the reconfigurations. To the contrary, Plaintiff-Relators do not deny that 50 soldiers and gear could not fit into a normal 50-person bus or that adjustments were not necessary to permit the use of the buses as intended.

Plaintiff-Relators further allege that DynCorp "repeatedly billed the United States for material handling equipment, construction equipment, SUVs, pick-up trucks, buses and other equipment and vehicles that was [sic] not mission capable for a portion of or for the entire preceding month" beginning in 2011[16] at more than 20 camps and forward operating bases throughout the south and southwestern portions of Afghanistan. Am. Compl. ¶ 125. DynCorp counters that these allegations are insufficiently particular to satisfy Rule 9(b) or to advise DynCorp of the alleged errors in billing. Plaintiff-Relators broadly allege:

> [t]he Administrative Contracting Officer had to rely on the DynCorp International records in making an approval determination as no other record was submitted. . . . Such statements [in DynCorp orders and other documents] were false and were relied upon [by] the United States in the Administrative Contracting Officer's approval determination and in the United States['] decision to pay invoices from DynCorp International. . . . Most equipment was Not Mission Capable *at least some of the time*.

*Id.* ¶¶ 129-30 (emphasis added). Plaintiff-Relators do not support these broad assertions with corresponding factual specifics, and, remembering that this contract was performed in a war zone, destroy their own allegation by the last highlighted phrase. They also allege that DynCorp

---

[16] In their Opposition, Plaintiff-Relators state that this practice of billing for non-mission-capable vehicles began in 2012, not 2011. Opp'n at 25.

failed to abide by an established practice of submitting "Service Received Reports" from subcontractors that would show whether vehicles were mission capable, but Plaintiff-Relators again fail to provide factual details, fail to cite the LOGCAP IV contract to show that such reports were required prior to payment, and fail to allege facts that support the allegation that the failure to submit Service Received Reports constituted a false claim. *See id.* ¶¶ 134-36. The Amended Complaint describes one "example" of a specific purchase order, but it does not connect that sole purchase order to the "not mission capable" allegations. *Id.* ¶ 139.

Plaintiff-Relators further allege that DynCorp billed the Army for at least 67 vehicles and other pieces of equipment that were older than authorized on their respective purchase orders. *Id.* ¶¶ 149-50, 152. The allegations do not make clear that DynCorp knew at the time it submitted the purchase orders and billed the Army that the vehicles, provided by subcontractors, would be older than stated. *See, e.g.*, *id.* ¶ 149 ("Upon inspection, the vehicle was really a 2007 model."). Without ongoing representations from DynCorp that the vehicles were current models when they in fact were not, Plaintiff-Relators cannot allege scienter.

Regardless, even if DynCorp "fail[ed] to disclose" the age of a vehicle so as to "render[] the claim false," Plaintiff-Relators fail to connect the vehicles' model years to any performance issues. These allegations might make out a breach of contract claim by the Army (which accepted the older vehicles) but the lack of alleged performance failures renders them non-material for purposes of Plaintiff-Relators' False Claims Act lawsuit. *Cf. Escobar*, 136 S. Ct. at 1997 (describing a patient's death due to medication prescribed by a "purported" doctor).

None of these allegations is sufficient to establish plausible liability under the False Claims Act. "[T]he bare assertion that defendants delivered goods that did not conform to contractual specifications is not enough to state a violation of the FCA. Instead, . . . the statute

proscribes only false 'claims'—that is, actual demands for money or property—and 'false records or statements' used to induce such claims." *Totten*, 286 F.3d at 551 (internal citations omitted). Counts 1(D), 1(E), 1(F), and 1(H) will be dismissed for failure to state a claim and lack of particularity.

### 4. Count 1(G): Falsifying "Service Received Reports" to Obtain Unauthorized Payment from the Army

Plaintiff-Relators allege that management personnel at Kandahar Air Field in Afghanistan falsely stated on Service Received Reports that "heavy equipment and leased vehicles" were mission capable when they lacked authority to sign such reports and lacked sufficient information to certify the mission capable status of the vehicles or equipment. Am. Compl. ¶¶ 170-71. Plaintiff-Relators specify that falsified Service Received Reports were prepared in connection with the reconfigured buses addressed in Count 1(D), but give no further factual information as to other false reports that might have been submitted to the Army. DynCorp responds that Plaintiff-Relators' allegation regarding a "widespread problem" of falsified reports is insufficiently particular to satisfy the requirements of Rule 9(b). DynCorp Mem. at 32-33.

