UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| CHARLES HUTCHINS AND JOYCE SUBHI, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 15-355 (RMC) |
| DYNCORP, INTERNATIONAL, INC., *et al.*, | ) ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OPINION**

When Plaintiff-Relators alleged violations of the False Claims Act, all claims but one were dismissed. Without counsel, they now seek leave to amend their complaint pro se as Plaintiffs, not Relators on behalf of the United States, and so avoid final judgment. But the proposed amendment does not overcome the legal deficiencies that resulted in dismissal of the claim they seek to revive. Accordingly, the motion for leave to amend is futile and will be denied.

**I. BACKGROUND**

**A. Procedural History**

On November 11, 2017, Plaintiff-Relators Charles T. Hutchins and Joyce Subhi filed their First Amended Complaint against Defendants DynCorp International, Inc., and its wholly-owned subsidiary, DynCorp International, LLC (collectively, DynCorp), alleging violations of the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq*. *See* Am. Compl. (FAC) [Dkt. 24]. The facts of that case are recounted in the Court's previous opinion, *United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32 (D.D.C. 2018), but broadly speaking

1

Plaintiff-Relators alleged fraud in DynCorp's performance of a contract to provide logistics support to the United States Army in Afghanistan under the Army's LOGCAP program. Most of Plaintiff-Relators' claims were dismissed without prejudice, including claims alleging both fraud and retaliation; only Count 1(C), relating to allegedly duplicative waste management vehicles, survived. Plaintiff-Relators were given until December 31, 2018, to move for leave to amend their complaint. *See* 12/11/2018 Minute Order.

Instead of moving to amend, counsel for Plaintiff-Relators withdrew from the case. *See* 1/8/2019 Order [Dkt. 56] (granting leave to withdraw). As this Court has repeatedly made clear to Plaintiffs, "[a] pro se plaintiff may not represent the United States in a False Claims Act action." 6/21/2017 Order [Dkt. 14] at 1 (citing *United States ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F. Supp. 2d 10, 16 (D.D.C. 2003)). The Court thus granted Plaintiff-Relators six months to find replacement counsel or risk dismissal of the case. *See* 1/8/2019 Order; 2/28/2019 Minute Order. Although Plaintiffs-Relators have submitted a copy of their proposed Second Amended Complaint, *see* 3/6/2019 Order (denying leave to file), they have been unable to find counsel to file it for them.

Appearing now as Plaintiffs, the former Plaintiff-Relators ask the Court for leave to amend and proceed pro se on only their claims for retaliation. Although Plaintiffs acknowledge that they may not litigate alleged fraud on behalf of the United States without counsel, they argue that the retaliation claims belong to them in their individual capacities. *See* Mot. to Appear Pro Se in 31 U.S.C. 3730(h) Wrongful Termination/Retaliatory Discharge Actions (Mot.) [Dkt. 63]. For its part, DynCorp concedes that Plaintiffs may bring retaliation claims on their own behalves but argues that the Court has already dismissed those retaliation claims and that Plaintiffs do not explain how further litigation might change that outcome. *See*

Defs.' Opp'n to Pl./Relators' Mot. to Appear Pro Se [Dkt. 66]. Accordingly, although the Court previously rejected Plaintiffs' attempt to file their Second Amended Complaint pro se, the Court now reconsiders that proposed amendment in light of Plaintiffs' motion to file pro se an amended complaint with respect only to the retaliation claims.[1]

**B. Factual Allegations**

Although many of the details regarding the fraud claims are discussed in the Court's previous opinion, *see Hutchins*, 342 F. Supp. 3d at 36-45, a brief recap of the retaliation claims and their disposition is in order.

Plaintiffs both had the title of "subcontracts senior managers" at DynCorp and were in charge of administering subcontracts as part of DynCorp's performance under the Army's LOGCAP IV contract. Mr. Hutchins alleged that he was terminated after investigating, at the direction of his superiors, whether certain buses failed to satisfy the Army's requirements and were billed erroneously. *See* FAC ¶¶ 272-78. Ms. Subhi alleged that she was fired for complaining about improper medical care, improper medical billing, and the hiring of unqualified subcontractors. *Id.* ¶¶ 279-84.

When discussing the merits of their fraud claims, Plaintiffs argued that they were "in unusual positions as relators" because they were "experts in the areas about which they complain and worked." Opp'n to Mot. to Dismiss of DynCorp Defs. (Pls.' Opp'n) [Dkt. 42] at 3.