The claim concerning false Service Received Reports related to the seven buses will be dismissed for the same reason that Count 1(D) was dismissed: based on the allegations in the Amended Complaint, DynCorp did not conceal the reconfiguration and there was no Army protest that the buses could transport 43 soldiers with gear, rather than 50 soldiers without. There is, thus, no evidence of materiality to the contract performance by DynCorp. As to other

"heavy equipment and leased vehicles,"[17] Plaintiff-Relators do not identify what vehicles at which camps were not mission capable, much less the condition(s) that made them not mission capable. False Claims Act allegations must be supported by sufficient facts to support the inference that a violation of the law has occurred. Plaintiff-Relators broad claim is insufficient for this purpose. Plaintiff-Relators essentially argue that any submission for payment by DynCorp would have been false, but their allegations present only broad and speculative assertions that unnamed maintenance and service managers did not consult maintenance records and did not submit Service Received Reports for the vehicles. Am. Compl. ¶ 136. It is noteworthy that the Amended Complaint later clarifies that (at least some) Service Received Reports were—in fact—submitted but complains that they were submitted by the wrong people. *Id.* ¶ 170. Count 1(G) will be dismissed for failure to state a claim.

### 5. Counts 1(I) and 1(N): Charging for Unapproved Goods and Services and for Approved Goods and Services That Were Never Delivered[18]

Plaintiff-Relators allege that DynCorp requested funds for dental equipment and First-Aid training,[19] which were approved, but then used those funds to pay other outstanding

---

[17] The Amended Complaint is not entirely clear about which equipment and vehicles it refers. Based on context, it is likely that Plaintiff-Relators meant to refer to the vehicles which were "staged on more than 20 Camps and Forward Operating Bases." Am. Compl. ¶ 125.

[18] Plaintiff-Relators advance similar allegations in Counts 1(I) ("[R]equesting and obtaining funding from the United States for medical devices, which were not delivered.") and 1(N) ("[C]harging the United States for services, which were not approved and failed to acquire equipment and provide training specifically approved by the administrative contracting officer and funded by the department of the army."). Am. Compl. ¶ 286. Given the interrelatedness of these allegations, the Court considers Counts 1(I) and 1(N) together.

[19] Plaintiff-Relators also alleged fraud related to an X-ray unit. *See* Am. Compl. ¶ 208. DynCorp argues that the X-ray unit was the subject of prior litigation under the False Claims Act, *see United States ex. rel. Greer v. DynCorp Int'l Inc.*, No. 13-cv-326, Compl. Dkt. 1 ¶ 67 (D.D.C. Sept. 15, 2017), and that Plaintiff-Relators are not original sources of information and cannot pursue this claim themselves. *See* DynCorp Mem. at 35 n.21; 31 U.S.C. § 3730(e)(4)(A) and (B). Plaintiff-Relators have withdrawn Count 208 and their claim concerning an X-ray unit.

invoices.  *Id.* ¶¶ 208-13, 217-19.  Plaintiff-Relators also allege that this was a common practice so that the Administrative Contracting Officer would be unable to track actual expenditures.  *Id.* ¶ 225.  DynCorp responds that Plaintiff-Relators' allegations fail to satisfy the particularity requirements of 9(b) or to identify a violation of the LOGCAP IV contract.  DynCorp Mem. at 35-36.

The purpose of LOGCAP is to "reduce the contracting activity burden, especially in large scale operations with multiple and often related service requirements," Am. Compl. ¶ 28, and DynCorp was awarded the LOGCAP IV contract because of its "proven large scale" and because it "acts as the single point of accountability for access to subcontractor support at all tiers."  *Id.* ¶ 29.  Given this purpose, it is particularly noteworthy that Plaintiff-Relators do not allege violations of the LOGCAP IV contract, that DynCorp lacked the authority to move funds between approved subcontracts,[20] that DynCorp misappropriated the funds at a loss to the Army, or even that DynCorp did not intend to purchase the medical equipment when it first made the requests.  That is to say, Plaintiff-Relators have not alleged facts showing that DynCorp had the scienter necessary to defraud the Army.