---

[1] Plaintiffs state their intention is to appear pro se, then request appointment of pro bono counsel by the Court, and then revive their False Claims Act counts with the help of appointed counsel. *See* Relators' Resp. to Court's Order to Show Cause and Opp'n to Dismissal of Qui Tam Case Against DynCorp Int'l (Pls.' Reply) [Dkt. 67] at 5. This intention is flawed. The Court rarely appoints counsel in civil cases, for which there is no constitutional right. Further, it is not the role of court-appointed counsel to represent *qui tam* plaintiffs in their prosecution of alleged fraud—the award incentives provided by the False Claims Act already support prosecution of such cases.

3

Specifically, in their First Amended Complaint, Plaintiffs alleged that as subcontracts senior managers they were responsible for ensuring "that DynCorp International complies with contract requirements so that DynCorp International [could] represent to the United States that it is in compliance with the United States' regulatory and contractual requirements," FAC ¶ 13, and that they "reviewed information and documents provided to assure compliance with contractual and regulatory requirements, which was required for payment by the United States." *Id.* ¶ 14; *see also* Pls.' Opp'n at 3 ("Hutchins and Subhi's job responsibilities with DynCorp included (a) review of DynCorp's performance under the Prime Contract . . . .").

On that basis, DynCorp argued that Plaintiffs had merely been acting within their "normal job responsibilities" when they complained internally about DynCorp's practices and thus failed to provide DynCorp with notice that they were engaged in protected activity. Put another way, DynCorp argued that it lacked the scienter necessary to retaliate. Defs.' Mot. to Dismiss [Dkt. 38-1] at 38. Plaintiffs responded merely that "[t]here is nothing to demonstrate that either Hutchins or Subhi were 'simply performing his [or her] ordinary activities' by reporting the alleged false or fraudulent conduct," Pls.' Opp'n at 33, without further explanation.

The Court determined that Plaintiffs' alleged investigations fell "squarely within [their] job description" as subcontracts senior managers and that Plaintiffs failed to "give DynCorp notice that [they were] otherwise engaging in protected activity." *Hutchins*, 342 F. Supp. 3d at 60 (citing *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004)). That is, when Plaintiffs discovered the alleged fraud, they did not describe the activities as fraudulent in reporting to their superiors; they did not advise DynCorp to seek legal counsel; they did not step outside the usual chain of command to express their

4

concerns; and they did not warn the Army of the alleged fraud until after they had been terminated. *Id.* at 60-61.

Plaintiffs' proposed Second Amended Complaint now attempts to narrow the scope of their duties as subcontracts senior managers to show that their investigations did not fall within their job descriptions and therefore provided notice to DynCorp that they were engaging in protected activity. Plaintiffs emphasize that they managed only *subcontracts* and "had no responsibilities or duties related to monitoring, enforcing, coordinating, invoicing or compliance activities connected with the Prime Contract," Proposed Second Am. Compl. (SAC) [Dkt. 61] ¶ 17; that they "were not hired to investigate fraud or over-billing or any other form of crime," *id.* ¶ 123; and that they "did not communicate or otherwise interface with the US Army's Contracting Officer . . . or any other US Government or US Army officials," and further were "prohibited from such contacts . . . to ensure that DynCorp was speaking with one voice to the US Government." *Id.* ¶ 17. That said, Mr. Hutchins still alleges that as part of his duties he "reviewed information and documents provided to assure subcontractors' compliance with the executed subcontract, which was required for payment by the United States to subcontracts." *Id.* ¶ 12. Ms. Subhi alleges that she "closely advised DynCorp International personnel on legal requirements, client contract requirements and government regulations." *Id.* ¶ 16.

Plaintiffs' proposed Second Amended Complaint also expands on their conduct that allegedly gave notice. Mr. Hutchins highlights one specific instance: With regard to the allegedly duplicative waste management vehicles, Mr. Hutchins states that he "knew the United States would not knowingly pay for subcontractors to remove waste and delivery water while simultaneously paying DynCorp to have waste management and water delivery vehicles sitting on each camp." *Id.* ¶ 59. Mr. Hutchins asked Project Controls Manager Tonya Coffey how the

5

extra vehicles were being billed. Ms. Coffey did not know and so asked DynCorp's Project Controls and Accounting & Finance offices. She later reported to Mr. Hutchins that the extra vehicles were being charged as a generic equipment line item. *Id*. Mr. Hutchins argues that his question to Ms. Coffey, which was then forwarded to Project Control and Accounting & Finance offices, put DynCorp on notice that he was engaged in protected conduct. *Id*.