Further, Plaintiff-Relators cannot satisfy the materiality requirement for these claims.  DynCorp argues that "[u]sing funds allocated for one piece of equipment to cover payment for another piece of necessary equipment should not be deemed . . . an FCA violation."  DynCorp Mem. at 36.  In this context, the Court agrees.  The Army received necessary services and DynCorp advised the Administrative Contracting Officer both times when it submitted

---

*See* Opp'n at 29 n.18.  As is clear above, the circumstances related to the X-ray unit overlap almost entirely with those of First-Aid training.

[20] It appears that the funding was actually moved within the same OnSite Occupational Health and Safety subcontract.  *See* Am. Compl. ¶ 222.

materials requests.  *See* Am. Compl. ¶¶ 208, 216.  So advised, the Army approved the second

funding request.  *Id.* ¶ 216.  Cost overruns, without more, do not amount to fraud.  Counts 1(I)

and 1(N) will be dismissed for failure to state a claim.

### 6.  *Count 1(J):  Charging the Army for Unauthorized Services*

Plaintiff-Relators complain that DynCorp "charg[ed] the United States for

unauthorized services."  *Id.* ¶ 286.  The more specific allegations in the Amended Complaint

concerning billing for unauthorized services are alleged separately.  *See, e.g.*, Count 1(C) (billing

for leased waste management vehicles under generic billing codes); Count 1(N) (billing for

unauthorized medical services).  Count 1(J) is alleged with insufficient particularity to survive as

a separate claim.  *See, e.g.*, *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004)

(specifying that a complaint must provide the "who, what, where, when, and how with respect to

the circumstances of fraud") (internal marks omitted).  Further, merely charging the government

for unauthorized services, without falsity, does not constitute a claim under the False Claims Act.

*See Kellog Brown & Root*, 800 F. Supp. 2d at 155 (dismissing the government's theory that

"claims are 'false' precisely because they are 'disallowed' by the contract").  Count 1(J) also

fails to state a claim and will be dismissed.

### 7.  *Count 1(K):  Billing as Purchase Order Items to Obtain Higher Commissions Than for Subcontract Services*

Plaintiff-Relators allege that in April 2011 DynCorp began submitting invoices as

purchase orders, instead of for service subcontracts, in order to receive an extra 1.5%

commission on costs.  Although they acknowledge that the Administrative Contracting Officer

knew of this change, they allege that he was not authorized to change pay rates under the

LOGCAP IV contract.  Am. Compl. ¶¶ 185, 190-92.  DynCorp responds that Plaintiff-Relators

fail to identify any provision of the LOGCAP IV contract that would make purchase order claims

false and that it is "highly relevant" that the Administrative Contracting Officer knew of the change and did not object. DynCorp Mem. at 33-34.

Plaintiff-Relators allege that Administrative Contracting Officers do not have unilateral authority to amend the LOGCAP IV contract and DynCorp does not disagree. *Id.* ¶ 188. Plaintiff-Relators further contend that DynCorp "should have gone to the United States Army Sustainment Command" to secure a change in its contract rates. *Id.* ¶ 187. However, contrary to the implicit allegation in Paragraph 187, the Amended Complaint acknowledges that it was appropriate for DynCorp to "submit the required plan to change acquisitions to purchase order[s] for approval by the Administrative Contracting Officer." Am. Compl. ¶ 186; *see also id.* ¶ 191 (alleging DynCorp's Vice President for Sourcing "Robinson . . . had told the Administrative Contracting Officer" of the changed invoicing practice). Thus, Plaintiff-Relators admit that DynCorp did not violate the LOGCAP IV or the False Claims Act when it informed the Administrative Contracting Officer that it was changing its billing *practices*, but not the contract rates or any language in the contract. Plaintiff-Relators conflate changing billing practices with changing the actual contract rates.

Further, Plaintiff-Relators do not allege that this change in billing caused DynCorp to charge the Army for goods and services that it did not receive. While it is possible the Army could have paid less, without falsity there is no factual basis to make out a claim under the False Claims Act. To the contrary, Plaintiff-Relators allege conduct that was "not allowed under the contract" and may have constituted a breach of contract, but not a false claim. *Cf. Kellogg Brown & Root*, 800 F. Supp. 2d at 155. While Plaintiff-Relators allege that DynCorp "did not submit or otherwise inform the United States of their plan to engage in this practice,"

Am. Compl. ¶ 188, they later allege that DynCorp had informed the Administrative Contracting Officer.[22]  *See Id.* ¶ 191.  Count 1(K) fails to state a claim and will be dismissed.