Ms. Subhi highlights two specific instances by which she alleges that she gave notice of engaging in protected activity. First, also with regard to the allegedly duplicative waste management vehicles, Ms. Subhi states that she "attended a staff meeting" where "the topic was raised about continued invoicing of the waste management and water delivery vehicles under the generic equipment line category." *Id.* ¶ 60. At that meeting, "Project Management stated that these waste management . . . vehicles would continue to be invoiced under the generic equipment line item." *Id*. Ms. Subhi alleges that (unspecified) questions she and others asked about this practice put DynCorp on notice that she was engaged in protected conduct. *Id*.

Second, Ms. Subhi alleges that, while managing the OHS Health Services contract, she "noted and questioned the funding for equipment that was never purchased . . . , and the invoicing for physicals and immunizations that subcontractors were supposed to pay for." *Id.* ¶ 113. Because DynCorp was allegedly not permitted to use approved funding under her subcontract for these non-approved purposes, Ms. Subhi argues that her questions on this subject also put DynCorp on notice that she was engaged in protected conduct. *Id.*

Finally, Plaintiffs allege as part of their fraud claim that DynCorp directed its employees to drive unused waste management vehicles around bases to add miles to their odometers so that they would appear to be in use. Without providing any specifics, both Plaintiffs argue that "[w]hen questions were asked by Hutchins, Subhi, and other supplier

6

management personnel about this practice DynCorp was put on notice that these individuals were engaged in protected conduct." *Id.* ¶ 61.

## II. LEGAL STANDARD

### A. Leave to Amend

All plaintiffs seeking to amend a complaint more than "21 days after service of a responsive pleading" may only do so "with the opposing party's consent or the court's leave." Fed. R. Civ. P. 15(a). Rule 15 instructs courts to "freely give leave when justice so requires." *Id.* Nevertheless, "the grant or denial of leave to amend is committed to a district court's discretion." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The Supreme Court has stressed that leave to amend should be freely given "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman*, 371 U.S. at 182; *accord Miller v. Gray*, No. 13-cv-2018, 2016 WL 8671830, at *2 (D.D.C. Dec. 16, 2016). Nonetheless, "[t]he Court may deny leave to amend based on futility 'if the proposed claim would not survive a motion to dismiss.'" *Berry v. Coastal Int'l Sec. Inc.*, No. 12-cv-1420, 2015 WL 13216805, *2 (D.D.C. July 24, 2015) (quoting *Rumber v. District of Columbia*, 598 F. Supp. 2d 97, 102 (D.D.C. 2009)). A court may also deny a motion to amend "where the only result would be to waste time and judicial resources." *Ross v. DynCorp*, 362 F. Supp. 2d 344, 364 n.11 (D.D.C. 2005).

### B. False Claims Act Retaliation

The False Claims Act protects those who complain from retaliation. *See* 31 U.S.C. § 3730(h). An employer violates the law if its employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and

7

conditions of employment *because of* lawful *acts* done by the employee . . . *in furtherance of an action* under this section." *Id.* (emphasis added). An employee bringing a retaliation claim must satisfy two elements: (1) he must have engaged in protected activity; and (2) experienced discrimination *because of* that protected activity. *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422 (D.C. Cir. 2005). While a plaintiff need not anticipate a claim under the False Claims Act itself, he must have been investigating "more than his employer's compliance with federal or state regulations" and have been acting outside his normal job responsibilities. *Id.* at 423. Employers cannot intend to retaliate under the False Claims Act unless they have knowledge that an employee engaged in protected activity. *See Williams*, 389 F.3d at 1260-61. Thus, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *Id.* at 1261 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998)). "Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement—just as it does not constitute protected activity in the first place." *Yesudian*, 153 F.3d at 743. Critically, a plaintiff-relator need not prevail on a False Claims Act claim to recover on a retaliation claim. *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) (citing *Yesudian*, 153 F.3d at 739).

*Williams* is especially instructive. In *Williams*, the eponymous *qui tam* plaintiff was the chief contract negotiator between his defense-contractor employer and the U.S. Navy, and so was responsible for reviewing cost and pricing data submitted by his employer to the government. Mr. Williams informed his superiors of a pricing discrepancy, then informed the Navy, and then was fired. The D.C. Circuit held that

8

> [u]nless the employer is aware that the employee is investigating fraud, . . . the employer could not possess the retaliatory intent necessary to establish a violation of [the FCA]. . . . Thus, without evidence that the employee expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job, an employer could not be on notice that the employee was acting in furtherance of an FCA action.

*Williams*, 389 F.3d at 1260-61 (internal cites and marks omitted). The D.C. Circuit determined that Mr. Williams was acting within his regular capacity when he informed his superiors of the pricing discrepancy and that his act "could not have placed [the employer] on notice." *Id.* at 1261. However, it also determined that Mr. Williams was *not* acting in his regular capacity when he stepped outside of his organization and informed the Navy of that same discrepancy. At that point the defense contractor was notified "that litigation was a reasonable possibility," *id.*, and for that reason Mr. Williams' retaliation claim was allowed to proceed.