### 8.  *Count 1(L):  Charging for Duplicative or Unneeded Medical Procedures, Drugs, and Materials*

Plaintiff-Relators allege that DynCorp violated the contractual requirements of MOD 11 by requiring all employees who traveled through Dubai en route to Afghanistan to have physical examinations if the employee had not been examined in the last nine months, and then billing the Army for the physical exam and the time employees spent in Dubai.  *Id.* ¶¶ 247-50, 255-56.  Plaintiff-Relators also allege that DynCorp's employee processing facilities in Dubai and India administered "hundreds of inoculations and vaccines that were expired or were for pediatric doses" in violation of the standards of MOD 11, but DynCorp submitted claims for full reimbursement to the Army.  *Id.* ¶¶ 258-59, 261-63.  DynCorp responds that Plaintiff-Relators fail to allege that DynCorp ever misrepresented its practice of conducting physicals after nine months to the Army.  *See* DynCorp Mem. at 37.  DynCorp adds that no false claims were submitted regarding vaccinations and that, at most, Plaintiff-Relators allege a breach of contract.  *See id.* at 37-38.

Although perhaps examinations could have been opportunistically performed every 12 months, or more frequently, or less frequently, there is no indication that DynCorp

---

[22] This also undermines a finding of materiality, since the Army was aware of the practice and paid DynCorp anyway.  *See Escobar*, 136 S. Ct. at 2003-04 ("[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, . . . that is strong evidence that the requirements were not material.").  Plaintiff-Relators contend that the "government knowledge defense" is premature at the motion to dismiss phase. Opp'n at 9-10; s*ee also United States v. Southland Mgmt. Grp.*, 326 F.3d 669 (3rd Cir. 2003) ("The inaptly-named 'government knowledge defense' captures the understanding that the FCA reaches only the 'knowing presentation of what is known to be false.'").  But here what the government knew goes to materiality, not DynCorp's knowledge of falsity.

implemented an unreasonable, much less illegal policy.  Certainly, the Court does not read MOD 11 to require DynCorp to examine each employee exactly at 15 months.  It's possible that another policy would have saved the government money, but Plaintiff-Relators do not allege that the Army was unaware of DynCorp's policy, that DynCorp misrepresented its policy, or that DynCorp submitted any false statements to the government.  The Army may yet determine that DynCorp's policy was a breach of contract, but there is no indication of fraud.

Plaintiff-Relators' allegations regarding the immunization program fail for similar reasons.  First, Plaintiff-Relators do not allege that DynCorp had prior knowledge of the vaccine quality or intended that its employees receive deficient immunization.  To the contrary, the pleadings indicate that the issue was identified only after DynCorp made inquiries of the medical personnel in India and Dubai and examined the medical records.  *See* Am. Compl. ¶¶ 262-65.  As such, it cannot be said that DynCorp's knowledge at the time satisfies the scienter requirements of the False Claims Act.[23]  Second, there is no allegation that the Army was not informed of the mistake once it was identified.  DynCorp may have still charged the Army for the ineffective vaccines and the Army may have incurred additional costs for medical issues arising from this mistake, but, as with the claim above, whether the Army should be reimbursed is a question of breach of contract, not fraud.  Count 1(L) will be dismissed for failure to state a claim.

9. *Count 1(M):  Charging the Army for Personnel Who Were Not Qualified for the Positions Hired*

Plaintiff-Relators allege that at least 80% of the Subcontracts Department personnel were unqualified in violation of the LOGCAP IV Contract and that this problem "was

---

[23] The Amended Complaint ambiguously recites that "they stated that the vaccines were still good even though the effective date listed on the vaccine had expired."  Am. Compl. ¶ 266.  In context, this appears to be a statement made by the medical personnel in India and Dubai to DynCorp, not by DynCorp to the government.

repeated in each DynCorp International department in Afghanistan." *Id.* ¶¶ 196-205. Plaintiff-Relators also allege that "hundreds of workers from the Philippines, India, Bosnia, Nepal, [and] Kenya . . . did not meet the hiring criteria," "did not have the ability to speak English," and "were also working outside their job description." *Id.* ¶¶ 206-07. DynCorp responds that these "sweeping allegations" do not meet Rule 9(b)'s particularity requirement and have misunderstood the conditions of the LOGCAP IV contract regarding employee qualifications. Mem. at 34-35.