### III. ANALYSIS

The Court analyzes the evidence and contentions of each Plaintiff separately but concludes that neither shows activity beyond their job duties or DynCorp's knowledge of any protected activity.

Mr. Hutchins alleges that he "knew the United States would not knowingly pay for subcontractors to remove waste and delivery water" while paying DynCorp for the same kind of vehicles. SAC ¶ 59. His question to the local Project Controls Manager about payment to DynCorp and her forwarding the question to DynCorp's Project Controls and Accounting & Finance offices are alleged to have put DynCorp on notice of his investigation and protected status under the False Claims Act.

However, Mr. Hutchins' characterization that *he* knew what the United States would or would not pay for does not turn his question(s) into protected activity. As a subcontracts senior manager, Mr. Hutchins' question(s) concerning invoicing fell well within the

9

scope of his duties, especially since his job included ensuring that subcontracts were not duplicative of other work. *See id.* ¶ 65 ("[Plaintiffs] were regularly briefed, both formally . . . and informally . . . since both Hutchins and Subhi . . . would have had to supervise and administer the withdraw[al] of the subcontractors . . . if DynCorp was authorized . . . to self-perform these services."). There is no allegation that Mr. Hutchins did more than ask for job-appropriate information. *Cf. Yesudian*, 153 F.3d at 740 (finding plaintiff-relator was engaged in protected activity because he repeatedly voiced his concerns to upper management, collected documents, and took photographs).

Further, both Plaintiffs allege that these billing practices were the subject of general collective discussion between employees and managers in the subcontracts department, which again renders Plaintiffs' personal questions about these billing practices part of their job duties and less obvious and visible as protected activity. *See* SAC ¶ 68 ("This same information was addressed during subcontract department meetings . . . [where] [i]t was agreed that as long as the vehicles were not being used they would be billed under a generic equipment billing code."); *Id.* ¶ 62 (alleging that DynCorp managers participated in several conference calls where "[t]hese issues were openly discussed and debated").[2]

Ms. Subhi's claims fail for similar reasons. As with Mr. Hutchins, Ms. Subhi alleges that she was among those asking questions at staff meetings and on conference calls concerning unused vehicles billed by DynCorp. As with Mr. Hutchins, it is too great a leap to infer that asking such questions (much less unspecified questions) in an open forum put DynCorp

---

[2] Internal transparency about allegedly fraudulent conduct does not shield a contractor from FCA liability. Although such transparency reduces the inference that the contractor should have deduced protected employee activity, it also makes the contractor's allegedly fraudulent conduct easier for *qui tam* plaintiffs to identify.

10

on notice that Ms. Subhi was engaging in protected conduct or that Ms. Subhi was doing more than just her job.

Ms. Subhi also claims that she raised concerns related to alleged unauthorized medical equipment purchases and unauthorized subcontractor immunizations, and that those concerns separately gave notice to DynCorp of her protected conduct. But as the manager of the OHS Health Services contract governing those purchases and immunizations, raising internal concerns about the proper use of funds under her contract and about what costs the subcontractors were required to bear themselves fell squarely within her job description and, without more, does not provide notice of protected activity to DynCorp.

Plaintiffs emphasize repeatedly that they were not hired to investigate fraud and that they were prohibited from communicating directly with Army personnel. As to the former, asking questions related to one's job, much less asking questions about the subject of a meeting, does not become protected FCA activity without more, even if the answers to those questions incidentally reveal fraud. As to the latter, narrow restrictions on whom Plaintiffs could speak about invoicing concerns and Plaintiffs' adherence to those restrictions only highlights how little Plaintiffs did to pursue their suspicions of fraud and why DynCorp lacked notice that they were acting in furtherance of a False Claims Act suit. Again, when Plaintiffs discovered the allegedly fraudulent activity, Plaintiffs did no more than ask a few questions of management; they did not collect evidence; they did not describe the activities as fraudulent when reporting to their superiors; they did not advise DynCorp to seek legal counsel; they did not step outside the usual chain of command to express their concerns; and they did not warn the Army of the alleged fraud until after they had been terminated.

11

## IV. CONCLUSION

For the reasons stated, Plaintiffs' proposed Second Amended Complaint does not overcome those hurdles which resulted in dismissal of the retaliation claims in their First Amended Complaint and is futile. Leave to amend will be denied. A memorializing Order accompanies this Memorandum Opinion.

Date: December 9, 2019

ROSEMARY M. COLLYER
United States District Judge