Together with alleged statements by Ms. Wrubbel, Regional Human Resources Manager in Afghanistan, Plaintiff-Relators plead their claim regarding the Subcontracts Department with sufficient particularity. Who: 80-90% of the Subcontracts Department. Am. Compl. ¶¶ 197, 202. What: That the only requirements for employment were that "the person have a pulse, be able to string together a sentence in English and be enthusiastic." *Id.* ¶ 199. Where: The Subcontracts Department in Afghanistan. When: The period of Mr. Scott's tenure as head of the Subcontracts Department, "about eight months from late June 2011 to February 2012." *Id.* ¶¶ 200, 203. Plaintiff-Relators do not identify the unqualified employees in the Subcontracts Department. However, given that such a large percentage of workers in a relatively small department are alleged to have been unqualified, and given that Ms. Wrubbel's report is in DynCorp's possession, the Court is satisfied that this portion of the complaint has not been filed as "a pretext for the discovery of unknown wrongs."[24] *See Kowal*, 16 F.3d at 1279 n.3.

That said, "[t]he FCA's materiality requirement is demanding." *Escobar*, 136 S. Ct. at 1994. Materiality "cannot be found where noncompliance is minor or insubstantial." *Id.* at

---

[24] The Court notes that Ms. Wrubbel's report is not alleged to be so broad as to cover "each DynCorp International department in Afghanistan," Am. Compl. ¶ 198, and to the extent that this claim relates to unspecified departments, it will be dismissed for lack of particularity.

2003.  Further, the government's decision "to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.*; *see also id.* at 2001 (noting that "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment").  Here, Plaintiff-Relators allude generally to education and experience requirements for Subcontracts Department employees but do not explain how DynCorp's internal hiring decisions were material to the decisions of the Army.[25]  Plaintiff-Relators content themselves merely to state that the Army payed "for employees who did not meet the . . . qualifications . . . for the jobs for which they were hired to perform."  Am. Compl. ¶ 195.  But the crux of the Army's decision to award the LOGCAP IV contract to DynCorp was DynCorp's "proven, large scale, global reach logistic service sector capabilities," *id.* ¶ 29, not the qualifications of its 20-person Subcontracts Department staff.  In *Escobar,* the defendant "misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicare program would not have paid these claims had it known of these violations."  *Escobar*, 136 S. Ct. at 2004.  The importance of complying with the qualification requirements for the Subcontracts Department is not so apparent.  Indeed, notwithstanding whatever performance issues may have arisen (none are alleged), the Army was satisfied enough with DynCorp's performance that it renewed the contract each year from 2010 through at least 2016.  *See* Am. Compl. ¶ 46.

Regarding workers from the Philippines, India, and other countries, Plaintiff-Relators misstate the language requirements.  Although Plaintiff-Relators allege that many of the

---

[25] The Court notes that it can find no reference to educational requirements in the LOGCAP IV contract submitted by DynCorp.  Such requirements may be contained in one of the regulations, reports, or work plans also incorporated into the contract but not submitted, *see* Opp'n at 2 n.2, but Plaintiff-Relators fail to provide proof to that effect.

workers "did not have the ability to speak English," the LOGCAP IV contract requires only that "all Contractor employees shall either be *literate* in English *or there shall be a translator available*." LOGCAP IV Contract at 17 (emphasis added). Plaintiff-Relators further allege that these workers were not always working within their job descriptions, but Plaintiff-Relators do not allege that the contract does not allow the flexibility to have, at least on some occasions, "a crane operator . . . folding clothes," or why such arrangements would be material to the Army. Am. Compl. ¶ 207. Count 1(M) will be dismissed for failure to state a claim.

> ### 10. Count 1(O): Charging the Army for Medical Services that Subcontractor Was Not Subcontracted to Perform

Plaintiff-Relators allege that a DynCorp "subcontractor deployed medics to sites in which DynCorp International knew they were not authorized or funded to work" and that DynCorp then billed the Army for these unauthorized services. *Id.* ¶ 235. DynCorp responds that Plaintiff-Relators have misconstrued the required authorization for medical services and have failed to allege DynCorp charged the government for services it did not provide. DynCorp. Mem. at 36-37.

As the Court reads the Amended Complaint, Plaintiff-Relators' claim is simply that medical services needed at the Band 5 sites were beyond the scope of the existing contract, DynCorp nonetheless provided those services, and the Army completed the approvals and paperwork retroactively. *See* Am. Compl. ¶¶ 239-40. Plaintiff-Relators cannot meet the scienter requirement, since they do not allege that the Army was unaware that the medics had been deployed, or that it was unaware that it was billed for those services. At most, the deployment of medics to sites outside the scope of existing contract might constitute a breach of contract claim, but it does not make a claim under the False Claims Act. *See Kellog Brown & Root*, 800 F. Supp. 2d at 155. Here, Plaintiff-Relators do not allege that DynCorp submitted billings to the

Army for medical services not provided, *i.e.*, "false," but only that the LOGCAP IV contract did not identify the smaller bases as locales for medics.

Further, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003. Plaintiff-Relators allege that funding for the medics was never approved and that the costs were paid from "unspecific funds." Am. Compl. ¶¶ 232, 242. But the Court cannot reasonably interpret the LOGCAP IV contract as entitling the Army to receive additional medical services for an extended period for free. If DynCorp initially agreed to provide medics without charge, no contract term required it to do so continuously (or to ignore Army officers' requests for medics at forward bases where fighting may have been occurring). At some point DynCorp requested, and the Army approved, funding for "unspecified costs" which went towards medical services. *Id.* ¶ 242. Claim 1(O) will be dismissed for failure to state a claim.

### 11. Count 1(P): Making Numerous Related Fraudulent Charges to the Army[26, 27]

Finally, Plaintiff-Relators fail to explain their allegation of "making numerous related fraudulent charges" by DynCorp. *Id.* ¶ 1. Such a vague claim is totally lacking in

---

[26] Plaintiff-Relators omit Count 1(P) from their discussion as to which claims are "direct false claims" and which are "implied false certifications." *See* Opp'n at 8 n.7.

[27] Plaintiff-Relators make two references to allegations of conspiracy, presumably in violation of 31 U.S.C. § 3729(a)(1)(C). Plaintiff-Relators allege that "in carrying out these wrongful acts, defendants participated in a conspiracy to make false claims for payment from the United States." Am. Compl. ¶ 244a. Plaintiff-Relators also allege that DynCorp and former defendant Onsite Occupational "conspired with unnamed persons and entities to make false claims against the United States." *Id.* ¶ 3. These oblique references to "conspiracy" do not constitute legal claims; DynCorp does not address them in its motion to dismiss and Plaintiff-Relators make no attempt to revive them in their Opposition. All claims of conspiracy will be dismissed for failure to state a claim.

particulars and does not permit DynCorp to defend itself properly. *See Williams*, 389 F.3d at 1259. Count 1(P) will be dismissed for lack of particularity.

### B. Alleged Retaliation

The False Claims Act also protects those who complain from retaliation. *See* 31 U.S.C. § 3730(h). An employer violates the law if its employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section." *Id.* A retaliation claim must satisfy two elements: (1) the employee must have engaged in protected activity; and (2) experienced discrimination *because of* that protected activity. *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422 (D.C. Cir. 2005). While a plaintiff need not anticipate a statutory claim under the False Claims Act, he must have been investigating "more than his employer's compliance with federal or state regulations" and have been acting outside his normal job responsibilities. *Id.* at 423. Employers cannot intend to retaliate under the False Claims Act unless they have knowledge that an employee engaged in protected activity. *See Williams*, 389 F.3d at 1260-61. Thus, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *Id.* at 1261 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998)). A plaintiff-relator need not prevail on a False Claims Act claim to recover on a retaliation claim. *Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) (citing *Yesudian*, 153 F.3d at 739).

*Williams* is especially instructive. In *Williams*, the eponymous *qui tam* plaintiff was the chief contract negotiator between his defense-contractor employer and the U.S. Navy, and so was responsible for reviewing cost and pricing data submitted by the defense contractor to

the government.  Mr. Williams informed his superiors of a pricing discrepancy, then informed

the Navy, and then was fired.  The D.C. Circuit held that

> [u]nless the employer is aware that the employee is investigating
> fraud, . . . the employer could not possess the retaliatory intent
> necessary to establish a violation of [the FCA]. . . .  Thus, without
> evidence that the employee expressed any concerns to his superiors
> other than those typically raised as part of a contract administrator's
> job, an employer could not be on notice that the employee was acting
> in furtherance of an FCA action.

*Williams*, 389 F.3d at 1260-61 (internal cites and marks omitted).  The Circuit determined that

Mr. Williams was acting within his regular capacity when he informed his superiors of the

pricing discrepancy.  It also determined that Mr. Williams was *not* acting in his regular capacity

when he stepped outside of his organization and informed the Navy of that same discrepancy.  At

that point the defense contractor was "on notice that litigation was a reasonable possibility," *id.*

at 1261, and for that reason Mr. Williams' retaliation claim was allowed to proceed.

Plaintiff-Relators allege that DynCorp retaliated against them because they

"protested to management when they discovered fraudulent activity."  Am. Compl. ¶ 252a.

Plaintiff-Relators further allege that they "each specifically confronted management with issues

involving fraudulent activity in the performance of the LOGCAP IV contract," and that they

were terminated in retaliation for these confrontations.  *See id.* ¶¶ 253a-54a.  DynCorp argues

that Plaintiff-Relators were "simply performing [their] ordinary duties."  DynCorp Mem. at 38

(quoting *Williams*, 389 F.3d at 1261).

### 1.  *Count 2(A):  Retaliation Against Mr. Hutchins*

Plaintiff-Relators argue that Mr. Hutchins and Ms. Subhi "are in unusual positions

as relators" because they "are experts in the areas about which they complain and worked."

Opp'n at 3.  As a subcontracts senior manager, Mr. Hutchins was responsible for ensuring "that

DynCorp International complies with contract requirements so that DynCorp International

43

[could] represent to the United States that it is in compliance with the United States' regulatory and contractual requirements." Am. Compl. ¶ 13. As part of his job, Mr. Hutchins "reviewed information and documents provided to assure compliance with contractual and regulatory requirements." *Id.* ¶ 14. When he identified billing and paperwork discrepancies, he notified his superiors. *See, e.g.*, *id.* ¶ 192. In August 2012, Mr. Hutchins also submitted a memorandum, "[u]pon direction from more senior management," summarizing his concerns about the buses. *Id.* ¶ 167. Mr. Hutchins was terminated on August 28, 2012 for "an unspecified violation of DynCorp's Code of Conduct." *Id.* ¶ 177.

DynCorp argues that Mr. Hutchins cannot state a claim because his alleged investigations fall squarely within his job description, and he did not give DynCorp notice that he was otherwise engaging in protected activity. Plaintiff-Relators unhelpfully respond that "[t]here is nothing to demonstrate that either Hutchins or Subhi were 'simply performing his [her] ordinary activities' by reporting the alleged false or fraudulent conduct," Opp'n at 33, then restate the allegations in the Amended Complaint. *Id.*

Reading the Amended Complaint in the light most favorable to Mr. Hutchins, because Mr. Hutchins does not allege that he performed investigative or reporting activities outside of his regular job description, the Court understands his argument to be that "performance of [his] normal job responsibilities constitutes protected activity." *Williams*, 389 F.3d at 1261. However, the D.C. Circuit already disposed of this argument in *Williams*. "[W]ithout evidence that the employee expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job, an employer could not be on notice that the employee was acting in furtherance of an FCA action." *Id.* (internal quotation marks omitted). No matter how harsh its actions, without such notice, DynCorp could not have the

intent to retaliate against Mr. Hutchins for engaging in protected activity under the False Claims Act. *Id.* at 1260-61.

Further, unlike the plaintiff in *Williams*, Mr. Hutchins cannot salvage his claim with references to other activities performed beyond the scope of his ordinary responsibilities. Although he now characterizes the activities he observed as fraud, he did not describe these activities as fraudulent when he reported them to his superiors, *see, e.g.*, Am. Compl. ¶ 192 (describing only possible contractual remedies against DynCorp); he did not advise DynCorp to seek legal counsel; he did not step outside the usual chain of command to express his concerns; and he did not inform the Army of the alleged fraud until after he had been terminated. While Mr. Hutchins was not required to "incant talismanic words to satisfy the notice element," *Williams*, 389 F.3d at 1262, his day-to-day job of reviewing DynCorp's compliance with regulatory and contractual requirements did not automatically grant protected status to any noncompliance he may have discovered. *Cf. United States ex. rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239 (D.C. Cir. 2012) (finding plaintiff-relator "cannot succeed unless she alerted [her employer] of her protected conduct by acting outside her normal job responsibilities"). Thus, he has failed to overcome the presumption that he was "merely acting in accordance with [his] employment obligations." *Williams*, 389 F.3d at 1261.

Seeking to avoid this conclusion, Mr. Hutchins alleges that, just a few weeks before being terminated, he had been put on a DynCorp "trouble-maker" list. Am. Compl. ¶ 175. He also alleges that on the day he was terminated, an email went out instructing other employees not to respond to his requests for information. *Id.* Mr. Hutchens offers no more details and presumably knows none. Assuming the truth of the first allegation—that there were identified "trouble-makers" and he was so identified—the allegation does not support an inference that this

list described potential False Claims Act litigants.  As to the second, the actual fact—employees were instructed not to provide operational information to an exiting colleague—allows only a smidgen of an inference that the reason behind this direction was to retaliate against Mr. Hutchins rather than to protect corporate information.  The Court does not find that DynCorp was put on notice that "litigation was a reasonable possibility," which is necessary to support a claim for retaliation.  *Williams,* 389 F.3d at 1261.  Claim 2(A) will be dismissed for failure to state a claim.

### 2.  *Claim 2(B):  Retaliation Against Ms. Subhi*

Ms. Subhi had the same title and general responsibilities as Mr. Hutchins.  *See* Am. Compl. ¶¶ 16-17.  She was terminated by DynCorp in April 13 for "an alleged ethics violation," to wit working in the same department as her son.  *Id.* ¶ 284.  Like Mr. Hutchins, Ms. Subhi's argument in the Amended Complaint is that performance of her normal job responsibilities constituted protected activity.  Consistent with that argument, and also like Mr. Hutchins, Ms. Subhi did not allege fraud to her managers; did not step outside the usual chain of command; did not inform the Army of the alleged fraud until after she was terminated; and otherwise took no other steps to indicate to DynCorp that litigation was a reasonable possibility. Thus, for the same reasons as with Mr. Hutchins, the Amended Complaint does not support a reasonable inference that DynCorp knew enough to intend to retaliate against Ms. Subhi.

Ms. Subhi focuses on the alleged pretext behind her termination:  "it is not unusual for family members to work together at DynCorp."  *Id.*  Assuming this to be true, it fails to substitute for evidence that DynCorp knew she had engaged in protected activities and fired her because of them.  The Court makes all reasonable inferences in favor of Ms. Subhi but finds that she has not yet made out a *prima facie* case of retaliation.  Claim 2(B) will be dismissed for failure to state a claim.

**C. Rule 10(b)**

While the Amended Complaint is hardly clear and concise, it is not "too confusing to require [DynCorp] to respond." *Cf. Rogler v. United States Dept. of Health and Human Servs.*, 620 F. Supp. 2d 123, 127-28 (D.D.C. 2009). At the very least, it is not too confusing to determine that dismissal is largely appropriate. However, if Plaintiff-Relators successfully move to file a second amended complaint, they are strongly encouraged to describe each claim as a separate count so that the Court and DynCorp can better follow along.

## IV. CONCLUSION

Count 1(C), relating to the allegedly duplicative waste management vehicles, states a plausible violation of the False Claims Act and will be allowed to proceed to discovery. The remaining claims allege various potential breaches of the LOGCAP IV contract during the war in Afghanistan but do not make out violations of the False Claims Act. The Court will grant in part and deny in part Defendants' Motion to Dismiss, Dkt. 38. A memorializing Order accompanies this Opinion.

Date: September 28, 2018

_____
ROSEMARY M. COLLYER
United States District Judge